**EXHIBIT 2**

Page 1

1              IN THE UNITED STATES DISTRICT COURT

               FOR THE CENTRAL DISTRICT OF ILLINOIS

2                        EASTERN DIVISION

3

       CANDACE VAUGHN,              )

4                                   )

                  Plaintiff,        )

5                                   )

       vs.                          )Case No. 1:22-cv-01107

6                                   )

       FOX DEVELOPMENTAL CENTER, )

7                                   )

                  Defendant.        )

8      _____)

9

10              The videoconference deposition of

11     ANGELA SMITH, called by the plaintiff for

12     examination, pursuant to notice and pursuant to the

13

14     Federal Rules of Civil Procedure for the United

15

16     States District Courts pertaining to the taking of

17

18     depositions, taken before MARIA MAZZA, CSR, Notary

19

20     Public, within and for the County of Cook and State

21

22     of Illinois, commencing at 8:34 o'clock a.m., on

23

24     June 9, 2023.

**EXHIBIT 2**

Page 2

```
1   REMOTE APPEARANCES:
2
    SULAIMAN LAW GROUP LTD.
3   2500 South Highland Avenue
    Suite 200
4   Lombard, IL  60148
    Ataylor@sulaimanlaw.com
5   BY:  MR. ALEXANDER J. TAYLOR
         appearing on behalf of the Plaintiff;
6
7   ILLINOIS ATTORNEY GENERAL
    500 South Second Street
8   Springfield, IL  62701
    Robert.hogue@ilga.gov
9   BY:  MR. ROBERT HOGUE
         appearing on behalf of the Defendant.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**EXHIBIT 2**

Page 3

1                        I N D E X

                                             PAGES:

2

    WITNESS:

3

    ANGELA SMITH

4

5   Direct Examination by Mr. Taylor              4

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**EXHIBIT 2**

Page 4

1          THE REPORTER:  Do the attorneys agree that

2    the court reporter can swear in the witness

3    remotely?

4              MR. TAYLOR:  Yes.

5              MR. HOGUE:  Yes

6                  (Witness sworn.)

7              ANGELA SMITH,

8    called as a witness herein, having been first

9    duly sworn, was examined and testified as follows:

10          D I R E C T   E X A M I N A T I O N

11   BY MR. TAYLOR:

12        Q.   Good morning, Ms. Smith.  How are you

13   this morning?

14        A.   I'm very good.  How are you?

15        Q.   Okay.  It's a little early for me on

16   Friday but here we are.

17              We are going to be doing a deposition

18   in this case and I'm just going to be asking you a

19   series of questions to kind of get to the bottom of

20   a couple events here.  There are a couple of

21   instructions I want to give before we go further.

22   The first is that when I ask you a question, if you

23   could give a verbal answer and by that I mean a yes

24   or no or a complete sentence.  It's hard for the

Page 5

1    court reporter to write down a head nod or a head

2    shake or just kind of like a mumbled uh-huh type

3    answer.  Just make sure you give a complete answer;

4    is that fair?

5        A.   Yes.

6        Q.   The second thing I want to say is you're

7    not a hostage today so if you need a break at any

8    time, go ahead and say you need a break.  I'll just

9    ask you to finish answering whatever question I have

10   already asked, okay?

11       A.   Yes.

12       Q.   Lastly, if I ask you a question and you

13   answer it, I'm going to assume you understood the

14   question.  So if you don't understand what I'm

15   asking or the Internet chops out because ZOOM can do

16   that sometimes just make sure to let me know, okay?

17       A.   Yes.

18       Q.   The last question I ask you and I

19   apologize it can occasionally be offensive.  It's

20   not meant to be offensive.  It's just something I

21   have to ask.  Are you on any sort of prescription or

22   elicit drugs or any substance that would impair your

23   ability to answer questions here today?

24       A.   No.

Page 6

1        Q.    With that, did you do anything to prepare
2   for this deposition?
3        A.    I reviewed my statement.
4        Q.    Without telling me anything that your
5   lawyer said to you or anything you said to your
6   lawyer, did you do anything other than review that
7   statement?
8        A.    No.
9        Q.    Is that the only document that you used
10  to prepare for your deposition today?
11       A.    Yes.
12       Q.    And did you speak with anyone again other
13  than your attorneys to prepare for this deposition
14  today?
15       A.    No.
16       Q.    Did you see the notice of deposition that
17  we served to have you testify here today?
18       A.    Yes.
19       Q.    And did you bring any documents with you
20  to today's deposition?
21       A.    I have the statement in front of me.
22       Q.    A few background questions here for you.
23  What's your present address?
24       A.    917 Porter Street, Streater, Illinois,

1  61364.

2      Q.   How long have you lived there?

3      A.   23 years.

4      Q.   Do you own any other homes?

5      A.   No.

6      Q.   Have you gone by any other names or

7  aliases?

8      A.   No.

9      Q.   Did you graduate from high school?

10     A.   Yes.

11     Q.   What high school?

12     A.   Streater High School.

13     Q.   And when did you graduate?

14     A.   '93.

15     Q.   Did you attend any college?

16     A.   Yes.

17     Q.   Where did you go to school?

18     A.   IVCC in Oglesby.

19     Q.   And did you graduate?

20     A.   Yes.

21     Q.   What year did you graduate?

22     A.   '05.

23     Q.   Can you tell me what degree you earned?

24     A.   Associate.

Page 8

1       Q.   In what?

2       A.   An associate in nursing.

3       Q.   Thank you.

4          Outside of any college courses have

5  you taken any classes on discrimination or

6  harassment?

7       A.   I do every year.

8       Q.   And do you take those with your employer?

9       A.   Yes.

10      Q.   And who is your current employer?

11      A.   Department of Human Services.  I work for

12  Fox Center in Dwight.

13      Q.   And just moving forward in the

14  deposition, if I say Fox, will you understand that

15  I'm talking about Fox Center your employer?

16      A.   Yes.

17      Q.   It's early and sometimes I stumble on

18  words so I just like to keep it simple so I'll just

19  say Fox going forward.

20      A.   Sounds good.

21      Q.   What's your job title?

22      A.   I'm an RN2.

23      Q.   Is that a registered nurse?

24      A.   Yes.

Page 9

1          Q.    And when did you begin working for Fox?

2          A.    January 2010.

3          Q.    So a little over 13-and-a-half years?

4          A.    Yes.

5          Q.    In the 13-and-a-half years you've been

6      there have you held any other job titles?

7          A.    No, just the RN.

8          Q.    Was there like RN1 and then RN2?

9          A.    Yes, I was an RN1.  I was promoted to an

10     RN2 and temporarily right now I'm filling in as the

11     PT nurse until they have someone hired in this

12     position.

13         Q.    Has your office location always been at

14     Fox Center?

15         A.    Yes.

16         Q.    Because I know you're filling in I'll ask

17     you two separate questions.  Can you tell me what

18     your current job duties are as the fill-in PT?

19         A.    Physical Therapist Nurse.

20         Q.    What are you job duties?

21         A.    Assess ADLs, ambulate, help those stand,

22     do the documentation, paperwork, assist with

23     appointments, we do PT evaluations.

24         Q.    And what were your job duties as an RN2?

1        A.    An RN2 considered as a supervisory nurse.

2    That consists of supervising subordinate staff,

3    working the units, working as a supervisor when the

4    PSA is absent, assessments, normal nursing duties.

5        Q.    Are they pretty much the same duties as

6    an RN1 just seniority?

7        A.    Yes.

8        Q.    In your job do you ever have to

9    investigate any sort of claim.  -- Strike that.

10              I know you said you're in a

11    supervisory role right now.  In your supervisory

12    role do you ever have to investigate claims of

13    discrimination, harassment or retaliation?

14        A.    No.

15        Q.    You said you receive training every year

16    on discrimination, harassment and retaliation?

17        A.    Yes.

18        Q.    What does the training consist of?

19        A.    Module on a computer and we have to

20    review the information and then we have to take a

21    test in the end.

22        Q.    Being a little bit more specific does it

23    focus on racial discrimination, sex discrimination,

24    retaliation?

1        A.    All of that.

2        Q.    What does it define retaliation as?

3        A.    Retaliation is if someone does wrong to

4    you and then you react and do something wrong to

5    them.

6        Q.    Who's your current supervisor?

7        A.    My current supervisor would be Donna

8    Weiss.

9        Q.    I'm going to circle back quickly.  When

10   did you get promoted from RN1 to RN2?

11       A.    I don't remember.

12       Q.    Would you say it was before or after

13   2020?

14       A.    Before.

15       Q.    So whenever you would have worked with

16   Candace Vaughn, you would have been an RN2?

17       A.    Correct.

18       Q.    And then, I'm sorry, who was your

19   supervisor again?

20       A.    My supervisor as of today is Donna Weiss.

21       Q.    And what's her job title?

22       A.    PSA.

23       Q.    What does that stand for, I'm sorry?

24       A.    Public Service Administrator.

Page 12

1        Q.    Do you know if she reports to anyone?

2        A.    She reports to her supervisor.

3        Q.    Do you know who her supervisor is?

4        A.    Her supervisor would Rhonda Knockum.

5        Q.    And if you know what's Rhonda's job

6    title?

7        A.    SPSA, Supervisory Public Service

8    Administrator.

9        Q.    And as an RN2, just to clarify, is the

10   RN2 a supervisory role as well?

11       A.    Yes.

12       Q.    Have you ever been disciplined by Fox?

13       A.    Yes.

14       Q.    When?

15       A.    I don't remember my exact job discipline

16   ladder.  I don't have it with me.  I'm sorry.

17       Q.    No problem.

18       A.    This situation here I was disciplined a

19   two-day suspension.

20       Q.    Were you ever disciplined before the

21   situation with Candace Vaughn?

22       A.    Yes.

23       Q.    Do you remember approximately when?

24       A.    No, I don't remember.

Page 13

1      Q.    Do you remember what you were disciplined

2  for?

3      A.    Job duties and responsibilities.

4      Q.    Again, not to be vague on this but is

5  that not performing the job duties and

6  responsibilities?

7      A.    Correct.

8      Q.    What job duties and responsibilities did

9  you not perform?

10      A.    Reporting in a timely manner.

11      Q.    Again, sorry someone who is not in the

12  medical profession, can you let me know what that

13  means?

14      A.    We have a time frame that we have to

15  report something and outside of that time frame

16  becomes an infraction of job duties and

17  responsibilities.

18      Q.    And then the incident with Candace

19  Vaughn, do you remember exactly what you were

20  disciplined for?

21      A.    I don't exactly remember what I was

22  disciplined for.  I believe that was also job duties

23  and responsibilities, if I'm not mistaken.  Job

24  duties and responsibilities is a very vague

Page 14

1    statement.  A lot of things go under job duties and

2    responsibilities.

3         Q.   So just going back to your work history,

4    prior to working for Fox, did you have any previous

5    employment?

6         A.   Yes.

7         Q.   Where did you work?

8         A.   I worked in Streater at Heritage Manor

9    and Camelot Terrace.

10        Q.   What were your job positions there?

11        A.   At Camelot I was a CNA and that's when I

12   went to school to be an RN and at Heritage I was an

13   RN, PT and RN.

14        Q.   Was Heritage your job directly prior to

15   Fox?

16        A.   Correct.

17        Q.   Have you ever testified in a deposition

18   before?

19        A.   No.

20        Q.   So you never testified in a deposition

21   regarding anything at Fox before?

22        A.   No.

23        Q.   What about an EEOC proceeding?

24        A.   No.

Page 15

1          Q.   And I always do this, do you know what I
2     mean when I say EEOC, the Equal Employment
3     Opportunity Commission?
4          A.   Yes.
5          Q.   Have you ever been a party to a lawsuit
6     as a plaintiff or a defendant?
7          A.   No.
8          Q.   Have you ever been convicted of a crime?
9          A.   No.
10         Q.   I should clarify you already said no.
11         A.   Convicted of a crime, yeah, I have.
12         Q.   Again, I just want to clarify, other than
13    minor traffic tickets?
14         A.   No, minor traffic tickets.  Also
15    deceptive practice I think at 17-years-old, 18
16    maybe.
17         Q.   What was the --
18         A.   Deceptive practice.  I bounced a check.
19    That was before we had all that protection.
20         Q.   Just really quick, you were convicted of
21    deceptive practices about what year?
22         A.   I don't remember.  It was so long ago.
23    And also retail theft I believe it was all when I
24    was still a minor, if I'm not mistaken, 17, 18 in

**EXHIBIT 2**

Page 16

1    that area.

2         Q.    Deceptive practices, retail theft but you

3    don't remember exactly the year of either of those?

4         A.    Gosh, no.

5         Q.    Have you ever been a subject of a

6    complaint for human resources?

7         A.    No.

8         Q.    Have you ever been the subject of a

9    complaint of discrimination, harassment or

10   retaliation?

11        A.    No.

12        Q.    You said you started working at Fox in

13   2010, correct?

14        A.    Correct.

15        Q.    Did you ever receive an employee manual

16   or handbook when you were employed at Fox?

17        A.    Yes.

18        Q.    When?

19        A.    Upon hire.

20        Q.    Have you received any revisions to the

21   manual or handbook?

22        A.    No, it's always on the computer for us to

23   review.

24        Q.    Do you know of any postings around the

1  office regarding when an employee feels they have

2  been a victim of harassment, discrimination or

3  retaliation can do to address the problem?

4       A.   Can you repeat that?

5       Q.   Yes.  So are there any signs or posters

6  around the office where the victim of

7  discrimination, harassment or retaliation can see

8  and they tell them what to do?

9       A.   Yes.

10      Q.   Where?

11      A.   Across from the breakroom on the first

12 floor and it's on the units as well.

13      Q.   On the units and across from the

14 breakroom?

15      A.   Yes.

16      Q.   Can you tell me what these postings say

17 about what a victim of discrimination, harassment or

18 retaliation can do to address the problem?

19      A.   It tells you the steps and the number to

20 call.

21      Q.   Does Fox have policies regarding the

22 handling of complaints?

23      A.   Yes.

24      Q.   Can you tell me what the policies are?

Page 18

1        A.   We would go to our HR person for that and
2   report it.
3        Q.   So just to clarify, to the best of your
4   knowledge the policy for a victim of discrimination
5   would be to go to the HR person?
6        A.   Yes, or their direct supervisor.
7        Q.   Direct supervisor HR?
8        A.   Yes.
9        Q.   To the best of your knowledge is that
10   what's in the handbook?
11        A.   I believe so, yes.
12        Q.   To the best of your knowledge -- well, in
13   a supervisory role you don't actually investigate
14   these claims, correct?
15        A.   Correct.
16        Q.   So to the best of your knowledge do you
17   know what the policy addresses is discrimination
18   retaliation or harassment?
19        A.   In our training it specifies the
20   information on all of those.
21        Q.   Can you tell me what it specifies racial
22   discrimination as?
23        A.   That would be discriminating against
24   someone outside of my race or treat them wrong or

1   say wrong things about them or to them.

2        Q.   Does the policy address what kind of

3   incidents are severe enough to take to your

4   supervisor or HR?

5        A.   Yes, any type.  It's not based on the

6   severity.  It's just any type.

7        Q.   Does the policy address whether HR is to

8   investigate these claims?

9        A.   No, I don't think so.

10       Q.   So the policy does not address how the

11  company is going to respond to racial discrimination

12  complaints?

13       A.   Let me answer if this way:  I don't

14  remember.  It's not a policy I review and keep in

15  the back of my mind as to how they handle it.  I

16  know they do investigate it.

17       Q.   Have you ever been involved in any sort

18  of investigation of discrimination, harassment or

19  retaliation as either a party or a supervisor?

20       A.   No.

21       Q.   To the best of your knowledge has there

22  ever been an investigation into discrimination or

23  harassment at Fox?

24       A.   Not involving myself, no.

Page 20

1          Q.   To the best of your knowledge has there

2     been at all at Fox an investigation of

3     discrimination or harassment or retaliation?

4          A.   Not that I'm aware of.

5          Q.   I want to dig in a bit into the situation

6     with Candace Vaughn.  First of all, when did you

7     begin working with Candace Vaughn.

8          A.   I don't remember the exact date.  The

9     circumstances happened in March of 2021 so around

10    that time.

11         Q.   Had you worked with Candace Vaughn upon

12    her hire or was this kind of a one off experience

13    with her?

14         A.   I worked with her prior to this

15    situation.

16         Q.   Did you work with her after the situation

17    as well?

18         A.   Yes.

19         Q.   Let's talk about post-situation.  How

20    were your interactions with Ms. Vaughn after the

21    situation?

22         A.   A little testy at first.  I remember

23    saying hi to her in the hallway and she felt that

24    that was offense and reported me for saying hi to

1   her.  I was trying to pick a fight with her by

2   saying hi, how are you doing.

3        Q.   Who did she report you to?

4        A.   Raymond Jackson.

5        Q.   Did she ever report you to HR?

6        A.   I know she had a conversation with HR

7   about our situation.

8        Q.   Just addressing the previous question I

9   asked, you may have been the subject of an HR

10  complaint by Candace Vaughn, you're just unaware of

11  different HR complaints?

12       A.   Correct.

13       Q.   Let's talk about this March incident.  My

14  understanding is that there was a verbal altercation

15  between you and Ms. Vaughn?

16       A.   Correct.

17       Q.   What sparked the verbal altercation?

18       A.   That day I had two units, my unit and I

19  also picked up the unit that she was working on.  I

20  came up to the 3C unit that I was also helping to

21  cover.  There was a sticky note on the desk stating

22  that an individual had a temperature of 100.  I

23  asked the other staff who had this individual and

24  they reported to me that Candace had the individual.

1 And I sought out Candace and asked Candace when

2 Marcus had this temperature and it had been some

3 time ago so I educated her that when someone has a

4 temperature -- actually a temperature to be more

5 precise we always go and get a rectal temperature

6 because it's a better number to treat, more

7 definitive.  With that --

8     Q.   I want to interject for just one second.

9 I don't mean to cut you off.  For this deposition,

10 for the purposes of the deposition, if you're

11 reading off of whatever memo, we ask that you put it

12 aside?

13     A.   I'm not reading.

14     Q.   I know you said that you had your memo

15 with you.  We want to make sure that you answer

16 questions to the best of your knowledge or

17 recollection.  And if I show something as an

18 exhibit, obviously you can take a look at it.  If

19 you can make sure whatever documents you brought are

20 pushed away from you, I would appreciate it.  I did

21 not mean to cut you off.

22     A.   That's fine.  I kind of go all over the

23 place.

24     Q.   Go ahead.

**EXHIBIT 2**

Page 23

1          A.    So then I sought out Candace and asked

2     her what time he had this temperature, and it had

3     been some time ago.  So I explained to her that the

4     importance of reaching out and calling the nurse and

5     letting them know when she obtained that temperature

6     so we treat it right away.  She said that she was

7     not aware of that, no one had told her that.  She

8     said that she was trained by Toya, Toya Steele, and

9     that Toya would have told her that, that would have

10    been the case, so I just educated her a little bit.

11    And then I asked her if she would go take a rectal

12    temperature and finish setting up the vital signs so

13    I could report those findings to the doctor and

14    while she was doing that I was going to examine him

15    so we could come together with all of our findings

16    in a timely manner.  And she told me that I'm not

17    her boss nor her mom.  I said I'm just trying to do

18    my job, I'm a good nurse just trying to do my job

19    and take care of the individual.  I always hope that

20    we could work together and come up with the

21    assessment so that I can call the doctor and we can

22    take care of them.

23               She said that he's not the only

24    individual she has to take care of.  She has another

Page 24

1   group and was not going to do it.  I explained to

2   her the importance of it.  That it is her job.  Then

3   she became upset with me and said that somebody

4   better come and get her, I'm going to whoop her ass.

5   And she was talking to somebody out in the hallway.

6   Her name was Nicole Dickerson and it was kind of

7   like right in the doorway, the office doorway.  So

8   when she said that, I felt a little bit threatened

9   by her and I tapped her on the shoulder and said,

10  Candace, can you, please, leave the office?  And

11  then she said, Somebody better come and get this

12  bitch.  She doesn't know who she is fucking with.

13  Somebody is going to have to bond me out of jail.

14  Come and get her.  So then she was at the doorway

15  because Nicole was right outside the doorway.  I

16  went to shut the door and she pushed the door back

17  and I held the door in place and went from there.  I

18  called RSS which is her direct supervisor because it

19  just continued for them to come and deal with the

20  situation.  So then Jocelyn Miles was an RSS, she

21  came to the unit and I finished examining Marcus and

22  she walked me off the unit and then I went to HR and

23  reported myself.

24          Q.   You reported yourself?

Page 25

1          A.    I reported myself to HR Shelly Jackson,
2     the situation that it happened.
3          Q.    A couple questions I want to breakdown in
4     the situation.  Have you had verbal altercations
5     with employees before?
6          A.    Have I?
7          Q.    Yes.  Have you?
8          A.    No.
9          Q.    So this was the first verbal altercation
10    you had.  Have you had any verbal altercations since
11    then?
12         A.    Yes.  I would not say a verbal
13    altercation.  We just exchanged some words but it
14    never got loud and heaven where we were fighting.
15         Q.    Who was the next verbal altercation with?
16         A.    Reinie Doolin.
17         Q.    Reinie Doolin.  Okay.  What position is
18    Reinie Doolin?
19         A.    RN1.
20         Q.    Do you know what ethnicity Reinie is?
21         A.    She is Caucasian.
22         Q.    Since your altercation with Reinie Doolin
23    anyone else?
24         A.    No.

**EXHIBIT 2**

Page 26

1      Q.   You would say you have had two verbal

2  altercations in you entire time at Fox, Candace and

3  Reinie?

4      A.   Correct.

5      Q.   I want to circle in obviously on the

6  Candace incident.  It's your testimony that you had

7  not yelled or raised your voice or anything until

8  Candace had started to yell and raise her voice?

9      A.   Yes.

10      Q.   Were you Candace's supervisor at the

11  time?

12      A.   No.

13      Q.   You were an RN2, correct?

14      A.   Correct.

15      Q.   Do you know what Candace's position was

16  during this altercation?

17      A.   Mental Health Tech Trainee.

18      Q.   Did you have authority to tell Candace

19  what to do?

20      A.   Yes.

21      Q.   As you probably are aware Candace's

22  version of events is slightly different than yours.

23  How long after the altercation started did you put

24  your hands on to Candace?

1      A.   I tapped her on her shoulder briefly

2  after it started.  Right after she said that she was

3  going to whoop my ass.

4      Q.   So after she said she was going to whoop

5  your ass, you just calmly tapped her on the

6  shoulder?

7      A.   Yes.

8      Q.   So you were not yelling, your voice was

9  not raised or anything at this point?

10      A.   Oh, I became upset and my tone of voice

11  might have gotten louder but I was not screaming at

12  her.

13      Q.   So with potentially a raised voice, she

14  screamed I'm going to whoop your ass and you were

15  able to just calmly tap her on the shoulder to try

16  to deescalate the situation is what you're saying?

17      A.   Yes, because I was trying to deescalate

18  it.

19      Q.   Do you think Candace would have perceived

20  your calm tapping as a calm tapping on the shoulder

21  at this time?

22      A.   She did not.

23      Q.   How did Candace perceive it?

24      A.   She got more angry.

**EXHIBIT 2**

Page 28

1      Q.   Did you try and force a door open or keep
2  a door shut at any time during this?
3      A.   Once she was in the doorway I put the
4  door in between us and I held the door with my foot
5  and held the door so she could not come back in but
6  the door did not actually shut.
7      Q.   Your testimony is you're trying to hold
8  the door shut on her?
9      A.   Well, I shut the door -- when she was in
10  the doorway saying that somebody is going to have to
11  bond her out of jail, I knew that things were
12  getting even more serious so I put something in
13  between us to try to protect myself from her because
14  she became volatile.
15      Q.   And I just want to clarify, how many
16  witnesses to this event were there?
17      A.   I believe there were a few witnesses in
18  the hallway.
19      Q.   Can you tell me who the witnesses would
20  have been?
21      A.   It was Nicole Dickerson, it was Charles
22  Smith and I believe there was one more that I cannot
23  remember right offhand.
24      Q.   Who is Nicole Dickerson?

```
 1         A.    Nicole Dickerson was another employee.

 2         Q.    What was her title?

 3         A.    Mental health tech trainee.  I believe it

 4   was one of Candace's friends.  She knew her on a

 5   personal level.

 6         Q.    Did you know Nicole on a personal level?

 7         A.    No.

 8         Q.    So no previous relationship with Nicole

 9   or anything?

10         A.    No.

11         Q.    What about Charles Smith, what was his

12   job?

13         A.    He was laundry or housekeeping.

14         Q.    Was he also friends with Candace?

15         A.    No.

16         Q.    Did you have any sort of personal

17   relationship with Charles Smith?

18         A.    He was just a coworker.

19         Q.    Just a coworker, so not friends or

20   anything outside of work?

21         A.    No.

22         Q.    So we have two witnesses -- three

23   witnesses, two we know the names of and one of them

24   you're saying would have been Candace's friend and
```

1   Charles would have been neutral?

2           A.    Yeah.

3           Q.    I want to talk about the discipline that

4   was handed down.  Do you know what discipline

5   Candace received from this incident?

6           A.    No, it's none of my business.

7           Q.    What discipline did you receive from this

8   incident?

9           A.    Two-day suspension.

10          Q.    When you came back were you put on the

11  same unit?

12          A.    No, I did not work that unit.  Actually

13  they kept us trying to work apart as much as

14  possible.

15          Q.    Were you reassigned at all?

16          A.    Yes, I was reassigned.

17          Q.    What were you reassigned to?

18          A.    I was reassigned to do nursing work.  I

19  was making doctor's appointments and doing nursing

20  paperwork.

21          Q.    Do you know if Candace was reassigned?

22          A.    Yes, she was.

23          Q.    What was she reassigned to?

24          A.    I believe she was reassigned to dietary.

1     Q.   Can you just tell me what dietary is?

2     A.   Kitchen duties.

3     Q.   Would she have had to have more physical

4  labor, I guess, in the kitchen then?

5     A.   I don't think it was physical.  I mean, I

6  guess mine was more desk duties and hers was more on

7  her feet doing things.

8     Q.   Do you know where the kitchen is located?

9     A.   Yes.

10     Q.   Where is the kitchen located?

11     A.   First floor.

12     Q.   So you and Candace both received -- well,

13  to the best of your knowledge you received

14  discipline but you and Candace both received some

15  sort of discipline for the incident?

16     A.   Correct.

17     Q.   But you were reassigned to do desk duty

18  and Candace was made to work in the kitchen?

19     A.   That's what our reassignments were.

20  Nurses go and do nursing work because they can still

21  be utilized with their license and then for

22  technicians they go work in dietary which is

23  standard for their contract.

24     Q.   Have you seen Candace's contract?

Page 32

1       A.   Yeah, it's actually universal for
2   everybody.
3       Q.   Just going back to the incident, so all
4   nurses -- if a nurse and a tech would get into an
5   altercation, the nurse would generally get
6   reassigned to the words you used desk duty?
7       A.   Correct.
8       Q.   And the tech would be reassigned into the
9   kitchen or custodial or something like that?
10      A.   Yes.
11      Q.   I just have a few more questions for you
12  and then I can let you go.  In terms of working with
13  Candace prior to this incident, did you have any
14  issues with her previously?
15      A.   No.
16      Q.   I know this is going to be a tough
17  question because there was an altercation between
18  the two of you but how was Candace as a worker?
19      A.   I never really worked directly close with
20  Candace.  I did not work her unit.
21      Q.   Did you hear any complaints about
22  Candace's work before?
23      A.   No.
24      Q.   So if I were to tell you that Candace was

1  both promoted and always had met expectation

2  reviews, that would not be a shock to you?

3      A.  No.

4      Q.  Do you know of anyone that resigned from

5  their position at Fox?

6      A.  I'm sure I probably have.

7      Q.  Do you know if anyone resigned and tried

8  to come back?

9      A.  Yes.

10      Q.  Can you tell me who?

11      A.  Right offhand I have a nurse Angie

12  McGadda that resigned and tried to come back.  She

13  has not come back yet.  I do know a technician that

14  has resigned and came back.

15      Q.  How hard was it for that technician to

16  come back?

17      A.  They were able to come back.  They left

18  in good-standing.

19      Q.  Do you know what constitutes

20  good-standing?

21      A.  Was a good worker, was not in trouble and

22  gave two-week's notice.

23      Q.  The new tech -- I'm sorry -- the nurse,

24  Angie you said her name was right?

**EXHIBIT 2**

Page 34

1        A.    Yes.

2        Q.    Sorry.  I don't want to misquote that.

3             My question for you would be do you

4    know if she is going to be allowed back or if she is

5    in the interview process or what's her status of her

6    reapplication?

7        A.    She has not been called.  She applied in

8    February of 2023 and has not been called.

9        Q.    Do you know when she quit?

10       A.    She quit I'm going to say approximately

11   the fall of last year.

12       Q.    So it was months before she tried to come

13   back then?

14       A.    Yes.

15       Q.    And the tech, do you know when he quit

16   and he came back, he or she I'm sorry?

17       A.    I don't know the exact dates.

18       Q.    Are those the only two people you can

19   think of that quit and came back?

20       A.    Right offhand, yeah.

21            MR. TAYLOR:  That's all the questions I

22   have for you.  I can pass it over to Robert.

23            MR. HOGUE:  Actually I don't have any

24   questions for you, Ms. Smith, so thank you for your

Page 35

1   time.

2             Would you like me to ask about

3   signature now, Alex?

4             MR. TAYLOR:  Yes, that's fine.

5             MR. HOGUE:  So, Ms. Smith, you have the

6   opportunity to review the transcript and the purpose

7   of reviewing a transcript is to correct any errors.

8   And what I mean by errors is you would be allowed to

9   make minor corrections such as -- and we mentioned a

10  few acronyms, if an acronym was inadvertently

11  misspoken or inadvertently taken down incorrectly,

12  you would be able to correct that or very minor

13  spelling errors.  What you can't do is make

14  substantive changes like changing an answer,

15  changing a yes from a no or anything like that.

16  So, Ms. Smith, would you like the opportunity to

17  review the transcript or do you wish to waive

18  signature?

19             THE WITNESS:  Yes, I could review it and

20  sign.  Is that what you want me to do?

21             MR. HOGUE:  It's entirely up to do.  This

22  was a fairly short deposition.  I'm pretty confident

23  in what the court reporter does.

24             THE WITNESS:  I can waive it.

**EXHIBIT 2**

Page 36

1          MR. HOGUE:  Thank you.

2          THE REPORTER:  Mr. Taylor, are you

3    ordering?

4          MR. TAYLOR:  I'm unsure.

5          MR. HOGUE:  If, Alex, orders we will take

6    a copy.  Thank you.

7                    (WHEREUPON, the deposition

8                    concluded at 10:15 am.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**EXHIBIT 2**

Page 37

1                       CERTIFICATE

                            OF

2             CERTIFIED SHORTHAND REPORTER

3

4          I, Maria Mazza, a Certified Shorthand

5     Reporter of the State of Illinois, CSR License No.

6     084-002577, do hereby certify:

7              That previous to the commencement of the

8     videoconference examination of the aforesaid

9     witness, the witness was duly sworn by me to testify

10    the whole truth concerning the matters herein;

11             That the foregoing videoconference

12    deposition transcript was stenographically reported

13    by me and was thereafter reduced to typewriting

14    under my personal direction and constitutes a true

15    and accurate record of the testimony given and the

16    proceedings had at the aforesaid deposition;

17             That the said videoconference deposition

18    was taken before me at the time and place specified;

19             That I am not a relative or employee or

20    attorney or counsel for any of the parties herein,

21    nor a relative or employee of such attorney or

22    counsel for any of the parties hereto, nor am I

23    interested directly or indirectly in the outcome of

24    this action;

**EXHIBIT 2**

Page 38

1          IN WITNESS WHEREOF, I do hereunto set my

2   hand at Chicago, Illinois, this 14th day of August,

3   2023.

4

5

6

7

8

        MARIA MAZZA, CSR

9        CSR License No. 084-002577

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**[01107 - avenue]**                                  Page 1

| **0** |
|---|
| **01107**   1:5 |
| **05**   7:22 |
| **084-002577** |
| 37:6 38:9 |

| **1** |
|---|
| **100**   21:22 |
| **10:15**   36:8 |
| **13**   9:3,5 |
| **14th**   38:2 |
| **17**   15:15,24 |
| **1735**   38:7 |
| **18**   15:15,24 |
| **1:22**   1:5 |

| **2** |
|---|
| **200**   2:3 |
| **2010**   9:2 16:13 |
| **2020**   11:13 |
| **2021**   20:9 |
| **2023**   1:24 34:8 |
| 38:3 |
| **23**   7:3 |
| **2500**   2:3 |

| **3** |
|---|
| **3c**   21:20 |

| **4** |
|---|
| **4**   3:5 |

| **5** |
|---|
| **500**   2:7 |

| **6** |
|---|
| **60148**   2:4 |

**61364**   7:1
**62701**   2:8

| **8** |
|---|
| **8:34**   1:22 |

| **9** |
|---|
| **9**   1:24 |
| **917**   6:24 |
| **93**   7:14 |

| **a** |
|---|
| **a.m.**   1:22 |
| **ability**   5:23 |
| **able**   27:15 |
| 33:17 35:12 |
| **absent**   10:4 |
| **accurate**   37:15 |
| **acronym**   35:10 |
| **acronyms** |
| 35:10 |
| **action**   37:24 |
| **actually**   18:13 |
| 22:4 28:6 |
| 30:12 32:1 |
| 34:23 |
| **address**   6:23 |
| 17:3,18 19:2,7 |
| 19:10 |
| **addresses** |
| 18:17 |
| **addressing** |
| 21:8 |
| **adls**   9:21 |
| **administrator** |
| 11:24 12:8 |

**aforesaid**   37:8
37:16
**ago**   15:22 22:3
23:3
**agree**   4:1
**ahead**   5:8
22:24
**alex**   35:3 36:5
**alexander**   2:5
**aliases**   7:7
**allowed**   34:4
35:8
**altercation**
21:14,17 25:9
25:13,15,22
26:16,23 32:5
32:17
**altercations**
25:4,10 26:2
**ambulate**   9:21
**angela**   1:11 3:3
4:7
**angie**   33:11,24
**angry**   27:24
**answer**   4:23
5:3,3,13,23
19:13 22:15
35:14
**answering**   5:9
**apart**   30:13
**apologize**   5:19
**appearances**
2:1
**appearing**   2:5
2:9

**applied**   34:7
**appointments**
9:23 30:19
**appreciate**
22:20
**approximately**
12:23 34:10
**area**   16:1
**aside**   22:12
**asked**   5:10 21:9
21:23 22:1
23:1,11
**asking**   4:18
5:15
**ass**   24:4 27:3,5
27:14
**assess**   9:21
**assessment**
23:21
**assessments**
10:4
**assist**   9:22
**associate**   7:24
8:2
**assume**   5:13
**ataylor**   2:4
**attend**   7:15
**attorney**   2:7
37:20,21
**attorneys**   4:1
6:13
**august**   38:2
**authority**   26:18
**avenue**   2:3

**aware**  20:4
23:7 26:21

**b**

**back**  11:9 14:3
19:15 24:16
28:5 30:10
32:3 33:8,12
33:13,14,16,17
34:4,13,16,19
**background**
6:22
**based**  19:5
**behalf**  2:5,9
**believe**  13:22
15:23 18:11
28:17,22 29:3
30:24
**best**  18:3,9,12
18:16 19:21
20:1 22:16
31:13
**better**  22:6
24:4,11
**bit**  10:22 20:5
23:10 24:8
**bitch**  24:12
**bond**  24:13
28:11
**boss**  23:17
**bottom**  4:19
**bounced**  15:18
**break**  5:7,8
**breakdown**
25:3

**breakroom**
17:11,14
**briefly**  27:1
**bring**  6:19
**brought**  22:19
**business**  30:6

**c**

**c**  4:10
**call**  17:20
23:21
**called**  1:11 4:8
24:18 34:7,8
**calling**  23:4
**calm**  27:20,20
**calmly**  27:5,15
**camelot**  14:9
14:11
**candace**  1:3
11:16 12:21
13:18 20:6,7
20:11 21:10,24
22:1,1 23:1
24:10 26:2,6,8
26:18,24 27:19
27:23 29:14
30:5,21 31:12
31:14,18 32:13
32:18,20,24
**candace's**
26:10,15,21
29:4,24 31:24
32:22
**care**  23:19,22
23:24

**case**  1:5 4:18
23:10
**caucasian**
25:21
**center**  1:6 8:12
8:15 9:14
**central**  1:1
**certificate**  37:1
**certified**  37:2,4
**certify**  37:6
**changes**  35:14
**changing**  35:14
35:15
**charles**  28:21
29:11,17 30:1
**check**  15:18
**chicago**  38:2
**chops**  5:15
**circle**  11:9 26:5
**circumstances**
20:9
**civil**  1:14
**claim**  10:9
**claims**  10:12
18:14 19:8
**clarify**  12:9
15:10,12 18:3
28:15
**classes**  8:5
**close**  32:19
**cna**  14:11
**college**  7:15 8:4
**come**  23:15,20
24:4,11,14,19
28:5 33:8,12

33:13,16,17
34:12
**commencem...**
37:7
**commencing**
1:22
**commission**
15:3
**company**  19:11
**complaint**  16:6
16:9 21:10
**complaints**
17:22 19:12
21:11 32:21
**complete**  4:24
5:3
**computer**
10:19 16:22
**concerning**
37:10
**concluded**  36:8
**confident**  35:22
**considered**
10:1
**consist**  10:18
**consists**  10:2
**constitutes**
33:19 37:14
**continued**
24:19
**contract**  31:23
31:24
**conversation**
21:6

[convicted - employed]                                              Page 3

**convicted**  15:8
  15:11,20
**cook**  1:20
**copy**  36:6
**correct**  11:17
  13:7 14:16
  16:13,14 18:14
  18:15 21:12,16
  26:4,13,14
  31:16 32:7
  35:7,12
**corrections**
  35:9
**counsel**  37:20
  37:22
**county**  1:20
**couple**  4:20,20
  25:3
**courses**  8:4
**court**  1:1 4:2
  5:1 35:23
**courts**  1:16
**cover**  21:21
**coworker**
  29:18,19
**crime**  15:8,11
**csr**  1:18 37:5
  38:8,9
**current**  8:10
  9:18 11:6,7
**custodial**  32:9
**cut**  22:9,21
**cv**  1:5

**d**

**d**  3:1 4:10
**date**  20:8
**dates**  34:17
**day**  12:19
  21:18 30:9
  38:2
**deal**  24:19
**deceptive**  15:15
  15:18,21 16:2
**deescalate**
  27:16,17
**defendant**  1:7
  2:9 15:6
**define**  11:2
**definitive**  22:7
**degree**  7:23
**department**
  8:11
**deposition**  1:10
  4:17 6:2,10,13
  6:16,20 8:14
  14:17,20 22:9
  22:10 35:22
  36:7 37:12,16
  37:17
**depositions**
  1:18
**desk**  21:21 31:6
  31:17 32:6
**developmental**
  1:6
**dickerson**  24:6
  28:21,24 29:1

**dietary**  30:24
  31:1,22
**different**  21:11
  26:22
**dig**  20:5
**direct**  3:5 18:6
  18:7 24:18
**direction**  37:14
**directly**  14:14
  32:19 37:23
**discipline**
  12:15 30:3,4,7
  31:14,15
**disciplined**
  12:12,18,20
  13:1,20,22
**discriminating**
  18:23
**discrimination**
  8:5 10:13,16
  10:23,23 16:9
  17:2,7,17 18:4
  18:17,22 19:11
  19:18,22 20:3
**district**  1:1,1
  1:16
**division**  1:2
**doctor**  23:13,21
**doctor's**  30:19
**document**  6:9
**documentation**
  9:22
**documents**
  6:19 22:19

**doing**  4:17 21:2
  23:14 30:19
  31:7
**donna**  11:7,20
**doolin**  25:16,17
  25:18,22
**door**  24:16,16
  24:17 28:1,2,4
  28:4,5,6,8,9
**doorway**  24:7,7
  24:14,15 28:3
  28:10
**drugs**  5:22
**duly**  4:9 37:9
**duties**  9:18,20
  9:24 10:4,5
  13:3,5,8,16,22
  13:24 14:1
  31:2,6
**duty**  31:17 32:6
**dwight**  8:12

**e**

**e**  3:1 4:10,10
**early**  4:15 8:17
**earned**  7:23
**eastern**  1:2
**educated**  22:3
  23:10
**eeoc**  14:23 15:2
**either**  16:3
  19:19
**elicit**  5:22
**employed**
  16:16

**employee**  16:15
17:1 29:1
37:19,21
**employees**  25:5
**employer**  8:8
8:10,15
**employment**
14:5 15:2
**entire**  26:2
**entirely**  35:21
**equal**  15:2
**errors**  35:7,8
35:13
**ethnicity**  25:20
**evaluations**
9:23
**event**  28:16
**events**  4:20
26:22
**everybody**  32:2
**exact**  12:15
20:8 34:17
**exactly**  13:19
13:21 16:3
**examination**
1:12 3:5 37:8
**examine**  23:14
**examined**  4:9
**examining**
24:21
**exchanged**
25:13
**exhibit**  22:18
**expectation**
33:1

**experience**
20:12
**explained**  23:3
24:1

**f**

**fair**  5:4
**fairly**  35:22
**fall**  34:11
**february**  34:8
**federal**  1:14
**feels**  17:1
**feet**  31:7
**felt**  20:23 24:8
**fight**  21:1
**fighting**  25:14
**fill**  9:18
**filling**  9:10,16
**findings**  23:13
23:15
**fine**  22:22 35:4
**finish**  5:9 23:12
**finished**  24:21
**first**  4:8,22
17:11 20:6,22
25:9 31:11
**floor**  17:12
31:11
**focus**  10:23
**follows**  4:9
**foot**  28:4
**force**  28:1
**foregoing**
37:11
**forward**  8:13
8:19

**fox**  1:6 8:12,14
8:15,19 9:1,14
12:12 14:4,15
14:21 16:12,16
17:21 19:23
20:2 26:2 33:5
**frame**  13:14,15
**friday**  4:16
**friend**  29:24
**friends**  29:4,14
29:19
**front**  6:21
**fucking**  24:12
**further**  4:21

**g**

**general**  2:7
**generally**  32:5
**getting**  28:12
**give**  4:21,23 5:3
**given**  37:15
**go**  4:21 5:8
7:17 14:1 18:1
18:5 22:5,22
22:24 23:11
31:20,22 32:12
**going**  4:17,18
5:13 8:19 11:9
14:3 19:11
23:14 24:1,4
24:13 27:3,4
27:14 28:10
32:3,16 34:4
34:10
**good**  4:12,14
8:20 23:18

33:18,20,21
**gosh**  16:4
**gotten**  27:11
**graduate**  7:9
7:13,19,21
**group**  2:2 24:1
**guess**  31:4,6

**h**

**half**  9:3,5
**hallway**  20:23
24:5 28:18
**hand**  38:2
**handbook**
16:16,21 18:10
**handed**  30:4
**handle**  19:15
**handling**  17:22
**hands**  26:24
**happened**  20:9
25:2
**harassment**  8:6
10:13,16 16:9
17:2,7,17
18:18 19:18,23
20:3
**hard**  4:24
33:15
**head**  5:1,1
**health**  26:17
29:3
**hear**  32:21
**heaven**  25:14
**held**  9:6 24:17
28:4,5

help 9:21
helping 21:20
hereto 37:22
hereunto 38:1
heritage 14:8
14:12,14
hi 20:23,24
21:2
high 7:9,11,12
highland 2:3
hire 16:19
20:12
hired 9:11
history 14:3
hogue 2:9 4:5
34:23 35:5,21
36:1,5
hold 28:7
homes 7:4
hope 23:19
hostage 5:7
housekeeping
29:13
hr 18:1,5,7 19:4
19:7 21:5,6,9
21:11 24:22
25:1
huh 5:2
human 8:11
16:6

**i**

il 2:4,8
ilga.gov 2:8
illinois 1:1,22
2:7 6:24 37:5

38:2
impair 5:22
importance
23:4 24:2
inadvertently
35:10,11
incident 13:18
21:13 26:6
30:5,8 31:15
32:3,13
incidents 19:3
incorrectly
35:11
indirectly
37:23
individual
21:22,23,24
23:19,24
information
10:20 18:20
infraction
13:16
instructions
4:21
interactions
20:20
interested
37:23
interject 22:8
internet 5:15
interview 34:5
investigate
10:9,12 18:13
19:8,16

investigation
19:18,22 20:2
involved 19:17
involving 19:24
issues 32:14
ivcc 7:18

**j**

j 2:5
jackson 21:4
25:1
jail 24:13 28:11
january 9:2
job 8:21 9:6,18
9:20,24 10:8
11:21 12:5,15
13:3,5,8,16,22
13:23 14:1,10
14:14 23:18,18
24:2 29:12
jocelyn 24:20
june 1:24

**k**

keep 8:18 19:14
28:1
kept 30:13
kind 4:19 5:2
19:2 20:12
22:22 24:6
kitchen 31:2,4
31:8,10,18
32:9
knew 28:11
29:4

knockum 12:4
know 5:16 9:16
10:10 12:1,3,5
13:12 15:1
16:24 18:17
19:16 21:6
22:14 23:5
24:12 25:20
26:15 29:6,23
30:4,21 31:8
32:16 33:4,7
33:13,19 34:4
34:9,15,17
knowledge
18:4,9,12,16
19:21 20:1
22:16 31:13

**l**

labor 31:4
ladder 12:16
lastly 5:12
laundry 29:13
law 2:2
lawsuit 15:5
lawyer 6:5,6
leave 24:10
left 33:17
letting 23:5
level 29:5,6
license 31:21
37:5 38:9
little 4:15 9:3
10:22 20:22
23:10 24:8

**lived** 7:2
**located** 31:8,10
**location** 9:13
**lombard** 2:4
**long** 7:2 15:22
  26:23
**look** 22:18
**lot** 14:1
**loud** 25:14
**louder** 27:11

**m**

**m** 4:10
**made** 31:18
**make** 5:3,16
  22:15,19 35:9
  35:13
**making** 30:19
**manner** 13:10
  23:16
**manor** 14:8
**manual** 16:15
  16:21
**march** 20:9
  21:13
**marcus** 22:2
  24:21
**maria** 1:18
  37:4 38:8
**matters** 37:10
**mazza** 1:18
  37:4 38:8
**mcgadda** 33:12
**mean** 4:23 15:2
  22:9,21 31:5
  35:8

**means** 13:13
**meant** 5:20
**medical** 13:12
**memo** 22:11,14
**mental** 26:17
  29:3
**mentioned** 35:9
**met** 33:1
**miles** 24:20
**mind** 19:15
**mine** 31:6
**minor** 15:13,14
  15:24 35:9,12
**misquote** 34:2
**misspoken**
  35:11
**mistaken** 13:23
  15:24
**module** 10:19
**mom** 23:17
**months** 34:12
**morning** 4:12
  4:13
**moving** 8:13
**mumbled** 5:2

**n**

**n** 3:1 4:10,10
**name** 24:6
  33:24
**names** 7:6
  29:23
**need** 5:7,8
**neutral** 30:1
**never** 14:20
  25:14 32:19

**new** 33:23
**nicole** 24:6,15
  28:21,24 29:1
  29:6,8
**nod** 5:1
**normal** 10:4
**notary** 1:18
**note** 21:21
**notice** 1:12
  6:16 33:22
**number** 17:19
  22:6
**nurse** 8:23 9:11
  9:19 10:1 23:4
  23:18 32:4,5
  33:11,23
**nurses** 31:20
  32:4
**nursing** 8:2
  10:4 30:18,19
  31:20

**o**

**o** 4:10
**o'clock** 1:22
**obtained** 23:5
**obviously**
  22:18 26:5
**occasionally**
  5:19
**offense** 20:24
**offensive** 5:19
  5:20
**offhand** 28:23
  33:11 34:20

**office** 9:13 17:1
  17:6 24:7,10
**oglesby** 7:18
**oh** 27:10
**okay** 4:15 5:10
  5:16 25:17
**old** 15:15
**once** 28:3
**open** 28:1
**opportunity**
  15:3 35:6,16
**ordering** 36:3
**orders** 36:5
**outcome** 37:23
**outside** 8:4
  13:15 18:24
  24:15 29:20
**own** 7:4

**p**

**pages** 3:1
**paperwork**
  9:22 30:20
**parties** 37:20
  37:22
**party** 15:5
  19:19
**pass** 34:22
**people** 34:18
**perceive** 27:23
**perceived**
  27:19
**perform** 13:9
**performing**
  13:5

person  18:1,5
personal  29:5,6
  29:16 37:14
pertaining  1:16
physical  9:19
  31:3,5
pick  21:1
picked  21:19
place  22:23
  24:17 37:18
plaintiff  1:4,11
  2:5 15:6
please  24:10
point  27:9
policies  17:21
  17:24
policy  18:4,17
  19:2,7,10,14
porter  6:24
position  9:12
  25:17 26:15
  33:5
positions  14:10
possible  30:14
post  20:19
posters  17:5
postings  16:24
  17:16
potentially
  27:13
practice  15:15
  15:18
practices  15:21
  16:2

precise  22:5
prepare  6:1,10
  6:13
prescription
  5:21
present  6:23
pretty  10:5
  35:22
previous  14:4
  21:8 29:8 37:7
previously
  32:14
prior  14:4,14
  20:14 32:13
probably  26:21
  33:6
problem  12:17
  17:3,18
procedure  1:14
proceeding
  14:23
proceedings
  37:16
process  34:5
profession
  13:12
promoted  9:9
  11:10 33:1
protect  28:13
protection
  15:19
psa  10:4 11:22
pt  9:11,18,23
  14:13

public  1:20
  11:24 12:7
purpose  35:6
purposes  22:10
pursuant  1:12
  1:12
pushed  22:20
  24:16
put  22:11 26:23
  28:3,12 30:10

**q**

question  4:22
  5:9,12,14,18
  21:8 32:17
  34:3
questions  4:19
  5:23 6:22 9:17
  22:16 25:3
  32:11 34:21,24
quick  15:20
quickly  11:9
quit  34:9,10,15
  34:19

**r**

r  4:10
race  18:24
racial  10:23
  18:21 19:11
raise  26:8
raised  26:7
  27:9,13
raymond  21:4
reaching  23:4

react  11:4
reading  22:11
  22:13
really  15:20
  32:19
reapplication
  34:6
reassigned
  30:15,16,17,18
  30:21,23,24
  31:17 32:6,8
reassignments
  31:19
receive  10:15
  16:15 30:7
received  16:20
  30:5 31:12,13
  31:14
recollection
  22:17
record  37:15
rectal  22:5
  23:11
reduced  37:13
regarding
  14:21 17:1,21
registered  8:23
reinie  25:16,17
  25:18,20,22
  26:3
relationship
  29:8,17
relative  37:19
  37:21

**remember**
  11:11 12:15,23
  12:24 13:1,19
  13:21 15:22
  16:3 19:14
  20:8,22 28:23
**remote**  2:1
**remotely**  4:3
**repeat**  17:4
**report**  13:15
  18:2 21:3,5
  23:13
**reported**  20:24
  21:24 24:23,24
  25:1 37:12
**reporter**  4:1,2
  5:1 35:23 36:2
  37:2,5
**reporting**
  13:10
**reports**  12:1,2
**resigned**  33:4,7
  33:12,14
**resources**  16:6
**respond**  19:11
**responsibilities**
  13:3,6,8,17,23
  13:24 14:2
**retail**  15:23
  16:2
**retaliation**
  10:13,16,24
  11:2,3 16:10
  17:3,7,18
  18:18 19:19

20:3
**review**  6:6
  10:20 16:23
  19:14 35:6,17
  35:19
**reviewed**  6:3
**reviewing**  35:7
**reviews**  33:2
**revisions**  16:20
**rhonda**  12:4
**rhonda's**  12:5
**right**  9:10
  10:11 23:6
  24:7,15 27:2
  28:23 33:11,24
  34:20
**rn**  9:7 14:12,13
  14:13
**rn1**  9:8,9 10:6
  11:10 25:19
**rn2**  8:22 9:8,10
  9:24 10:1
  11:10,16 12:9
  12:10 26:13
**robert**  2:9
  34:22
**robert.hogue**
  2:8
**role**  10:11,12
  12:10 18:13
**rss**  24:18,20
**rules**  1:14

**s**

**saying**  20:23,24
  21:2 27:16
  28:10 29:24
**school**  7:9,11
  7:12,17 14:12
**screamed**  27:14
**screaming**
  27:11
**second**  2:7 5:6
  22:8
**see**  6:16 17:7
**seen**  31:24
**seniority**  10:6
**sentence**  4:24
**separate**  9:17
**series**  4:19
**serious**  28:12
**served**  6:17
**service**  11:24
  12:7
**services**  8:11
**set**  38:1
**setting**  23:12
**severe**  19:3
**severity**  19:6
**sex**  10:23
**shake**  5:2
**shelly**  25:1
**shock**  33:2
**short**  35:22
**shorthand**  37:2
  37:4
**shoulder**  24:9
  27:1,6,15,20

**show**  22:17
**shut**  24:16 28:2
  28:6,8,9
**sign**  35:20
**signature**  35:3
  35:18 38:7
**signs**  17:5
  23:12
**simple**  8:18
**situation**  12:18
  12:21 20:5,15
  20:16,19,21
  21:7 24:20
  25:2,4 27:16
**slightly**  26:22
**smith**  1:11 3:3
  4:7,12 28:22
  29:11,17 34:24
  35:5,16
**somebody**  24:3
  24:5,11,13
  28:10
**sorry**  11:18,23
  12:16 13:11
  33:23 34:2,16
**sort**  5:21 10:9
  19:17 29:16
  31:15
**sought**  22:1
  23:1
**sounds**  8:20
**south**  2:3,7
**sparked**  21:17
**speak**  6:12

specific  10:22
specified  37:18
specifies  18:19
    18:21
spelling  35:13
springfield  2:8
spsa  12:7
staff  10:2 21:23
stand  9:21
    11:23
standard  31:23
standing  33:18
    33:20
started  16:12
    26:8,23 27:2
state  1:20 37:5
statement  6:3,7
    6:21 14:1
states  1:1,16
stating  21:21
status  34:5
steele  23:8
stenographic...
    37:12
steps  17:19
sticky  21:21
streater  6:24
    7:12 14:8
street  2:7 6:24
strike  10:9
stumble  8:17
subject  16:5,8
    21:9
subordinate
    10:2

substance  5:22
substantive
    35:14
suite  2:3
sulaiman  2:2
sulaimanlaw....
    2:4
supervising
    10:2
supervisor  10:3
    11:6,7,19,20
    12:2,3,4 18:6,7
    19:4,19 24:18
    26:10
supervisory
    10:1,11,11
    12:7,10 18:13
sure  5:3,16
    22:15,19 33:6
suspension
    12:19 30:9
swear  4:2
sworn  4:6,9
    37:9

t

t  4:10,10
take  8:8 10:20
    19:3 22:18
    23:11,19,22,24
    36:5
taken  1:18 8:5
    35:11 37:18
talk  20:19
    21:13 30:3

talking  8:15
    24:5
tap  27:15
tapped  24:9
    27:1,5
tapping  27:20
    27:20
taylor  2:5 3:5
    4:4,11 34:21
    35:4 36:2,4
tech  26:17 29:3
    32:4,8 33:23
    34:15
technician
    33:13,15
technicians
    31:22
tell  7:23 9:17
    17:8,16,24
    18:21 26:18
    28:19 31:1
    32:24 33:10
telling  6:4
tells  17:19
temperature
    21:22 22:2,4,4
    22:5 23:2,5,12
temporarily
    9:10
terms  32:12
terrace  14:9
test  10:21
testified  4:9
    14:17,20

testify  6:17
    37:9
testimony  26:6
    28:7 37:15
testy  20:22
thank  8:3 34:24
    36:1,6
theft  15:23
    16:2
therapist  9:19
thing  5:6
things  14:1
    19:1 28:11
    31:7
think  15:15
    19:9 27:19
    31:5 34:19
threatened
    24:8
three  29:22
tickets  15:13,14
time  5:8 13:14
    13:15 20:10
    22:3 23:2,3
    26:2,11 27:21
    28:2 35:1
    37:18
timely  13:10
    23:16
title  8:21 11:21
    12:6 29:2
titles  9:6
today  5:7,23
    6:10,14,17
    11:20

[today's - yelled]                                                                      Page 10

| | | | |
|---|---|---|---|
| today's 6:20 | **u** | version 26:22 | words 8:18 |
| together 23:15 | | victim 17:2,6 | 25:13 32:6 |
| 23:20 | uh 5:2 | 17:17 18:4 | work 8:11 14:3 |
| told 23:7,9,16 | unaware 21:10 | videoconfere... | 14:7 20:16 |
| tone 27:10 | under 14:1 | 1:10 37:8,11 | 23:20 29:20 |
| tough 32:16 | 37:14 | 37:17 | 30:12,13,18 |
| toya 23:8,8,9 | understand | vital 23:12 | 31:18,20,22 |
| traffic 15:13,14 | 5:14 8:14 | voice 26:7,8 | 32:20,22 |
| trained 23:8 | understanding | 27:8,10,13 | worked 11:15 |
| trainee 26:17 | 21:14 | volatile 28:14 | 14:8 20:11,14 |
| 29:3 | understood | vs 1:5 | 32:19 |
| training 10:15 | 5:13 | | worker 32:18 |
| 10:18 18:19 | unit 21:18,19 | **w** | 33:21 |
| transcript 35:6 | 21:20 24:21,22 | waive 35:17,24 | working 9:1 |
| 35:7,17 37:12 | 30:11,12 32:20 | walked 24:22 | 10:3,3 14:4 |
| treat 18:24 | united 1:1,14 | want 4:21 5:6 | 16:12 20:7 |
| 22:6 23:6 | units 10:3 | 15:12 20:5 | 21:19 32:12 |
| tried 33:7,12 | 17:12,13 21:18 | 22:8,15 25:3 | write 5:1 |
| 34:12 | universal 32:1 | 26:5 28:15 | wrong 11:3,4 |
| trouble 33:21 | unsure 36:4 | 30:3 34:2 | 18:24 19:1 |
| true 37:14 | upset 24:3 | 35:20 | |
| truth 37:10 | 27:10 | way 19:13 | **x** |
| try 27:15 28:1 | used 6:9 32:6 | week's 33:22 | x 3:1 4:10 |
| 28:13 | utilized 31:21 | weiss 11:8,20 | |
| trying 21:1 | | went 14:12 | **y** |
| 23:17,18 27:17 | **v** | 24:16,17,22 | yeah 15:11 |
| 28:7 30:13 | vague 13:4,24 | whereof 38:1 | 30:2 32:1 |
| two 9:17 12:19 | vaughn 1:3 | whoop 24:4 | 34:20 |
| 21:18 26:1 | 11:16 12:21 | 27:3,4,14 | year 7:21 8:7 |
| 29:22,23 30:9 | 13:19 20:6,7 | wish 35:17 | 10:15 15:21 |
| 32:18 33:22 | 20:11,20 21:10 | witness 3:2 4:2 | 16:3 34:11 |
| 34:18 | 21:15 | 4:6,8 35:19,24 | years 7:3 9:3,5 |
| type 5:2 19:5,6 | verbal 4:23 | 37:9,9 38:1 | 15:15 |
| typewriting | 21:14,17 25:4 | witnesses 28:16 | yell 26:8 |
| 37:13 | 25:9,10,12,15 | 28:17,19 29:22 | yelled 26:7 |
| | 26:1 | 29:23 | |

**EXHIBIT 2**

**[yelling - zoom]**                                                Page 11

| | |
|---|---|
| **yelling** | 27:8 |

**z**

| | |
|---|---|
| **zoom** | 5:15 |

**EXHIBIT 2**

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**EXHIBIT 2**

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

**EXHIBIT 2**

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.