**EXHIBIT 3**

Page 1

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
2                  URBANA DIVISION

3

4    CANDACE VAUGHN,                    )
              Plaintiff;               )
5                                       )
                                        )
6                                       )
       -v-                     )No. 1:22-CV-01107
7                                       )
                                        )
8                                       )
     FOX DEVELOPMENTAL CENTER,          )
9              Defendant.              )

10

11

12       The 30(b)(6) Deposition of FOX DEVELOPMENTAL
13    CENTER (By Rochelle Jackson), having been called by
14    Plaintiff for examination, taken pursuant to notice,
15    and pursuant to all applicable rules of the Federal
16    Code of Civil Procedure, conducted via
17    videoconference, and commencing at the hour of
18    approximately 11:09 a.m. on the 13th day of June,
19    2023.

20

21

22

23    Reported By Beth Radtke, RPR, CRR
24    License No. 084-004561

**EXHIBIT 3**

Page 2

```
 1                    APPEARANCES

 2

 3    ATLAS CONSUMER LAW GROUP

      By Mr. Alexander J. Taylor

 4        2500 South Highland Avenue

          Suite 200

 5        Lombard, Illinois 60148

          ataylor@sulaimanlaw.com

 6        Appeared on behalf of the Plaintiff;

 7

      OFFICE OF THE ATTORNEY GENERAL, STATE OF ILLINOIS

 8    By Mr. Robert Hogue, Assistant Attorney General

          500 South Second Street

 9        Springfield, Illinois 62701

          robert.hogue@ilga.gov

10        Appeared on behalf of the Defendant.

11                      * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**EXHIBIT 3**

Page 3

1                       INDEX

2

3    WITNESS                                    PAGE

4     ROCHELLE JACKSON                          4
      EXAMINATION BY MR. TAYLOR                 4

5     EXAMINATION BY MR. HOGUE                  67
      FURTHER EXAMINATION BY MR. TAYLOR         70

6

7    EXHIBITS

8     Exhibit A    Deposition notice            6

      Exhibit B    Discrimination Policies      15
9                  document

      Exhibit C    Defendant's Responses to     22
10                 Plaintiff's First Set of
                   Interrogatories

11

              Exhibits Retained By Counsel
12
                        * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

**EXHIBIT 3**

Page 4

1              (The witness was duly sworn.)

2                    ROCHELLE JACKSON

3    having been first duly sworn, was examined and

4    testified as follows:

5                         EXAMINATION

6    BY MR. TAYLOR:

7        Q.   Good morning, Ms. Jackson.  My name is

8    Alexander Taylor, an attorney with Atlas Consumer

9    Law.  I'm here in case number 22 CV 01107 for the

10   30(b)(6) deposition of defendant, Illinois Department

11   of Human Services.

12           Couple of just preliminary things before we

13   get any further.

14           First, to make the court reporter's job

15   easier, I'm going to be asking you a series of

16   questions today.  If you could answer verbally, and

17   what I mean by that is yes, no, just verbalize your

18   answer, right?  She has to write down everything we

19   say, and it's hard for her to write down a head nod

20   or shake your head no or even verbalizations like

21   uh-huh or nuh-uh, it's just easier to give a full

22   verbal answer.

23           Is that going to be a problem?

24       A.   No.

Page 5

1      Q.   And I'm sorry I have to do this, but I do

2   this at every deposition.  Are you on any sort of

3   substance, either illicit or prescription, that would

4   affect your ability to answer the questions today?

5      A.   No.

6      Q.   Okay.  So then we're going to go ahead and

7   get started.

8           Did you do anything to prepare for this

9   deposition?

10     A.   I did.

11     Q.   Without telling me anything your lawyer said

12  to you or anything that you said to your lawyer, I

13  don't want any of that, what did you do to prepare

14  for the deposition?

15     A.   I reviewed the information that I had sent

16  to you based on the subpoena, so the incidents and

17  policies.

18     Q.   Okay, so you reviewed documents, and they

19  were the incident reports and the policies of Fox?

20          And I'm sorry, let me clarify before you

21  answer that question.

22          When I say "Fox" are you going to understand

23  that I'm talking about your employer?

24     A.   Correct.

**EXHIBIT 3**

Page 6

```
1        Q.   Okay.  So back to my previous questions, so
2    you reviewed documents that were the policies and the
3    incident reports?
4        A.   Yes.
5        Q.   One more preliminary note.  If I ask a
6    question and you don't understand it, let me know.
7    If you answer the question, I'm going to assume you
8    understood it.  Is that fair?
9        A.   Yes.
10       Q.   Okay.  So did you speak with anyone, other
11   than the company's attorneys, to prepare for this
12   deposition today?
13       A.   No.
14       Q.   Okay.  I'm going to show you Exhibit A, and
15   we're doing this on Zoom, so I apologize.  Make sure
16   you can see it.  If you can't see it, let me know.
17       A.   Okay.
18       Q.   Do you see yourself, or do you see the --
19   can you see the notice?
20       A.   I can.
21       Q.   Okay.  Can you see that this is Plaintiff's
22   Notice of Taking Deposition of Designated Corporate
23   Representative?
24       A.   Yes.
```

**EXHIBIT 3**

Page 7

1    Q.   And that's for June 13th at 10:30?

2    A.   Yes.

3    Q.   Okay.  Obviously we're running a little

4  late, but have you seen this notice before?

5    A.   Yes.

6    Q.   And I will scroll through it just to make

7  sure you've seen it.

8         You recognize the notice?

9    A.   Yes.

10   Q.   Okay.  And you understand that you have been

11 identified as one of the employees to answer

12 questions on these topics, correct?

13   A.   Yes.

14   Q.   Okay.  And you understand that you are going

15 to be answering these questions on behalf of Fox and

16 not on your own behalf?

17   A.   Correct.

18   Q.   And you are prepared to answer the questions

19 on these topics?

20   A.   I am.

21   Q.   Did you bring any documents with you to

22 today's deposition?

23   A.   I did.

24   Q.   Okay.  What did you bring?

**EXHIBIT 3**

1    A.    I brought the notice that you have on the

2  screen, I brought Ms. Vaughn's personnel file, I

3  brought administrative directives, I brought the

4  incident folders referenced in the document.

5    Q.    Okay.  So we're going to be asking questions

6  and answering off of exhibits that I show you and

7  your memory.

8          So what we would ask is that you put all of

9  your own personal documents aside until we're done

10  with the deposition.  Is that understood?

11    A.    Yes.

12    Q.    Okay.  Again I'm not exactly Zoom

13  proficient.  I should be stopping my screen share

14  shortly.  We should be back.  Okay, good.

15          So what is your present address?

16    A.    134 West Main Street, Dwight, Illinois,

17  60420.

18    Q.    How long have you lived at this location?

19    A.    I'm sorry, that is my work address.

20    Q.    Okay.  What's your present home address?

21    A.    31419 East 2100 North Road, Emington,

22  Illinois, 60934, since 1995.

23    Q.    Okay.  And do you own any other homes?

24    A.    I do not.

1      Q.    Have you ever gone by any other names or

2   aliases?

3      A.    I have previous married names.

4      Q.    Okay.  So just other married names, no --

5      A.    Correct.

6      Q.    Did you graduate high school?

7      A.    I did.

8      Q.    Okay.  When did you graduate high school?

9      A.    1982.

10     Q.    And where did you go to high school?

11     A.    Alan B. Shepard in Palos Heights, Illinois.

12     Q.    Did you attend college?

13     A.    I did.

14     Q.    And where did you go to college?

15     A.    I went to Moraine Valley Community College

16   in Palos Hills, and then I went to the University of

17   Illinois at Chicago.

18     Q.    I also went to Moraine Valley and UIC.  My

19   wife went to Moraine, and both my parents taught at

20   Moraine, so I know that one very well.

21           And when did you graduate college?

22     A.    1986.

23     Q.    Have you taken any courses or classes on

24   discrimination or harassment outside of college?

Page 10

1       A.    I am trained annually with DHS in both.

2       Q.    Okay.  Did you take any courses when you

3  were in college?

4       A.    Not that I recall.

5       Q.    What was your degree in?

6       A.    Criminal justice and psychology.

7       Q.    Did you -- have you taken any sort of

8  postgraduate classes?

9       A.    I have not.

10      Q.    Who is your current employer?

11      A.    State of Illinois, Department of Human

12  Services at Fox Center.

13      Q.    What's your job title?

14      A.    Human -- well, public service administrator.

15  HR director.

16      Q.    And when did you begin working for the State

17  of Illinois?

18      A.    October of 2000.

19      Q.    Just to clarify, you said you were the HR

20  director?

21      A.    Correct.

22      Q.    Have you had any other job titles during

23  your employment with the State of Illinois?

24      A.    I have.

**EXHIBIT 3**

Page 11

1     Q.   And what are those job titles?

2     A.   I was a mental health technician, I was a

3  habilitation coordinator, I was a human resources

4  representative, and then the public service

5  administrator/human resources director.

6     Q.   How long have you been the public service

7  administrator/HR director?

8     A.   Since July 16th of 2020.

9     Q.   Okay.  Is your office located at the Fox

10  Center?

11     A.   It is.

12     Q.   Has your office been at the Fox Center since

13  your employment began with the State of Illinois?

14     A.   It has.

15     Q.   Okay.  And I'm sorry, what was the job you

16  said you were previous to HR director?

17     A.   A human resources representative.

18     Q.   And when were you the human resources

19  representative?

20     A.   From February of 2013 through July of 2020.

21     Q.   What were your duties as -- in your current

22  position as HR director, what are your current

23  duties?

24     A.   I am the labor relations workplace violence

Page 12

1    group insurance deferred comp liaison.  So...

2         Q.   Would it be fair to say that your job duties

3    include investigating claims made by employees

4    regarding discrimination, harassment, or retaliation?

5         A.   I make informal investigations, yes.

6         Q.   Okay.  And you receive -- just to clarify,

7    you receive antidiscrimination, antiharassment, and

8    anti-retaliation training yearly with Fox?

9         A.   Correct.

10        Q.   Do you have a current supervisor?

11        A.   I do.

12        Q.   Who is that supervisor?

13        A.   The facility director.

14        Q.   What's their name?

15        A.   Rhonda Knockum and Ray Jackson are the

16   facility directors.

17        Q.   Are they the highest level at Fox?

18        A.   Yes.

19        Q.   Have you ever been disciplined by the State

20   of Illinois?  And I mean in a job capacity.

21        A.   I think I have received warnings for tardy

22   and mandate refusal when I was a technician.

23        Q.   So this would have been -- when were you a

24   technician?

**EXHIBIT 3**

Page 13

1      A.    Oh, golly.  From 2000 to 2002.

2      Q.    Prior to working at Fox, where did you work?

3      A.    I was a substitute teacher from 1996 to

4  2000.

5      Q.    And as a substitute teacher, you didn't do

6  any sort of antidiscrimination, antiharassment or

7  anti-retaliation training or work?

8      A.    I don't believe so.

9      Q.    Have you ever testified in a deposition,

10  administrative proceeding, or in court on behalf of

11  Fox?

12      A.    I have not.

13      Q.    Have you ever been involved in any EEOC

14  proceeding related to a claim of discrimination,

15  harassment, or retaliation?

16      A.    I have not.

17      Q.    Okay.  And just for clarity purposes, you

18  know when I say EEOC I'm referring to the Equal

19  Employment Opportunity Commission?

20      A.    I do.

21      Q.    Have you ever been a party to any lawsuit,

22  either as a plaintiff or a defendant?

23      A.    I don't believe so, no.

24      Q.    Have you ever been convicted of a crime

Page 14

1    other than minor traffic tickets?

2         A.    No.

3         Q.    Have you personally ever been the subject of

4    a complaint to human resources?

5         A.    No.

6         Q.    Okay.  To the best of your knowledge, have

7    you ever been the subject of a complaint of

8    discrimination, harassment, or retaliation?

9         A.    No.

10        Q.    Okay.  Did you receive an employee manual or

11   handbook while you have been employed at Fox?

12        A.    All employees receive a DHS employee

13   handbook, so yes.

14        Q.    When did you receive that?

15        A.    Upon hire, in 2000.

16        Q.    And it's still, to the best of your

17   knowledge, the policy that all employees receive that

18   when they start?

19        A.    Correct, yes.

20        Q.    Did they receive it in physical form or do

21   they receive an electronic copy or both?

22        A.    They would receive a physical form; however,

23   they now receive an electronic copy as of the last

24   six months through DocuSign.

**EXHIBIT 3**

Page 15

```
 1        Q.    To the best of your knowledge, have you
 2   received any revisions to the manual or handbook?
 3        A.    Yes.
 4        Q.    Okay.  When was the last revision made?
 5        A.    That I don't recall.
 6        Q.    Okay.  Would you say it was before 2020 or
 7   after 2020?
 8        A.    Honestly, I don't recall.  I would have to
 9   look to see what version is current.
10        Q.    Okay.  I'm also going to bring up what we're
11   going call Exhibit B.  Give me again one second to
12   pull this up.
13             Okay, do you see the mandated policies,
14   equal employment opportunity/affirmative action?
15             Do you need me to zoom in?
16        A.    Yeah, please.
17        Q.    Okay.  Sorry.  Again, I apologize if I'm
18   zooming in on your face, but I'm not sure if you see
19   that or not, but it's --
20        A.    I see that.
21        Q.    Equal Employment Opportunity/Affirmative
22   Action EEO/AA Discrimination and Harassment.
23        A.    Yes.
24        Q.    Okay.  To the best of your knowledge, are
```

1   these the current policies?  And you can have a

2   second; let me know if you want me to scroll in or

3   out.

4           Are these the current policies regarding

5   race discrimination with -- with Fox?

6       A.   Honestly, I'm not certain, as I see that

7   there's a 4-1-09 date on that.  I would want to refer

8   to the current DHS handbook to be sure.  So I'm not

9   sure if that's the current one, most current.

10      Q.   Okay.  Would you -- looking at this, would

11  you say you've seen these policies previously,

12  whether they are the most current or at some point

13  were current with Fox?

14      A.   Yes.

15      Q.   So the employer, Fox, does have policies

16  regarding the handling of complaints by employees for

17  discrimination?

18      A.   Yes.

19      Q.   Okay.  Is it the extent of those policies?

20      A.   No.  Fox -- well, we follow the DHS

21  administrative directive in regards to

22  discrimination, harassment, workplace violence.  Fox

23  Center also has an antidiscrimination policy that is

24  built off of that administrative directive.

1    Q.    Would Fox give all employees copies of this

2   policy and the subsequent policies you brought up?

3    A.    All employees receive the employee handbook

4   upon hire.

5    Q.    Right, so -- so are all of those policies

6   you just outlined in the employee handbook?

7    A.    No, the employee handbook is a separate

8   document from the administrative directive.  I would

9   have to look at them side by side to ensure that they

10  reflect the same information.  I will assume that

11  they do, but I'm not going to say for certain.

12   Q.    Okay.  Just because I want to make sure I'm

13  clear on this, using this -- and at least on 4-2-2009

14  was the most recent policy.  Would this policy that

15  you are looking at on the screen have been in the

16  employee handbook?

17   A.    Rephrase that question, please.

18   Q.    I know that you said you are unsure if this

19  is the most recent policy for EEO/AA, however at one

20  point it was, right?  So on April 2, 2009, right?

21  Because this was updated April 1, 2009, so on

22  April 2, 2009, if there was a new hire, in the

23  employee handbook would they have received this

24  specific policy?

1      A.    Yes, it would have been in the handbook and
2   they received the handbook, yes.
3      Q.    And if this policy has not been updated,
4   then a new hire would receive this policy?
5      A.    Yes.
6      Q.    So talking about the administrative
7   directives and these policies here, what do they say
8   about racial discrimination?
9           I'll be a little more specific.
10          Do they constitute how to make a complaint
11  of racial discrimination?
12     A.    Yes.
13     Q.    How do you make a complaint of racial
14  discrimination?
15     A.    Me personally or an employee?
16     Q.    An employee.
17     A.    The employee is provided -- if the employee
18  comes to me as HR, I am going to review the
19  administrative directive with them.  I give them a
20  copy, I give them a copy of the complaint form,
21  explain the process of completing that complaint and
22  sending it in to the Bureau of Civil Affairs.
23     Q.    Does the policy or the more updated version
24  or the administrative directives, do they address

Page 19

1   what type of complaint would merit a response or

2   investigation by human resources and which would not?

3        A.   It identifies and spells it out what each --

4   basically the administrative directive is going to

5   illustrate what rises to the level of antiharassment,

6   discrimination, hostile work environment, et cetera,

7   and then provides the detailed steps on filing a

8   complaint.

9        Q.   Okay.  So is there a policy or procedure for

10  human resources to determine, on an initial

11  complaint, whether it merits investigation or whether

12  it merits just kind of casting to the side?

13       A.   Well, there is a process that I was -- I was

14  instructed to basically -- if somebody came to me

15  with a complaint, I'm going to informally

16  investigate, review the information, review it

17  against the administrative directive to determine if

18  it rises to the level of what is listed in the

19  complaint.

20       Q.   What does the administrative directive say

21  would rise to the level of harassment or

22  discrimination?

23       A.   I would have to look at it to be exact, but

24  it does make reference to whether or not a reasonable

Page 20

1   person, upon review, would agree that this is

2   interfering with the -- I don't want to misquote the

3   administrative directive, because to be honest, if

4   I'm receiving a complaint, I'm always going to review

5   it.  So without it being in front of me, I hesitate

6   to answer.

7       Q.   Okay.  If someone came to you with a

8   complaint of racial discrimination, so for example,

9   someone comes to HR and says I'm being discriminated

10  against because I'm Black, and when you investigate

11  -- would you investigate that?  If that was the

12  complaint, if the complaint was I'm being

13  discriminated against because of my race, would that

14  be something that would merit an investigation?

15      A.   I would -- yes, I would ask that employee to

16  provide a written statement of her issues, his

17  issues.  Based on what that information contains, I'm

18  going to informally get written statements from

19  anybody else named, and then, based on the

20  information provided, I am going to proceed based on

21  what I discover.

22      Q.   Do any of the policies make a distinction

23  between a formal complaint of discrimination and

24  other types of complaints?  So really between, like,

1  a formal and informal complaint?

2      A.   Well, when I say informal -- hmm.  I'm not

3  sure.  Please rephrase the question.

4      Q.   Sure.  If an employee comes in distressed

5  and just tells their manager, okay, I've been

6  discriminated against because of my race, or I've

7  been harassed because of my race, versus filling out

8  a written memo and submitting it, would HR treat

9  those differently?

10      A.   No, I guess I'm using the term "informal,"

11  because I am doing the informal investigation and

12  gathering the information.  If an employee brings me

13  a complaint, a complaint is a complaint that merits

14  investigation.  I'm thinking of formal complaint as

15  the complaint form provided to BCA.

16      Q.   Okay.  So you say informal investigation.

17          Can you tell me what the difference between

18  a formal investigation and an informal investigation

19  is by HR?

20      A.   I guess that's just my term that, when I

21  think of formal investigation, I am thinking of BCA,

22  State Police, OIG.  So to me, not being one of those

23  investigators, I refer to myself as an informal

24  investigator.  So that's just my title that I gave

Page 22

1  myself.

2      Q.  No, understood.  I'm going to zoom in on a

3  paragraph here.  I just want to make sure we can see

4  it.

5          So it says:  An employee or applicant who

6  either observes or believes himself or herself to be

7  the object of discrimination or harassment.

8          You see the paragraph I'm looking at, right?

9      A.  I do.

10      Q.  Okay.  So it says:  Either immediately

11  contact the DHS Bureau of Civil Affairs for

12  consultation, or file a written internal charge.

13          Is that the correct reading of this, that

14  it's a one or the other?

15      A.  Correct.

16      Q.  Okay.  I'm going to pull up a different

17  exhibit, if you could give me one second.  This will

18  be Exhibit C.

19          Do you recognize this document, the

20  Defendant's Responses to Plaintiff's First Set of

21  Interrogatories?

22      A.  I mean, yes, I see it.

23      Q.  Have you ever seen it before?

24      A.  Yes.

Page 23

1    Q.   Did you assist with the answering of these

2  questions?

3    A.   Yes.

4    Q.   I just want to direct your attention to

5  interrogatory 7.  I'm going to paraphrase it a bit.

6  If you can't read it, let me know.

7       Describe fully and in detail what steps

8  defendant took to prevent retaliation after she

9  complained of discrimination, unlawful activity, and

10  favoritism and unfair treatment.

11      Do you see the question?

12    A.   I do.

13    Q.   Now there were documents produced, but then

14  it says:  Plaintiff never filed a complaint of

15  discrimination, unlawful activity, and/or harassment

16  with defendant's Bureau of Civil Affairs, which is

17  the appropriate place to file such complaints

18  internally.

19      But according to your procedure, that's not

20  necessarily the truth; that's one of the two places

21  to file complaints?

22    A.   Well, from my standpoint, I'm also providing

23  and giving the administrative directive to the

24  employee regardless, so they have that mechanism for

Page 24

1    filing a complaint.

2        Q.   I understand, but according to the company's

3    policies and procedures we just read, it says as long

4    as -- you can either report to the defendant's Bureau

5    -- or Fox's Bureau of Civil Affairs or file a written

6    complaint, which my client did do.

7             So she did file an appropriate complaint; is

8    that fair to say?

9        A.   I don't know that I agree with that.

10       Q.   Per your policies, a written complaint would

11   be an appropriate way to bring up discrimination?

12       A.   Well, so if you're defining -- so yes, she

13   wrote a memo with her issue.

14       Q.   Okay.

15       A.   And she was provided the administrative

16   directive and the complaint form for BCA.

17       Q.   So again, just flipping back to the policy,

18   I just want to make sure I understand everything

19   here.

20             It says immediately contact the DHS Bureau

21   of Civil Affairs, which is what the interrogatory

22   said my client didn't do, or to file a written

23   internal charge without fear of retaliation.

24             To the best of your knowledge, did my client

**EXHIBIT 3**

Page 25

1   file any written charges, written internal memos with

2   her managers?

3       A.   She did.

4       Q.   So per policy, she did what needed to be

5   done when some -- an employee or applicant believes

6   himself or herself is the object of discrimination?

7       A.   Okay.

8       Q.   So going back to interrogatory answer 7 in

9   Exhibit C, this is not -- would you like to update

10  the answer at all and say that she -- she did file a

11  complaint in the appropriate place?

12      A.   She did file an internal memo.

13      Q.   I'm going to turn off the exhibits again for

14  now, so please bear with me.

15           MR. HOGUE:  And while you're doing that, I

16  guess for the record, I will object to the previous

17  question that -- for foundation that she didn't

18  herself explicitly answer the interrogatory, but I

19  understand that she's already answered, so I would

20  just like to preserve my objection for the record.

21           MR. TAYLOR:  She did say she assisted in

22  answering the questions.

23           MR. HOGUE:  Yes, she did say that, but...

24           MR. TAYLOR:  Okay.

Page 26

1    BY MR. TAYLOR:
2         Q.   Let's see.  Let's move on to -- okay.
3              During your time at Fox, have you ever
4    personally handled any investigations into claims of
5    racial discrimination or harassment or retaliation by
6    an employee?
7         A.   I have reviewed memos that have been
8    submitted and measured them against the
9    administrative directive.
10        Q.   So you have investigated claims of racial
11   discrimination?
12        A.   Not previously, just this -- just this case.
13        Q.   Okay.  So outside of Ms. Vaughn, have you
14   handled any investigation into discrimination,
15   harassment, or retaliation?
16        A.   No.
17        Q.   Have you ever been involved in an
18   investigation, whether with Ms. Vaughn or a previous
19   one, that resulted in discipline for the alleged
20   wrongdoer?
21        A.   Rephrase that, please.
22        Q.   Okay.  Have you ever been involved in a
23   racial discrimination investigation, okay?  And I
24   mean including Candace Vaughn's, that resulted in

Page 27

1    discipline for the alleged wrongdoer?  So was anyone

2    ever punished for discriminating or allegedly

3    discriminating against another employee?

4         A.   Would not have been in an investigation.  I

5    don't issue discipline, so I'm going to answer no.

6         Q.   So the best of your knowledge, has an

7    employee ever been punished for allegedly racially

8    discriminating against another employee?

9         A.   Not that I'm aware of.

10        Q.   So the to the best of your knowledge, has

11   any other employee of Fox made any sort of complaint

12   of discrimination or harassment in connection with

13   their employment with Fox?

14        A.   Not that I'm aware of.

15        Q.   Has any employee made a formal or informal

16   complaint of retaliation in connection with their

17   employment with Fox?

18        A.   Not that I'm aware of.

19        Q.   So to the best of your knowledge there has

20   been one complaint of discrimination or retaliation

21   in connection with employment at Fox, and that would

22   be Ms. Vaughn?

23        A.   Yes, during my time as the HR director.

24        Q.   Of course, I know you can't speak on things

1    you don't know of.

2           That's why I'm saying to the best of your

3    knowledge, since you've been in HR, you've been there

4    since 2000, the only complaint you know of is

5    Ms. Vaughn's in terms of race discrimination,

6    retaliation, or harassment?

7       A.   Yes.

8       Q.   Okay.  Did you conduct the investigation

9    into Candace Vaughn's complaint?

10      A.   Which complaint?

11      Q.   Let's talk about all three of them.  We'll

12   start with Angela Smith.

13           Did you investigate the complaint Ms. Vaughn

14   had with Angela Smith?

15      A.   I did seek memos, as well as written

16   statements from all employees involved, yes.

17      Q.   Okay.  Does Fox deny Ms. Vaughn's statement

18   about what happened with Ms. Smith?

19           MR. HOGUE:  I'm going to --

20           THE WITNESS:  Yeah --

21           MR. HOGUE:  -- object at this time.  I think

22   that in part calls for speculation, and I object on a

23   foundation basis.

24           MR. TAYLOR:  I'm just going to remind

Page 29

1   opposing counsel to keep the objections to form, you

2   know, no speaking objections here because we are in a

3   federal dep, but the objection is noted.

4   BY MR. TAYLOR:

5       Q.   And, Ms. Jackson, you can answer if you know

6   the answer to it.  But the objection is preserved

7   obviously.

8       A.   So rephrase the question.

9            MR. TAYLOR:  Beth, can you read the question

10  back?

11           (Record read as follows:  Does Fox deny

12           Ms. Vaughn's statement about what happened

13           with Ms. Smith?)

14  BY THE WITNESS:

15      A.   I feel that I can't accurately answer that.

16  BY MR. TAYLOR:

17      Q.   Why not?

18      A.   Do I deny it?  I...

19           I wasn't there, I did not observe it, so I

20  can only attest to the written documentation that I

21  received.

22      Q.   Okay.  Based on the written documentation,

23  how did Fox respond to the altercation between

24  Ms. Vaughn and Ms. Smith?

Page 30

1    A.   So based on the memos that were provided and

2    the information it contained, a workplace violence

3    packet was completed and sent to Bureau of Civil

4    Affairs, as well as the Illinois State Police were

5    called and they investigated that charge as well.

6    Q.   What was the outcome of those

7    investigations?

8    A.   Charges were not filed on behalf of

9    Ms. Vaughn against Ms. Smith by the Illinois State

10   Police, and as far as the workplace violence, it was

11   unsubstantiated.

12   Q.   Okay.  Did Ms. Vaughn get disciplined for

13   the altercation with Ms. Smith?

14   A.   She did.

15   Q.   What was Ms. Vaughn's discipline?

16   A.   She received a written reprimand.

17   Q.   Was she suspended?

18   A.   She was not.

19   Q.   Did Ms. Smith receive any discipline?

20   A.   She did.

21   Q.   What was her discipline?

22   A.   She was suspended.

23   Q.   Okay.  Was Ms. Vaughn's -- strike that.

24        Did Ms. Vaughn get reassigned based on the

Page 31

1   altercation with Ms. Smith?

2      A.  Both she and Ms. Smith were reassigned.

3      Q.  What was Ms. Vaughn -- what was Ms. Vaughn's

4   position prior to reassignment?

5      A.  She was a mental health tech trainee.

6      Q.  And what was she reassigned to?

7      A.  She was reassigned to work in our dietary

8   department.

9      Q.  Was this as a punishment for what happened

10   with Ms. Smith?

11      A.  No.  Our supplemental designates the dietary

12   department as a location for reassignment, should it

13   be necessary.

14      Q.  Okay.  And what was Ms. Smith's position

15   prior to being reassigned?

16      A.  Registered nurse 2.

17      Q.  And then what was she reassigned to?

18      A.  She was reassigned to the nursing

19   department.

20      Q.  Okay.  Was Ms. Vaughn instructed to do

21   custodial work when she was reassigned?

22      A.  I -- I can't speak to that.  I don't know.

23      Q.  Would Ms. Smith have been reassigned to

24   doing any dietary or custodial work?

Page 32

1      A.   I can't speak to that.

2      Q.   Is Ms. Smith, to the best of your knowledge,

3  African-American?

4      A.   She is not.

5      Q.   Okay.  When was plaintiff brought back to

6  her regular position?

7      A.   I believe it was April 9th.

8      Q.   And Ms. Smith, same question?

9      A.   I assume the same.

10     Q.   Are you familiar with an incident between

11  Ms. Vaughn and a co-worker, Paula Hertz?

12     A.   Yes.

13     Q.   Can you let me know how you are familiar

14  with this incident?

15     A.   I believe I was notified by the supervisor

16  that Ms. Vaughn had called that office to complain

17  about her interaction.

18     Q.   Okay.  And were there any complaints of

19  racial discrimination made between Ms. Vaughn and

20  Ms. Hertz?

21     A.   I would have to review the document to be

22  sure.

23     Q.   Did you -- were you part of HR the entire

24  time Candace Vaughn was employed with Fox?

1      A.   I was.

2      Q.   Okay.  Were you the director of HR at the

3    time of this incident with Paula Hertz?  I believe it

4    was May 31, 2020.

5      A.   No.  Of 2020?

6      Q.   2021.

7      A.   Oh, 2021, yes.

8      Q.   Would you have -- had a complaint of racial

9    discrimination been made, would you have reviewed

10   that complaint?

11     A.   Yes.

12     Q.   And if a memo was written, you would have

13   seen the memo?

14     A.   If she submitted it to me, yes.

15     Q.   If she submitted a memo of discrimination to

16   Joshlyn -- strike that.

17          Are you familiar with Joshlyn Miles?

18     A.   Yes.

19     Q.   Okay.  Who is Joshlyn Miles?

20     A.   She was one of our residential services

21   supervisors.

22     Q.   Okay.  And that would be the RSS office,

23   correct?

24     A.   Correct.

Page 34

1      Q.   Okay.  So if Ms. Vaughn submitted a

2  complaint of discrimination, whether she just told

3  Joshlyn or wrote something to Joshlyn, would you have

4  heard about that complaint?

5      A.   Possibly.

6      Q.   Okay.  To the best of your recollection was

7  there any investigation done into --

8      A.   So I --

9      Q.   -- Ms. Vaughn's complaint against Ms. Hertz?

10     A.   Yes, I believe she was asked to submit a

11  memo.  That memo would have been reviewed to

12  determine was it job duties she was being requested

13  to do, was it -- you know, what's the merit of the

14  issue being brought up.  Sometimes it's personality

15  issues.

16     Q.   Okay.  I've got an exhibit here, but it's

17  sideways, so I'm going to try and fix it, but I'm

18  going to try and pull an exhibit up, if you guys can

19  bear with me.

20          Okay, again, it's sideways, and I apologize,

21  but can you see what should be the top, it says

22  Message Reply Form in the far left?  I'm sorry to

23  make you do that.

24          It says Message Reply Form.  It says "To

Page 35

1  whom it may concern," and it says Candace Vaughn.

2      A.   Yes.

3      Q.   Would this be a written memo for a complaint

4  of discrimination?

5      A.   It's -- it's a memo, yes.

6      Q.   If you can see, the date is May 31, 2021?

7      A.   Yes.

8      Q.   And the first sentence is:  I'm feeling like

9  I'm being harassed and discriminated by Ms. Paula

10 Hertz.

11     A.   Yes.

12     Q.   So this would have been an incident of

13 discrimination that would have been elevated to you?

14     A.   It did come to me.

15     Q.   And did it ever get investigated?

16     A.   So what I'm going do is I'm going to look at

17 the incidents that occurred, I'm going to get written

18 statements, I'm going to review to determine whether

19 or not it rises to the administrative directive.

20          If it is a matter of personality issues,

21 that does not rise.  If she is being asked to perform

22 duties within the scope of her position and -- and

23 she is refusing or she doesn't believe she should, I

24 am always going to take all of that and I'm also

1  going to present it to the facility director for

2  guidance as well.

3      Q.   Okay.  So what was the outcome of this

4  investigation with Paula Hertz?

5      A.   Can I look at the memo again?

6      Q.   Yes.  Give me one second and I will bring up

7  the memo.

8          I am no longer sharing my screen, correct?

9          MR. HOGUE:  Correct.

10          THE WITNESS:  Correct.

11          MR. TAYLOR:  Okay.  Sorry, it's hard for me

12  to tell.

13  BY MR. TAYLOR:

14      Q.   Okay, the memo is back up on screen.  Only

15  the first one is sideways here.

16      A.   So the outcome of this was I proceeded to

17  get written statements from other staff and

18  determined that it was a matter of she was requested

19  to complete -- let's see.

20          So when I read further, she continues to

21  write that...

22      Q.   Do you need me to scroll?

23      A.   No, no, I'm reading it.

24          It's just in the context of this situation,

**EXHIBIT 3**

Page 37

1  she has her lead worker requesting her to do tasks

2  within the scope of her position.  She does -- she's

3  stating that she's being asked to put sunscreen on,

4  but it wasn't sunny.

5          So she stated that she felt she was being

6  discriminated against, but yet when this was

7  reviewed, the -- the tasks that she was being asked

8  to complete had nothing to do with -- they fell

9  within the scope of being a tech trainee, therefore,

10  it did not appear that there was harassment or

11  discrimination.  She was just being asked to do her

12  job.

13          But I also met with her and discussed and

14  provided her again with the administrative directive

15  and the complaint form.  I asked her if she needed

16  assistance, and she did not.

17      Q.   So to clarify, you met with Ms. Vaughn and

18  your position at this time was director of HR,

19  correct?

20      A.   It was.

21      Q.   Okay.  You met with Ms. Vaughn, and did you

22  inform her there would be no further action from HR

23  on this complaint and that she would have to go to

24  the -- I'm sorry, DHS Bureau of Services?

Page 38

1      A.   No.  So the process is, again, review the

2   administrative directive, provide her with the

3   complaint form.

4         All this information then goes to the

5   facility director for the facility director to

6   determine what is going to occur at that point.

7         I am not part of the discipline process; I

8   don't make that determination.  I gather the

9   information and provide it to the appropriate entity.

10     Q.   Okay.  You had mentioned that Ms. Vaughn was

11  being instructed to do things that were within the

12  purview of a tech -- I'm sorry, a tech trainee?

13     A.   Correct.

14     Q.   Okay.  However, just looking at Ms. Vaughn's

15  complaint here, the complaint, to me, looks like

16  she's complaining about being forced to do things

17  that other employees were not being forced to do.

18         Was that investigated?

19     A.   Well, yes.

20     Q.   Okay.  How so?

21     A.   Well, throughout written statements it's

22  being asked what was she being asked to do, and in

23  talking to Ms. Vaughn herself, what was she being

24  asked to do that she did not feel she should be

1   doing.

2        Q.   Well, I'm not asking that specifically.

3             What I'm saying is, was it investigated that

4   she had to do certain things that Ms. Hertz was not

5   making other employees do, even if those activities

6   were within the purview of what a tech trainee would

7   do?

8        A.   I don't understand your question, because I

9   feel like I answered that.

10       Q.   Okay.  So I guess let me be more specific,

11  just because I want to make sure I have the correct

12  answer here.

13            For example, Ms. Vaughn complained

14  specifically of using a lift to get individuals up,

15  and Ms. Vaughn specifically -- so is using a lift

16  within the purview of a tech trainee?

17       A.   Yes.

18       Q.   Is that something --

19       A.   We're a no-lift facility.  All techs are

20  required to use a lift.

21       Q.   Okay.  So knowing that she was asked to do

22  that, that's not outside of her job duties?

23       A.   Correct.

24       Q.   However, was it investigated that she was

Page 40

1   the only tech trainee being asked to use a lift?

2       A.   She would not be the only tech asked to use

3   a lift.  All --

4       Q.   It says in her complaint here she was the

5   only tech that was asked to use lift.

6       A.   Yes.  When asked -- so -- I'm trying to

7   think how I can best answer this.

8           So although she's saying that she is being

9   required to do things other staff are not required to

10  do, other staff were asked do they use the lift

11  because they are required to use the lift.

12      Q.   Okay.

13      A.   So she wouldn't be being asked to do

14  anything else that a technician wouldn't be doing or

15  shouldn't be doing.

16      Q.   Okay.  Let's go towards her breaks.  Again,

17  her specific complaint is I had to ask for both of my

18  15-minute breaks, but none of the other techs had to.

19          Was that investigated?

20      A.   It was.

21      Q.   Okay.  How?

22      A.   One, I spoke to the lead worker, who was

23  Paula Hertz, and Paula Hertz, as the lead worker,

24  assigns all breaks.  There is a break schedule.

Page 41

```
 1       Q.   And Paula Hertz is the individual that
 2   Ms. Vaughn complained about was being racist.
 3       A.   Okay.
 4       Q.   So if you were asked, had you racially
 5   discriminated against another individual, would you
 6   admit, yes, I racially discriminated against that
 7   individual, or would you answer differently?
 8       A.   I would hope I would answer honestly.
 9       Q.   I would hope so too, but in the course of --
10       A.   -- how she would answer.
11       Q.   Okay.  In the course of your career -- well,
12   you haven't dealt with racial -- strike that.
13            You said this is the only racial
14   discrimination complaint you've seen.
15            So did you interview anyone else regarding
16   the breaks, or just Paula Hertz?
17       A.   Well, as the lead worker, I did talk to
18   Paula Hertz, and Paula Hertz stated that she did not
19   require Candace to do anything that the other
20   technicians aren't required to do.  For example,
21   going to break.
22       Q.   And just to harken back on the lift, I
23   believe the complaint here is that Ms. Vaughn had to
24   do all lifting while the other employees didn't, and
```

Page 42

1  again, I'm just going say you interviewed Paula Hertz

2  on this topic?

3      A.   Correct.

4      Q.   So the only person you interviewed is the

5  person who was complained about as the person that

6  was racially discriminating against Candace Vaughn?

7      A.   Correct.

8      Q.   So the course of your entire discrimination

9  investigation was speaking to Ms. Vaughn and speaking

10  to Ms. Hertz?

11      A.   Correct.

12      Q.   Is the administrative directive to not have

13  any other witnesses, if there are any?

14      A.   Well, neither stated there were any other

15  witnesses, therefore, I did not have reason to

16  interview anybody.

17      Q.   Okay.  Would there have been anybody else on

18  the floor with Paula and with Candace Vaughn?

19      A.   I can't answer that.

20      Q.   Okay.

21      A.   I would not know.

22      Q.   So do you have any reason to doubt the

23  veracity of Ms. Vaughn's claim that Paula was

24  discriminating against her?

Page 43

1      A.    I don't have any reason to believe it's

2    true, I don't have any reason to believe it's not

3    true.

4      Q.    Okay.  And how did the investigation

5    conclude?  What was the final outcome of this

6    investigation?

7      A.    My part would have been to assemble the

8    written statements, to provide Ms. Vaughn with the

9    administrative directive and the complaint form, and

10    to provide that to the facility director to determine

11    what action would be taken.

12      Q.    To the best of your knowledge, was any

13    action taken either with Ms. Vaughn or Ms. Hertz?

14      A.    Not to my knowledge.

15      Q.    And I'm sorry, just because I want to make

16    sure I understand the full structure, you don't have

17    any power as the HR director to initiate any sort of

18    action being taken against one or the other; that

19    would go up to the director of Fox?

20      A.    You have your residential services director

21    and you have your facility director, so -- I'm sorry.

22    The facility director is going to be the person who,

23    based on all the information presented, determines if

24    there is an outcome in terms of do we allow -- is

1   there discipline warranted based on the statements

2   provided.  So he would be better to answer that

3   question.

4       Q.   Okay, I'm going to move on to the last

5   incident, and that's the incident with Veronica.

6            Are you familiar with the incident with

7   Veronica?

8       A.   I believe so.

9       Q.   To the best of your knowledge, what happened

10  between Ms. Vaughn and Veronica?

11      A.   I believe that was the instance in which

12  Ms. Vaughn was upset at her assignment for that day,

13  and then called to complain to the residential

14  services director, and then went home sick.

15      Q.   Who would have been the residential services

16  director that Ms. Vaughn would have complained to?

17      A.   It would be either Yvonne or Joshlyn.

18  Yvonne Thweatt or Joshlyn Miles.

19      Q.   Did you -- did you read Ms. Vaughn's memo

20  where she complains of racial discrimination by

21  Veronica and subsequently feels the need to resign

22  because of it?

23      A.   I did.

24      Q.   Okay.  And was this ever investigated?

Page 45

1      A.   So what I did was I received the memo in

2   which she said that -- so I called RSS to determine

3   what would be the reason for Ms. Vaughn feeling that

4   way.

5           I'm aware that the day before, the person,

6   the employee who was assigned that same person only

7   provided care for that individual.  When Candace was

8   assigned that person the next day, she then was

9   requested to assist with other individuals on that

10  living area.

11          And what I found out was there was a

12  definite staffing issue; the day before, that unit

13  had more staff, therefore, that person was not

14  required to assist.  On the day that Candace was

15  assigned that group, facility staffing was less; we

16  had one less staff person in the living area.  The

17  individual who she was assigned to was already up and

18  dressed by the midnight staff, therefore, his

19  supervision changed.  So she was asked to then assist

20  with other individuals, because his cares were

21  already provided.

22      Q.   So my question really is, in terms of

23  investigating the alleged racial discrimination, did

24  you do any interviews?  Did you look into what --

Page 46

1    other than statements, which I understand this is

2    your statement of what happened.

3        A.    Right.

4        Q.    But did you do any interviews with

5    individuals based on the alleged racial

6    discrimination?

7        A.    What do you mean specifically by

8    investigation?  Did I call the supervisor and ask

9    what the staffing was for both days?  I did.

10       Q.    Okay.

11       A.    I also -- so I spoke with RSS, I spoke with

12   Candace.  I also spoke to Veronica to try and get a

13   clear picture of what exactly happened that day.

14       Q.    Okay.  Have you heard or did you speak with

15   Joshlyn Miles regarding what happened that day?

16       A.    I did.

17       Q.    Okay.  Were you informed that Ms. Vaughn

18   alleged Veronica stated she couldn't stand working

19   with Black women?

20       A.    She did not.

21       Q.    Did Ms. Vaughn -- I'm sorry, strike that.

22             When you're saying "she did not," are you

23   saying you had not heard from Joshlyn Miles that my

24   client had made that allegation?

Page 47

1      A.   I -- I don't recall.

2      Q.   Okay.

3      A.   I would have to look at the memo to be sure.

4      Q.   Give me one minute.  I'm going to pull up

5  this memo.  If you give me one second, I'm pulling up

6  the memo.

7           Okay, can you see the memo here?

8      A.   Yes.

9      Q.   To whom it may concern, Candace Vaughn.  Is

10  this the memo you were referencing?

11     A.   Yes.

12     Q.   If I scroll down here at the bottom, I

13  believe it starts -- from the highlighted section,

14  one, two, three --

15     A.   Okay, yeah, I see that Candace states

16  Veronica said that.  I had no --

17     Q.   I was going to say, so Candace did state

18  that Veronica made that comment?

19     A.   Yes.  I thought you meant did Joshlyn convey

20  that to me.

21     Q.   When I originally asked the question, yes,

22  that was what I asked, but now I'm asking are you

23  aware that comment was made?

24     A.   I'm aware that it was stated that it was

**EXHIBIT 3**

Page 48

1    made.

2        Q.   Okay.  And did you investigate to the best

3    of your ability whether or not this comment was made?

4        A.   I then had a conversation, or a received a

5    written memo from Veronica in which she states she

6    did not mumble anything to Candace.

7        Q.   Okay.

8        A.   So she said/she said.

9        Q.   Okay.  Did you interview any of the other

10   employees that were working with Veronica and

11   Candace?

12       A.   I did not.

13       Q.   There were how many other employees working

14   there?

15       A.   I don't know.

16       Q.   But there was probably at least a lead nurse

17   and, I believe, one other person, based on the fact

18   there would have been three employees, I think,

19   according to the memo?

20       A.   If they were within -- I -- I don't know.

21       Q.   Okay.

22       A.   I can't say.

23       Q.   Do you have any reason to doubt the veracity

24   of Ms. Vaughn's statement?

1      A.    No.

2      Q.    And the only investigation that was

3  undertaken was asking Veronica if she had made a

4  blatantly and openly racist statement?

5      A.    That wasn't all.  I asked for a summary of

6  exactly what occurred.  Neither one stated that there

7  were any other witnesses for me to interview, so to

8  your previous question, there may have been other

9  people on the living area, but not as a witness to

10 what occurred.

11     Q.    Okay.  Let me ask, did you -- as part of

12 your investigation, did you ask Candace and Veronica

13 whether or not there were any potential witnesses, or

14 did they just not bring up that there were any

15 potential witnesses?

16     A.    Both.

17     Q.    Okay.  But in terms the racist comment, the

18 only investigation that you thought you could do was

19 by asking Veronica, did you say "I can't stand

20 working with Black people"?

21     A.    I had nobody else -- yes.  I had nobody else

22 to ask.

23     Q.    Okay.  And what was the result of that

24 investigation between -- specifically on the racist

Page 50

1  comments?  I understand that you're saying that you

2  looked into it and that Ms. Vaughn had to do three

3  times as much work because there was one less

4  employee.

5          But in terms of the racist comment itself,

6  was there any further investigation into it?

7      A.   Well, I'm going to answer that question --

8  so it's a little frustrating, because I'm going to

9  review the whole incident to determine whether or not

10  the tasks that are being asked of her are in the

11  scope of her -- of her job.  And anybody can say

12  anything, so -- so I have nobody else to ask, did you

13  in fact hear Veronica make this statement?  Did she

14  -- I can't tell you that she actually made this

15  statement.

16          So did I investigate -- I'm not sure what

17  that would look like.

18      Q.   Okay.  Did this -- was there any sort of

19  action taken regarding this formal complaint?

20      A.   What do you mean by "action"?

21      Q.   You know, was there any sort of discipline

22  handed out to either Veronica or Ms. Vaughn?

23      A.   No, there was not discipline.

24      Q.   Okay.  And did HR look into Veronica

Page 51

1   allegedly making or allegedly having discriminatory

2   tendencies any further, or was this the end of that

3   investigation as well?

4       A.   If I am looking into the context of this

5   incident -- so I'm sorry with my frustrated answer,

6   because I had no reason to look any further because

7   the -- the basis of her statement was not true from

8   the work assignment perspective.  She was not asked

9   to do more work based -- based upon her race, she was

10  being asked to do the work within the scope of her

11  job based on the staffing that day, and the person

12  that she was assigned to that day had already had

13  care provided to him.  He was already dressed, he was

14  already up, he --

15      Q.   Okay.

16      A.   -- was -- his supervision level was being

17  met by a different employee, therefore, she was asked

18  to assist to get other individuals on the living area

19  up.

20           So to me, there -- there did not need to be

21  any further investigation.

22      Q.   Okay.  Now for the purpose of this

23  discussion, let's concede that Ms. Vaughn was

24  incorrect about the role that she needed to play as

Page 52

1   the -- as she was a med tech 2 at this point, right?

2        A.   No, she was a mental health tech trainee.

3        Q.   Okay.

4        A.   I'm sorry, she was a mental health tech 2 at

5   that time.  She had been promoted in August or

6   somewhere around there.

7        Q.   Okay.  So she was promoted, just -- just for

8   a timeline, she was promoted after the incident with

9   Angela and after the incident with Paula?

10       A.   Yes.  She was promoted 7-16-21.

11       Q.   Okay.  So she was promoted previous to this,

12   but post the other two incidents.

13            So for the purpose of this question, let's

14   say she misunderstood her duties, okay?  Her

15   misunderstanding her duties, does that give you

16   reason to doubt the veracity of her allegation that

17   Veronica made a racial comment?

18       A.   I don't know that Veronica made a racial

19   comment.

20       Q.   I understand you were not there, but do you

21   believe that her misunderstanding her duties affected

22   her testimony that Veronica made this comment?

23   Again, I understand that, to you, this is an

24   allegedly made comment --

Page 53

1      A.    Right.

2      Q.    -- but are you saying you couldn't -- you

3  disagreed with Ms. Vaughn's suggestion of racial bias

4  in the duties, that that automatically would

5  disqualify the fact that Veronica could have said a

6  racist comment in frustration?

7      A.    I'm saying that what Veronica was being

8  asked to do was within the scope of her job duties

9  that had nothing to do with race.

10     Q.    Okay.  Again, but -- I -- I'm specifically

11  asking about the comment.

12          I'm saying even if Ms. Vaughn did

13  misunderstand her job duties, why would that mean

14  that this comment should be glossed over as something

15  that may not have happened?

16     A.    I don't have proof that it happened, I don't

17  have proof that it didn't happen.

18          She was also then provided the

19  administrative directive and complaint form.  I'm not

20  saying how -- that I glossed over the comment; it's

21  an alleged comment, with no witnesses, and she was

22  being asked to do her job.

23     Q.    Okay.

24     A.    I understand your question.  I -- I can't

Page 54

1  answer that, I don't believe.

2      Q.   Okay.  So just -- what can't you answer,

3  just so I'm specific about it?

4      A.   Maybe I can't give you the answer that I

5  think you want.

6      Q.   No, I think you've given me -- I just want

7  you to answer as best you can.  I'm just trying to

8  look into why a comment -- and I want to just be

9  clear, right?  I understand that your position is

10 that what happened to Ms. Vaughn -- this is how I

11 understand your position; I don't want to put words

12 in your mouth or misstate your testimony.

13         I understand your position to be that what

14 happened to Ms. Vaughn under Veronica's instruction

15 was not racial discrimination, okay?

16         But what I also don't understand is how

17 Ms. Vaughn misunderstanding her position would

18 somehow bring less truthfulness to her allegation

19 that Veronica said this.  That's what I'm trying to

20 get to.

21     A.   Okay.

22     Q.   So -- so just again, let me ask you this.

23 If a complaint was made to you by an employee, okay?

24 That only said "My boss told me I cannot stand

Page 55

1  working with Black people," what would the process be

2  of investigating and moving that complaint forward?

3      A.    Well, I would, again, take written

4  statements, I would provide the administrative

5  directive with the complaint form, I would provide

6  that information to my facility director for guidance

7  on how to proceed.

8      Q.    And did you bring this -- this statement in

9  Ms. Vaughn's case up to the facility director for

10  guidance on how to proceed?

11      A.    Yeah, she had all this information.

12      Q.    Okay.  Oh, so I'm sorry, when you say "she

13  had all this information" you mean Ms. Vaughn or you

14  mean the facility director?

15      A.    The facility director.

16      Q.    Okay.  All right.  I would like to move to

17  the end of this memo where Ms. Vaughn gives her

18  14-day notice.

19      A.    Okay.

20      Q.    She resigns here.  She cannot tolerate

21  working in this racist environment.  I'm putting in

22  my 14-day notice.

23          And actually, while we go forward, I think

24  this is kind of what you're saying.

Page 56

1          When you see "racist environment," you took

2    that solely to mean what happened with Veronica, or

3    did you investigate that as a compounding what

4    happened with Paula and with Veronica?

5         A.   I took it as Paula -- or I'm sorry, Candace

6    and Veronica.

7         Q.   Okay.  Okay, I'm going to turn the memo off.

8    Give me one second.

9          Okay, is it back to me?  Are we still --

10        A.   It's you.

11        Q.   Okay, thank you.

12        All right.  So -- so Ms. Vaughn puts in a

13   two-week notice and attempts to rescind her two-week

14   notice, is that correct?

15        A.   She did.

16        Q.   Okay.  Were you part of decision-making

17   process on whether or not to allow Ms. Vaughn to

18   rescind her two-week notice?

19        A.   I was not.

20        Q.   Okay.  Who made that decision?

21        A.   Sibyl Nash.

22        Q.   Okay.  When -- in your experience at Fox,

23   has any other employee resigned and then attempted to

24   rescind their resignation?

Page 57

1       A.    No.

2       Q.    Has any other employee left and then come

3    back?

4       A.    Yes.

5       Q.    Okay.  So let's start with rescinding the

6    resignation.  Is there a policy or procedure on

7    rescinding the resignation?

8       A.    There is an administrative directive that

9    says that once you put your notice in writing, in

10   order for you to have that rescinded, it would go to

11   the secretary; however, the facility director or the

12   facility has to agree.

13      Q.    Okay.  To the best of your knowledge, why

14   wasn't Ms. Vaughn allowed back?

15      A.    I would have to look at the -- the

16   information that I have in her chart.

17            I believe that she put in her 14-day notice,

18   and we believed that it was her intent to resign, to

19   -- she submitted a memo on the 16th, her resignation

20   was effective the 17th, we received it on the 17th,

21   and so she must have put it in overnight.  The

22   facility director reviewed that, and decided that she

23   would honor her original request, believing that that

24   would be best.

Page 58

1      Q.   Why would that have been best?

2      A.   You would have to ask her.  I believe --

3  yeah, I'm not sure.

4      Q.   Can I -- I'm going to pull up one more

5  exhibit here.

6           Okay, so this is an e-mail from Sibyl Nash

7  to, it looks like, Kimberly Jones, and Rochelle

8  Jackson is you, CC'd on the e-mail.

9      A.   Yes.

10     Q.   And this is in regards to Candace Vaughn's

11 attempt to rescind her resignation?

12     A.   Correct.

13     Q.   So it looks like here in paragraph 2,

14 Ms. Vaughn -- it states that Ms. Vaughn attempted to

15 rescind her resignation on the 16th, not the 17th.

16 Paragraph 2, sentence two, on 12-16-2021 she reported

17 that she was rescinding her resignation.

18     A.   Correct.

19     Q.   It says she then contacted you, the HR

20 director, regarding her desire to rescind her

21 resignation, and it says there was a fruitless

22 discussion with Ms. Vaughn.  Do you know --

23     A.   Sure.  So she had called to say she wanted

24 to rescind her resignation.  I stated that I did not

1   have anything in writing.  She then submitted a memo.

2   And I explained to her the process that once it's in

3   writing, that the facility director is going to have

4   to accept -- she was the entity to make that

5   decision, and if she agreed, it would go to the

6   secretary's office for approval, and she did not

7   understand that.

8          So because the facility director was the

9   entity making that decision, I conference called the

10  three of us.

11      Q.   Okay.  So you conference called Sibyl Nash

12  in?

13      A.   Correct.

14      Q.   And then Ms. Vaughn started bringing up the

15  allegations she believed were swept under the rug?

16      A.   Yes.

17      Q.   So -- and then finally, Ms. Nash told

18  Ms. Vaughn, looks like on the 16th, she was not

19  accepting her rescinded resignation because Fox

20  Center was not a good fit for her, and it looks like

21  we're speaking a lot about some of Ms. Vaughn's

22  allegations.

23          Do you think Ms. Vaughn making these

24  complaints, just based on this e-mail, had any

1  influence on whether or not she was "a good fit" for

2  Fox?

3      A.   That statement's coming from Ms. Nash.  She

4  would need to comment on that.

5      Q.   Okay.  Do you think Ms. Vaughn was a -- was

6  a good fit for Fox as an HR manager?

7      A.   Well, from an HR standpoint, I really didn't

8  have a lot of interaction with Ms. Vaughn other than

9  these three incidents.  I didn't have a bad rapport

10  with her at all, so I deferred to the facility

11  director's decision.

12      Q.   Okay.  Ms. Vaughn was promoted, you said, in

13  July of 2021, right?

14      A.   Yes.

15      Q.   Have you seen any of Ms. Vaughn's

16  performance reviews?

17      A.   I have.

18      Q.   So she consistently met expectations,

19  correct?

20      A.   She -- so in the time that she was a

21  trainee, she would have received two evaluations, and

22  then upon promotion, she have would have had one

23  evaluation.

24           I believe when I reviewed these, her initial

Page 61

1 evaluation, after three months, if I recall that

2 correctly, she did meet everything.

3         Subsequently, her final probationary as a

4 trainee, there was a "not met" in human relations.

5     Q.   Okay, "not met" in human relations.   When

6 was the final evaluation.

7     A.   Pardon me?

8     Q.   When was the final evaluation?

9     A.   I would have to look, but they typically

10 would be at about three or four months, and then at

11 the six-month mark of the training time.

12     Q.   Okay.  So this would be -- so human

13 relations, is that -- just to clarify, human

14 relations between, like, the techs and the patients,

15 or like intercompany human relations she needed to

16 improve?

17     A.   I would have to review the section of the

18 evaluation.

19     Q.   Okay.

20     A.   I believe it's peers.

21     Q.   Okay.  So would this one area of "needs

22 improvement" have come before or after the incident

23 with Paula?

24     A.   Honestly, I would have to look at the date.

Page 62

1    I don't know.

2        Q.    Okay.  So if it came -- but if it came

3    after, she was still promoted despite one area of

4    "needs improvement" because she met or exceeded all

5    the other expectations?

6        A.    Correct, she met the -- yes.

7        Q.    Okay.  So Ms. Vaughn was an employee who

8    exceeded expectations or met expectations --

9        A.    She met them.  I can't say that she exceeded

10   them without looking at the evaluation.

11       Q.    Okay.  So "met expectations" is enough to be

12   promoted, but was still considered not a good fit.

13   Why?

14       A.    That is a statement that Sibyl Nash made.  I

15   don't know.

16       Q.    Okay.  So the company's position -- because

17   again, you are testifying on behalf of the company

18   here too.  The company's position isn't that she

19   wasn't good fit, it's just Sibyl Nash who thought she

20   wasn't a good fit?

21       A.    Well, no, I can't say that.  I would also

22   need to review her discipline history to see were

23   there other issues of concern.  I'd also need to look

24   at her attendance to see if that played into the

Page 63

1    picture for Ms. Nash.  I -- I don't know.

2         Q.   Okay.  Had this discussion not been

3    fruitless, the discussion you were on, would -- would

4    there have been a chance that Ms. Vaughn would have

5    been let back to Fox?

6         A.   I don't know.

7         Q.   Okay.

8         A.   Because again, that was not my decision.

9         Q.   Sure.  Okay.  So -- but the e-mail that you

10   are on here does say that she told her she was not

11   accepting her rescinded resignation after they had a

12   fruitless discussion?

13        A.   Fruitless.  Her words, not mine.

14        Q.   Understood.

15             And that discussion mostly related to -- my

16   understanding is you were on the entire call, right?

17   This discussion mostly related to the investigations

18   into Veronica and Paula and Angela Smith?

19        A.   I don't recall that those were discussed at

20   any length, other than a statement being made.

21        Q.   Okay.  In this e-mail you are copied on

22   here, you disagreed with her that the incidents were

23   not thoroughly investigated and swept under the rug.

24             I also let her know regarding her position

Page 64

1   there was no consequence to her peers, that she

2   alleged to have harassed her.  She would not have

3   knowledge of what discipline another staff received.

4   Finally, I told Ms. Vaughn I was not accepting her

5   rescinded resignation.

6          So what is in the e-mail is specifically in

7   relation to these three incidents, even more so

8   harassment to Veronica and Paula; is that correct?

9      A.   Paraphrased, yes.

10     Q.   And then after discussing that, the decision

11  was made, finalized, that we are not going to accept

12  her rescinded resignation?

13     A.    I believe she said finally, I told

14  Ms. Vaughn that I was going to accept her rescinded

15  resignation and agreed with Ms. Vaughn that Fox

16  wasn't a good fit.

17     Q.   Okay.  So after discussing these incidents,

18  we -- the decision was made to not rescind her

19  resignation?  I know you did not make the decision,

20  but --

21     A.   Correct.

22     Q.   -- discussing these, it was finalized -- I'm

23  not paraphrasing the e-mail.  It was finalized that

24  the recision would not be accepted?

Page 65

1      A.   Ms. Nash did not rescind the resignation,

2   that is correct.

3      Q.   I'm going to...

4           Here's an e-mail to you, or from you to

5   Ms. -- Ms. Nash regarding the memos, it looks like

6   attempting to rescind the resignation, and the actual

7   resignation, and it looks like you say here, again,

8   I'm just going to basically paraphrase, but basically

9   once in writing, a resignation can only be rescinded

10  with her approval and the agency/secretary's

11  approval, and I'm not sure if you require division

12  approval.

13          So that's basically you saying I can't

14  rescind it, it has to come from you and then

15  potentially above you?

16     A.   Correct.

17     Q.   Okay.  So at this time, to the best of your

18  knowledge, the recision wasn't final -- I'm sorry,

19  the resignation wasn't final; there was still an

20  opportunity for it to be rescinded?

21     A.   Sure.

22     Q.   Okay.  And this is prior to this fruitless

23  phone call.  I think I just popped it off.  Sorry.

24          This is at 10:03, so this is prior to the

1    allegedly fruitless phone call?

2        A.   So 10:03, and what is the e-mail time of

3    Sibyl's?  Because honestly -- so that was 11:12.

4            Attached memo...

5            So I had the memo, I scanned it at 10:03,

6    I'm going to assume that the phone call occurred

7    between this time and the time that Sibyl sent out

8    the e-mail.

9        Q.   Okay.  I'm going to turn the exhibit off

10   here.

11           Was Ms. Vaughn ever told the outcome of her

12   final investigation -- I'm sorry, strike that whole

13   question.

14           Was Ms. Vaughn ever informed of the outcome

15   of the dispute between herself and Veronica?

16       A.   What do you mean by "outcome"?

17       Q.   That --

18       A.   Because I'm --

19       Q.   Sorry.

20       A.   I don't know.  It is my responsibility to

21   provide the information to the facility director.

22       Q.   Then after December 17th when that

23   resignation refused to be rescinded, do you know if

24   there was any contact with Ms. Vaughn whatsoever from

Page 67

1   either HR or anywhere else?

2       A.   I don't know.

3           MR. TAYLOR:  Okay, those are all the

4   questions I have.

5           I'll go ahead and pass the witness.

6           MR. HOGUE:  Okay.  I have a few questions

7   for you, Ms. Jackson.

8           THE WITNESS:  Sure.

9                     EXAMINATION

10  BY MR. HOGUE:

11      Q.   I'd like to start with the discussion about

12  BCA versus an internal written charge.  Is BCA the

13  proper place for a complaint to go?

14      A.   Yes.

15      Q.   Can you just briefly explain why?

16      A.   Because they are the entity that

17  investigates all allegations of discrimination and

18  harassment.

19      Q.   And so the reason why you're only aware of

20  one complaint for the internal process is because all

21  the other complaints would have gone to BCA?

22      A.   Correct.

23      Q.   Okay.  And does the administrative directive

24  supersede the handbook?

**EXHIBIT 3**

Page 68

1      A.    I don't know.

2      Q.    Fair enough.  Thank you.

3            I'd like to go to the 14-day notice then.

4  So you -- you actually received it on 12-17, correct?

5      A.    Correct.

6      Q.    All right.  And does -- does a late notice

7  on the last day, does that complicate the process for

8  rescinding it?

9      A.    Well, I'm not even certain how I received

10  it, because it would have been in my in-house mail, I

11  stamped it the 17th, Ms. Vaughn called off on the

12  17th, so she did not work her last day.

13      Q.    Okay, thank you for that.

14            But would receiving a last -- on the last

15  day, receiving a request to rescind the -- I guess to

16  receive a -- sorry, I don't know why I can't say this

17  right now.

18            Receiving a request to rescind a resignation

19  on the last day, does that create any difficulties

20  for processing the request to rescind?

21      A.    Yes.

22      Q.    And can you explain that?

23      A.    So the process for rescinding, if the

24  facility director agreed, she is going to have to get

1  that up to her supervisor in the division, then it

2  has to go to the secretary, and it would not be able

3  to be processed in a timely manner, likely, by the

4  end of the 17th.

5       Q.    Thank you for that.

6             Then I'd like to address what's -- it's been

7  called a promotion from trainee to mental health

8  technician 2.

9             Is that more of an automatic process,

10 though, as long as the Agency doesn't terminate the

11 trainee's position?

12      A.    Yes.  So with the mental health trainee,

13 they were required to be promoted within one year

14 minus one day.  If they are not promoted, then they

15 would be terminated.  It's a target title.

16      Q.    Okay.  So this promotion then is more of an

17 automatic process that occurs?

18      A.    Not -- not to be confused with a

19 semiautomatic promotion which the contract

20 designates.  They have to meet the qualifications to

21 be promoted, yes.  It -- sorry.

22      Q.    No, thank you for your answer.  I appreciate

23 that.

24             One moment, please.  Let me re-review my

Page 70

1   notes.

2          Oh, sorry.  And so did you suggest to

3   Ms. Vaughn that she reach out to BCA to file her

4   complaints?

5       A.   I did.

6       Q.   And did you do that multiple times?

7       A.   I did.

8       Q.   Okay.  And that's -- okay.

9          Did Ms. Vaughn ever indicate to you the

10  reason why she did not want to file -- or send her

11  complaints to BCA?

12      A.   She did not.

13          MR. HOGUE:  Okay, that's everything I have

14  then.

15          Do you have anything else, Alex?

16          MR. TAYLOR:  I have a couple of follow-ups.

17              FURTHER EXAMINATION

18  BY MR. TAYLOR:

19      Q.   You recommended Ms. Vaughn submit her

20  complaints to BCA?

21      A.   Correct.

22      Q.   However the written policy we looked at

23  earlier said she should complain either to BCA or

24  file a written complaint with her superior, correct?

1      A.   That is what the administrative -- I'm

2  sorry, that is what the handbook indicates.

3      Q.   And that's the handbook Ms. Vaughn would

4  have received?

5      A.   Correct.

6      Q.   Okay.  Couple other questions.

7           We said -- I'm sorry.  You said that on the

8  17th, it would be more complicated to re -- strike

9  that.

10          It would be more complicated for an employee

11 to rescind her resignation on the last day because it

12 has to go up the chain?  Paraphrasing, but that's

13 what I understood.

14     A.   Yes.

15     Q.   Would Ms. Nash -- where would Ms. Nash be on

16 that chain?

17     A.   She would be the first.

18     Q.   Did it ever go up the chain?

19     A.   I assume so.  I don't know.

20     Q.   But Ms. Nash, in this e-mail -- and I can

21 pull it back up if you need to.  Ms. Nash said she

22 was not going to be rescinding it post phone call, so

23 that would have been after the very first step on the

24 chain, correct?

Page 72

1      A.   Correct.

2      Q.   Okay.  So it never needed to go up the

3   chain, so any of those future complications never

4   actually occurred?

5      A.   Correct.

6      Q.   Okay.  So there was no added complication in

7   this specific instance of the timeliness of it

8   because it never got past the first step?

9      A.   Correct.

10          MR. TAYLOR:  Okay, that's all I have.

11          MR. HOGUE:  I have nothing based on that.

12          Would you like me to discuss signature,

13   Alex?

14          MR. TAYLOR:  Yes.

15          MR. HOGUE:  Ms. Jackson, you have the

16   opportunity to review this transcript, and the

17   purpose of the review is to correct minor errors.  I

18   know we discussed acronyms a few times, so in case an

19   acronym was inadvertently misspoken or inadvertently

20   not taken down properly, an acronym could be

21   corrected, minor spelling errors, particularly with

22   names could be corrected.

23          What you wouldn't be able to do is correct

24   substantive -- make substantive changes; you wouldn't

Page 73

1    be able to change a "no" to a "yes" for example.

2            Would you like the opportunity to review the

3    transcript, or do you wish to waive signature?

4            THE WITNESS:  I will waive signature.

5            MR. HOGUE:  Thank you.

6            Signature's waived.  We can go off the

7    record.

8            (Deposition concluded at 12:45 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 74

1                    CERTIFICATE OF

2              CERTIFIED SHORTHAND REPORTER

3        I, Beth Radtke, a Certified Shorthand

4   Reporter of the State of Illinois, CSR License No.

5   084-004561, do hereby certify:

6        That previous to the commencement of the

7   examination of the aforesaid witness, the witness

8   was duly sworn by me to testify the whole truth

9   concerning the matters herein;

10       That the foregoing deposition transcript was

11  stenographically reported by me and was thereafter

12  reduced to typewriting under my personal direction

13  and constitutes a true and accurate record of the

14  testimony given and the proceedings had at the

15  aforesaid deposition;

16       That I am not a relative or employee or attorney

17  or counsel for any of the parties herein, nor am I

18  interested directly or indirectly in the outcome of

19  this action.

20       IN WITNESS WHEREOF, I do hereunto set my hand at

21  Chicago, Illinois, this 17th day of August, 2023.

22

23

                        Beth Radtke, RPR, CRR

24                      License No. 084-004561

**[01107 - aforesaid]**                                        Page 1

| **0** |
| **01107**   1:6 4:9 |
| **084-004561** |
| 1:24 74:5,24 |

| **1** |
| **1**   17:21 |
| **10:03**   65:24 |
| 66:2,5 |
| **10:30**   7:1 |
| **11:09**   1:18 |
| **11:12**   66:3 |
| **12-16-2021** |
| 58:16 |
| **12-17**   68:4 |
| **12:45**   73:8 |
| **134**   8:16 |
| **13th**   1:18 7:1 |
| **14**   55:18,22 |
| 57:17 68:3 |
| **15**   3:8 40:18 |
| **16th**   11:8 57:19 |
| 58:15 59:18 |
| **17th**   57:20,20 |
| 58:15 66:22 |
| 68:11,12 69:4 |
| 71:8 74:21 |
| **1982**   9:9 |
| **1986**   9:22 |
| **1995**   8:22 |
| **1996**   13:3 |
| **1:22**   1:6 |

| **2** |
| **2**   17:20,22 |
| 31:16 52:1,4 |

58:13,16 69:8
**200**   2:4
**2000**   10:18
13:1,4 14:15
28:4
**2002**   13:1
**2009**   17:20,21
17:22
**2013**   11:20
**2020**   11:8,20
15:6,7 33:4,5
**2021**   33:6,7
35:6 60:13
**2023**   1:19
74:21
**2100**   8:21
**2112**   74:23
**22**   3:9 4:9
**2500**   2:4

| **3** |
| **30**   1:12 4:10 |
| **31**   33:4 35:6 |
| **31419**   8:21 |

| **4** |
| **4**   3:4,4 |
| **4-1-09**   16:7 |
| **4-2-2009**   17:13 |

| **5** |
| **500**   2:8 |

| **6** |
| **6**   1:12 3:8 4:10 |
| **60148**   2:5 |
| **60420**   8:17 |

**60934**   8:22
**62701**   2:9
**67**   3:5

| **7** |
| **7**   23:5 25:8 |
| **7-16-21**   52:10 |
| **70**   3:5 |

| **9** |
| **9th**   32:7 |

| **a** |
| **a.m.**   1:18 |
| **aa**   15:22 17:19 |
| **ability**   5:4 48:3 |
| **able**   69:2 72:23 |
| 73:1 |
| **above**   65:15 |
| **accept**   59:4 |
| 64:11,14 |
| **accepted**   64:24 |
| **accepting** |
| 59:19 63:11 |
| 64:4 |
| **accurate**   74:13 |
| **accurately** |
| 29:15 |
| **acronym**   72:19 |
| 72:20 |
| **acronyms** |
| 72:18 |
| **action**   15:14,22 |
| 37:22 43:11,13 |
| 43:18 50:19,20 |
| 74:19 |

**activities**   39:5
**activity**   23:9,15
**actual**   65:6
**actually**   50:14
55:23 68:4
72:4
**added**   72:6
**address**   8:15,19
8:20 18:24
69:6
**administrative**
8:3 13:10
16:21,24 17:8
18:6,19,24
19:4,17,20
20:3 23:23
24:15 26:9
35:19 37:14
38:2 42:12
43:9 53:19
55:4 57:8
67:23 71:1
**administrator**
10:14 11:5,7
**admit**   41:6
**affairs**   18:22
22:11 23:16
24:5,21 30:4
**affect**   5:4
**affected**   52:21
**affirmative**
15:14,21
**aforesaid**   74:7
74:15

african  32:3
agency  65:10
  69:10
agree  20:1 24:9
  57:12
agreed  59:5
  64:15 68:24
ahead  5:6 67:5
alan  9:11
alex  70:15
  72:13
alexander  2:3
  4:8
aliases  9:2
allegation
  46:24 52:16
  54:18
allegations
  59:15,22 67:17
alleged  26:19
  27:1 45:23
  46:5,18 53:21
  64:2
allegedly  27:2,7
  51:1,1 52:24
  66:1
allow  43:24
  56:17
allowed  57:14
altercation
  29:23 30:13
  31:1
american  32:3
angela  28:12
  28:14 52:9

63:18
annually  10:1
answer  4:16,18
  4:22 5:4,21 6:7
  7:11,18 20:6
  25:8,10,18
  27:5 29:5,6,15
  39:12 40:7
  41:7,8,10
  42:19 44:2
  50:7 51:5 54:1
  54:2,4,7 69:22
answered
  25:19 39:9
answering  7:15
  8:6 23:1 25:22
anti  12:8 13:7
antidiscrimin...
  12:7 13:6
  16:23
antiharassment
  12:7 13:6 19:5
anybody  20:19
  42:16,17 50:11
apologize  6:15
  15:17 34:20
appear  37:10
appearances
  2:1
appeared  2:6
  2:10
applicable  1:15
applicant  22:5
  25:5

appreciate
  69:22
appropriate
  23:17 24:7,11
  25:11 38:9
approval  59:6
  65:10,11,12
approximately
  1:18
april  17:20,21
  17:22 32:7
area  45:10,16
  49:9 51:18
  61:21 62:3
aside  8:9
asked  34:10
  35:21 37:3,7
  37:11,15 38:22
  38:22,24 39:21
  40:1,2,5,6,10
  40:13 41:4
  45:19 47:21,22
  49:5 50:10
  51:8,10,17
  53:8,22
asking  4:15 8:5
  39:2 47:22
  49:3,19 53:11
assemble  43:7
assigned  45:6,8
  45:15,17 51:12
assignment
  44:12 51:8
assigns  40:24

assist  23:1 45:9
  45:14,19 51:18
assistance
  37:16
assistant  2:8
assisted  25:21
assume  6:7
  17:10 32:9
  66:6 71:19
ataylor  2:5
atlas  2:3 4:8
attached  66:4
attempt  58:11
attempted
  56:23 58:14
attempting
  65:6
attempts  56:13
attend  9:12
attendance
  62:24
attention  23:4
attest  29:20
attorney  2:7,8
  4:8 74:16
attorneys  6:11
august  52:5
  74:21
automatic  69:9
  69:17
automatically
  53:4
avenue  2:4
aware  27:9,14
  27:18 45:5

[aware - civil]

47:23,24 67:19

**b**

**b** 1:12 3:8 4:10
9:11 15:11
**back** 6:1 8:14
24:17 25:8
29:10 32:5
36:14 41:22
56:9 57:3,14
63:5 71:21
**bad** 60:9
**based** 5:16
20:17,19,20
29:22 30:1,24
43:23 44:1
46:5 48:17
51:9,9,11
59:24 72:11
**basically** 19:4
19:14 65:8,8
65:13
**basis** 28:23
51:7
**bca** 21:15,21
24:16 67:12,12
67:21 70:3,11
70:20,23
**bear** 25:14
34:19
**began** 11:13
**behalf** 2:6,10
7:15,16 13:10
30:8 62:17
**believe** 13:8,23
32:7,15 33:3

34:10 35:23
41:23 43:1,2
44:8,11 47:13
48:17 52:21
54:1 57:17
58:2 60:24
61:20 64:13
**believed** 57:18
59:15
**believes** 22:6
25:5
**believing** 57:23
**best** 14:6,16
15:1,24 24:24
27:6,10,19
28:2 32:2 34:6
40:7 43:12
44:9 48:2 54:7
57:13,24 58:1
65:17
**beth** 1:23 29:9
74:3,23
**better** 44:2
**bias** 53:3
**bit** 23:5
**black** 20:10
46:19 49:20
55:1
**blatantly** 49:4
**boss** 54:24
**bottom** 47:12
**break** 40:24
41:21
**breaks** 40:16
40:18,24 41:16

**briefly** 67:15
**bring** 7:21,24
15:10 24:11
36:6 49:14
54:18 55:8
**bringing** 59:14
**brings** 21:12
**brought** 8:1,2,3
8:3 17:2 32:5
34:14
**built** 16:24
**bureau** 18:22
22:11 23:16
24:4,5,20 30:3
37:24

**c**

**c** 3:9 22:18 25:9
**call** 15:11 46:8
63:16 65:23
66:1,6 71:22
**called** 1:13 30:5
32:16 44:13
45:2 58:23
59:9,11 68:11
69:7
**calls** 28:22
**candace** 1:4
26:24 28:9
32:24 35:1
41:19 42:6,18
45:7,14 46:12
47:9,15,17
48:6,11 49:12
56:5 58:10

**capacity** 12:20
**care** 45:7 51:13
**career** 41:11
**cares** 45:20
**case** 4:9 26:12
55:9 72:18
**casting** 19:12
**cc'd** 58:8
**center** 1:8,13
10:12 11:10,12
16:23 59:20
**central** 1:1
**certain** 16:6
17:11 39:4
68:9
**certificate** 74:1
**certified** 74:2,3
**certify** 74:5
**cetera** 19:6
**chain** 71:12,16
71:18,24 72:3
**chance** 63:4
**change** 73:1
**changed** 45:19
**changes** 72:24
**charge** 22:12
24:23 30:5
67:12
**charges** 25:1
30:8
**chart** 57:16
**chicago** 9:17
74:21
**civil** 1:16 18:22
22:11 23:16

24:5,21 30:3
**claim** 13:14
42:23
**claims** 12:3
26:4,10
**clarify** 5:20
10:19 12:6
37:17 61:13
**clarity** 13:17
**classes** 9:23
10:8
**clear** 17:13
46:13 54:9
**client** 24:6,22
24:24 46:24
**code** 1:16
**college** 9:12,14
9:15,21,24
10:3
**come** 35:14
57:2 61:22
65:14
**comes** 18:18
20:9 21:4
**coming** 60:3
**commencem...**
74:6
**commencing**
1:17
**comment** 47:18
47:23 48:3
49:17 50:5
52:17,19,22,24
53:6,11,14,20
53:21 54:8

60:4
**comments** 50:1
**commission**
13:19
**community**
9:15
**comp** 12:1
**company** 62:17
**company's**
6:11 24:2
62:16,18
**complain** 32:16
44:13 70:23
**complained**
23:9 39:13
41:2 42:5
44:16
**complaining**
38:16
**complains**
44:20
**complaint** 14:4
14:7 18:10,13
18:20,21 19:1
19:8,11,15,19
20:4,8,12,12,23
21:1,13,13,13
21:14,15 23:14
24:1,6,7,10,16
25:11 27:11,16
27:20 28:4,9
28:10,13 33:8
33:10 34:2,4,9
35:3 37:15,23
38:3,15,15

40:4,17 41:14
41:23 43:9
50:19 53:19
54:23 55:2,5
67:13,20 70:24
**complaints**
16:16 20:24
23:17,21 32:18
59:24 67:21
70:4,11,20
**complete** 36:19
37:8
**completed** 30:3
**completing**
18:21
**complicate**
68:7
**complicated**
71:8,10
**complication**
72:6
**complications**
72:3
**compounding**
56:3
**concede** 51:23
**concern** 35:1
47:9 62:23
**concerning**
74:9
**conclude** 43:5
**concluded** 73:8
**conduct** 28:8
**conducted** 1:16

**conference**
59:9,11
**confused** 69:18
**connection**
27:12,16,21
**consequence**
64:1
**considered**
62:12
**consistently**
60:18
**constitute**
18:10
**constitutes**
74:13
**consultation**
22:12
**consumer** 2:3
4:8
**contact** 22:11
24:20 66:24
**contacted**
58:19
**contained** 30:2
**contains** 20:17
**context** 36:24
51:4
**continues**
36:20
**contract** 69:19
**conversation**
48:4
**convey** 47:19
**convicted**
13:24

**coordinator**
  11:3
**copied** 63:21
**copies** 17:1
**copy** 14:21,23
  18:20,20
**corporate** 6:22
**correct** 5:24
  7:12,17 9:5
  10:21 12:9
  14:19 22:13,15
  33:23,24 36:8
  36:9,10 37:19
  38:13 39:11,23
  42:3,7,11
  56:14 58:12,18
  59:13 60:19
  62:6 64:8,21
  65:2,16 67:22
  68:4,5 70:21
  70:24 71:5,24
  72:1,5,9,17,23
**corrected** 72:21
  72:22
**correctly** 61:2
**counsel** 3:11
  29:1 74:17
**couple** 4:12
  70:16 71:6
**course** 27:24
  41:9,11 42:8
**courses** 9:23
  10:2
**court** 1:1 4:14
  13:10

**create** 68:19
**crime** 13:24
**criminal** 10:6
**crr** 1:23 74:23
**csr** 74:4
**current** 10:10
  11:21,22 12:10
  15:9 16:1,4,8,9
  16:9,12,13
**custodial** 31:21
  31:24
**cv** 1:6 4:9

### d

**date** 16:7 35:6
  61:24
**day** 1:18 44:12
  45:5,8,12,14
  46:13,15 51:11
  51:12 55:18,22
  57:17 68:3,7
  68:12,15,19
  69:14 71:11
  74:21
**days** 46:9
**dealt** 41:12
**december**
  66:22
**decided** 57:22
**decision** 56:16
  56:20 59:5,9
  60:11 63:8
  64:10,18,19
**defendant** 1:9
  2:10 4:10
  13:22 23:8

**defendant's** 3:9
  22:20 23:16
  24:4
**deferred** 12:1
  60:10
**defining** 24:12
**definite** 45:12
**degree** 10:5
**deny** 28:17
  29:11,18
**dep** 29:3
**department**
  4:10 10:11
  31:8,12,19
**deposition** 1:12
  3:8 4:10 5:2,9
  5:14 6:12,22
  7:22 8:10 13:9
  73:8 74:10,15
**describe** 23:7
**designated**
  6:22
**designates**
  31:11 69:20
**desire** 58:20
**despite** 62:3
**detail** 23:7
**detailed** 19:7
**determination**
  38:8
**determine**
  19:10,17 34:12
  35:18 38:6
  43:10 45:2
  50:9

**determined**
  36:18
**determines**
  43:23
**developmental**
  1:8,12
**dhs** 10:1 14:12
  16:8,20 22:11
  24:20 37:24
**dietary** 31:7,11
  31:24
**difference**
  21:17
**different** 22:16
  51:17
**differently** 21:9
  41:7
**difficulties**
  68:19
**direct** 23:4
**direction** 74:12
**directive** 16:21
  16:24 17:8
  18:19 19:4,17
  19:20 20:3
  23:23 24:16
  26:9 35:19
  37:14 38:2
  42:12 43:9
  53:19 55:5
  57:8 67:23
**directives** 8:3
  18:7,24
**directly** 74:18

[director - employment]                                              Page 6

**director** 10:15
10:20 11:5,7
11:16,22 12:13
27:23 33:2
36:1 37:18
38:5,5 43:10
43:17,19,20,21
43:22 44:14,16
55:6,9,14,15
57:11,22 58:20
59:3,8 66:21
68:24
**director's**
60:11
**directors** 12:16
**disagreed** 53:3
63:22
**discipline**
26:19 27:1,5
30:15,19,21
38:7 44:1
50:21,23 62:22
64:3
**disciplined**
12:19 30:12
**discover** 20:21
**discriminated**
20:9,13 21:6
35:9 37:6 41:5
41:6
**discriminating**
27:2,3,8 42:6
42:24
**discrimination**
3:8 9:24 12:4

13:14 14:8
15:22 16:5,17
16:22 18:8,11
18:14 19:6,22
20:8,23 22:7
23:9,15 24:11
25:6 26:5,11
26:14,23 27:12
27:20 28:5
32:19 33:9,15
34:2 35:4,13
37:11 41:14
42:8 44:20
45:23 46:6
54:15 67:17
**discriminatory**
51:1
**discuss** 72:12
**discussed** 37:13
63:19 72:18
**discussing**
64:10,17,22
**discussion**
51:23 58:22
63:2,3,12,15,17
67:11
**dispute** 66:15
**disqualify** 53:5
**distinction**
20:22
**distressed** 21:4
**district** 1:1,1
**division** 1:2
65:11 69:1

**document** 3:9
8:4 17:8 22:19
32:21
**documentation**
29:20,22
**documents**
5:18 6:2 7:21
8:9 23:13
**docusign** 14:24
**doing** 6:15
21:11 25:15
31:24 39:1
40:14,15
**doubt** 42:22
48:23 52:16
**dressed** 45:18
51:13
**duly** 4:1,3 74:8
**duties** 11:21,23
12:2 34:12
35:22 39:22
52:14,15,21
53:4,8,13
**dwight** 8:16

**e**

**e** 58:6,8 59:24
63:9,21 64:6
64:23 65:4
66:2,8 71:20
**earlier** 70:23
**easier** 4:15,21
**east** 8:21
**eeo** 15:22 17:19
**eeoc** 13:13,18

**effective** 57:20
**either** 5:3 13:22
22:6,10 24:4
43:13 44:17
50:22 67:1
70:23
**electronic**
14:21,23
**elevated** 35:13
**emington** 8:21
**employed**
14:11 32:24
**employee** 14:10
14:12 17:3,6,7
17:16,23 18:15
18:16,17,17
20:15 21:4,12
22:5 23:24
25:5 26:6 27:3
27:7,8,11,15
45:6 50:4
51:17 54:23
56:23 57:2
62:7 71:10
74:16
**employees** 7:11
12:3 14:12,17
16:16 17:1,3
28:16 38:17
39:5 41:24
48:10,13,18
**employer** 5:23
10:10 16:15
**employment**
10:23 11:13

13:19 15:14,21
27:13,17,21
**ensure**  17:9
**entire**  32:23
42:8 63:16
**entity**  38:9 59:4
59:9 67:16
**environment**
19:6 55:21
56:1
**equal**  13:18
15:14,21
**errors**  72:17,21
**et**  19:6
**evaluation**
60:23 61:1,6,8
61:18 62:10
**evaluations**
60:21
**exact**  19:23
**exactly**  8:12
46:13 49:6
**examination**
1:14 3:4,5,5
4:5 67:9 70:17
74:7
**examined**  4:3
**example**  20:8
39:13 41:20
73:1
**exceeded**  62:4
62:8,9
**exhibit**  3:8,8,9
6:14 15:11
22:17,18 25:9

34:16,18 58:5
66:9
**exhibits**  3:7,11
8:6 25:13
**expectations**
60:18 62:5,8,8
62:11
**experience**
56:22
**explain**  18:21
67:15 68:22
**explained**  59:2
**explicitly**  25:18
**extent**  16:19

**f**

**face**  15:18
**facility**  12:13
12:16 36:1
38:5,5 39:19
43:10,21,22
45:15 55:6,9
55:14,15 57:11
57:12,22 59:3
59:8 60:10
66:21 68:24
**fact**  48:17
50:13 53:5
**fair**  6:8 12:2
24:8 68:2
**familiar**  32:10
32:13 33:17
44:6
**far**  30:10 34:22
**favoritism**
23:10

**fear**  24:23
**february**  11:20
**federal**  1:15
29:3
**feel**  29:15 38:24
39:9
**feeling**  35:8
45:3
**feels**  44:21
**fell**  37:8
**felt**  37:5
**file**  8:2 22:12
23:17,21 24:5
24:7,22 25:1
25:10,12 70:3
70:10,24
**filed**  23:14 30:8
**filing**  19:7 24:1
**filling**  21:7
**final**  43:5 61:3
61:6,8 65:18
65:19 66:12
**finalized**  64:11
64:22,23
**finally**  59:17
64:4,13
**first**  3:10 4:3
4:14 22:20
35:8 36:15
71:17,23 72:8
**fit**  59:20 60:1,6
62:12,19,20
64:16
**fix**  34:17

**flipping**  24:17
**floor**  42:18
**folders**  8:4
**follow**  16:20
70:16
**follows**  4:4
29:11
**forced**  38:16,17
**foregoing**
74:10
**form**  14:20,22
18:20 21:15
24:16 29:1
34:22,24 37:15
38:3 43:9
53:19 55:5
**formal**  20:23
21:1,14,18,21
27:15 50:19
**forward**  55:2
55:23
**found**  45:11
**foundation**
25:17 28:23
**four**  61:10
**fox**  1:8,12 5:19
5:22 7:15
10:12 11:9,12
12:8,17 13:2
13:11 14:11
16:5,13,15,20
16:22 17:1
26:3 27:11,13
27:17,21 28:17
29:11,23 32:24

[fox - hire]

43:19 56:22
59:19 60:2,6
63:5 64:15
**fox's** 24:5
**front** 20:5
**fruitless** 58:21
63:3,12,13
65:22 66:1
**frustrated** 51:5
**frustrating**
50:8
**frustration**
53:6
**full** 4:21 43:16
**fully** 23:7
**further** 3:5
4:13 36:20
37:22 50:6
51:2,6,21
70:17
**future** 72:3

**g**

**gather** 38:8
**gathering**
21:12
**general** 2:7,8
**give** 4:21 15:11
17:1 18:19,20
22:17 36:6
47:4,5 52:15
54:4 56:8
**given** 54:6
74:14
**gives** 55:17

**giving** 23:23
**glossed** 53:14
53:20
**go** 5:6 9:10,14
37:23 40:16
43:19 55:23
57:10 59:5
67:5,13 68:3
69:2 71:12,18
72:2 73:6
**goes** 38:4
**going** 4:15,23
5:6,22 6:7,14
7:14 8:5 15:10
15:11 17:11
18:18 19:4,15
20:4,18,20
22:2,16 23:5
25:8,13 27:5
28:19,24 34:17
34:18 35:16,16
35:17,18,24
36:1 38:6
41:21 42:1
43:22 44:4
47:4,17 50:7,8
56:7 58:4 59:3
64:11,14 65:3
65:8 66:6,9
68:24 71:22
**golly** 13:1
**good** 4:7 8:14
59:20 60:1,6
62:12,19,20
64:16

**graduate** 9:6,8
9:21
**group** 2:3 12:1
45:15
**guess** 21:10,20
25:16 39:10
68:15
**guidance** 36:2
55:6,10
**guys** 34:18

**h**

**habilitation**
11:3
**hand** 74:20
**handbook**
14:11,13 15:2
16:8 17:3,6,7
17:16,23 18:1
18:2 67:24
71:2,3
**handed** 50:22
**handled** 26:4
26:14
**handling** 16:16
**happen** 53:17
**happened**
28:18 29:12
31:9 44:9 46:2
46:13,15 53:15
53:16 54:10,14
56:2,4
**harassed** 21:7
35:9 64:2
**harassment**
9:24 12:4

13:15 14:8
15:22 16:22
19:21 22:7
23:15 26:5,15
27:12 28:6
37:10 64:8
67:18
**hard** 4:19
36:11
**harken** 41:22
**head** 4:19,20
**health** 11:2
31:5 52:2,4
69:7,12
**hear** 50:13
**heard** 34:4
46:14,23
**heights** 9:11
**hereunto** 74:20
**hertz** 32:11,20
33:3 34:9
35:10 36:4
39:4 40:23,23
41:1,16,18,18
42:1,10 43:13
**hesitate** 20:5
**high** 9:6,8,10
**highest** 12:17
**highland** 2:4
**highlighted**
47:13
**hills** 9:16
**hire** 14:15 17:4
17:22 18:4

| history 62:22 | **i** | indicates 71:2 | insurance 12:1 |
|---|---|---|---|
| hmm 21:2 | identified 7:11 | indirectly | intent 57:18 |
| hogue 2:8 3:5 | identifies 19:3 | 74:18 | interaction |
| 25:15,23 28:19 | ilga.gov 2:9 | individual 41:1 | 32:17 60:8 |
| 28:21 36:9 | illicit 5:3 | 41:5,7 45:7,17 | intercompany |
| 67:6,10 70:13 | illinois 1:1 2:5 | individuals | 61:15 |
| 72:11,15 73:5 | 2:7,9 4:10 8:16 | 39:14 45:9,20 | interested |
| home 8:20 | 8:22 9:11,17 | 46:5 51:18 | 74:18 |
| 44:14 | 10:11,17,23 | influence 60:1 | interfering |
| homes 8:23 | 11:13 12:20 | inform 37:22 | 20:2 |
| honest 20:3 | 30:4,9 74:4,21 | informal 12:5 | internal 22:12 |
| honestly 15:8 | illustrate 19:5 | 21:1,2,10,11,16 | 24:23 25:1,12 |
| 16:6 41:8 | immediately | 21:18,23 27:15 | 67:12,20 |
| 61:24 66:3 | 22:10 24:20 | informally | internally |
| honor 57:23 | improve 61:16 | 19:15 20:18 | 23:18 |
| hope 41:8,9 | improvement | information | interrogatories |
| hostile 19:6 | 61:22 62:4 | 5:15 17:10 | 3:10 22:21 |
| hour 1:17 | inadvertently | 19:16 20:17,20 | interrogatory |
| house 68:10 | 72:19,19 | 21:12 30:2 | 23:5 24:21 |
| hr 10:15,19 | incident 5:19 | 38:4,9 43:23 | 25:8,18 |
| 11:7,16,22 | 6:3 8:4 32:10 | 55:6,11,13 | interview 41:15 |
| 18:18 20:9 | 32:14 33:3 | 57:16 66:21 | 42:16 48:9 |
| 21:8,19 27:23 | 35:12 44:5,5,6 | informed 46:17 | 49:7 |
| 28:3 32:23 | 50:9 51:5 52:8 | 66:14 | interviewed |
| 33:2 37:18,22 | 52:9 61:22 | initial 19:10 | 42:1,4 |
| 43:17 50:24 | incidents 5:16 | 60:24 | interviews |
| 58:19 60:6,7 | 35:17 52:12 | initiate 43:17 | 45:24 46:4 |
| 67:1 | 60:9 63:22 | instance 44:11 | investigate |
| huh 4:21 | 64:7,17 | 72:7 | 19:16 20:10,11 |
| human 4:11 | include 12:3 | instructed | 28:13 48:2 |
| 10:11,14 11:3 | including 26:24 | 19:14 31:20 | 50:16 56:3 |
| 11:5,17,18 | incorrect 51:24 | 38:11 | investigated |
| 14:4 19:2,10 | index 3:1 | instruction | 26:10 30:5 |
| 61:4,5,12,13,15 | indicate 70:9 | 54:14 | 35:15 38:18 |
| | | | 39:3,24 40:19 |

44:24 63:23
**investigates**
67:17
**investigating**
12:3 45:23
55:2
**investigation**
19:2,11 20:14
21:11,14,16,18
21:18,21 26:14
26:18,23 27:4
28:8 34:7 36:4
42:9 43:4,6
46:8 49:2,12
49:18,24 50:6
51:3,21 66:12
**investigations**
12:5 26:4 30:7
63:17
**investigator**
21:24
**investigators**
21:23
**involved** 13:13
26:17,22 28:16
**issue** 24:13
27:5 34:14
45:12
**issues** 20:16,17
34:15 35:20
62:23

**j**

**j** 2:3
**jackson** 1:13
3:4 4:2,7 12:15

29:5 58:8 67:7
72:15
**job** 4:14 10:13
10:22 11:1,15
12:2,20 34:12
37:12 39:22
50:11 51:11
53:8,13,22
**jones** 58:7
**joshlyn** 33:16
33:17,19 34:3
34:3 44:17,18
46:15,23 47:19
**july** 11:8,20
60:13
**june** 1:18 7:1
**justice** 10:6

**k**

**keep** 29:1
**kimberly** 58:7
**kind** 19:12
55:24
**knockum** 12:15
**know** 6:6,16
9:20 13:18
16:2 17:18
23:6 24:9
27:24 28:1,4
29:2,5 31:22
32:13 34:13
42:21 48:15,20
50:21 52:18
58:22 62:1,15
63:1,6,24
64:19 66:20,23

67:2 68:1,16
71:19 72:18
**knowing** 39:21
**knowledge**
14:6,17 15:1
15:24 24:24
27:6,10,19
28:3 32:2
43:12,14 44:9
57:13 64:3
65:18

**l**

**labor** 11:24
**late** 7:4 68:6
**law** 2:3 4:9
**lawsuit** 13:21
**lawyer** 5:11,12
**lead** 37:1 40:22
40:23 41:17
48:16
**left** 34:22 57:2
**length** 63:20
**level** 12:17 19:5
19:18,21 51:16
**liaison** 12:1
**license** 1:24
74:4,24
**lift** 39:14,15,19
39:20 40:1,3,5
40:10,11 41:22
**lifting** 41:24
**likely** 69:3
**listed** 19:18
**little** 7:3 18:9
50:8

**lived** 8:18
**living** 45:10,16
49:9 51:18
**located** 11:9
**location** 8:18
31:12
**lombard** 2:5
**long** 8:18 11:6
24:3 69:10
**longer** 36:8
**look** 15:9 17:9
19:23 35:16
36:5 45:24
47:3 50:17,24
51:6 54:8
57:15 61:9,24
62:23
**looked** 50:2
70:22
**looking** 16:10
17:15 22:8
38:14 51:4
62:10
**looks** 38:15
58:7,13 59:18
59:20 65:5,7
**lot** 59:21 60:8

**m**

**made** 12:3 15:4
27:11,15 32:19
33:9 46:24
47:18,23 48:1
48:3 49:3
50:14 52:17,18
52:22,24 54:23

56:20 62:14
63:20 64:11,18
**mail**  58:6,8
59:24 63:9,21
64:6,23 65:4
66:2,8 68:10
71:20
**main**  8:16
**make**  4:14 6:15
7:6 12:5 17:12
18:10,13 19:24
20:22 22:3
24:18 34:23
38:8 39:11
43:15 50:13
59:4 64:19
72:24
**making**  39:5
51:1 56:16
59:9,23
**manager**  21:5
60:6
**managers**  25:2
**mandate**  12:22
**mandated**
15:13
**manner**  69:3
**manual**  14:10
15:2
**mark**  61:11
**married**  9:3,4
**matter**  35:20
36:18
**matters**  74:9

**mean**  4:17
12:20 22:22
26:24 46:7
50:20 53:13
55:13,14 56:2
66:16
**meant**  47:19
**measured**  26:8
**mechanism**
23:24
**med**  52:1
**meet**  61:2
69:20
**memo**  21:8
24:13 25:12
33:12,13,15
34:11,11 35:3
35:5 36:5,7,14
44:19 45:1
47:3,5,6,7,10
48:5,19 55:17
56:7 57:19
59:1 66:4,5
**memory**  8:7
**memos**  25:1
26:7 28:15
30:1 65:5
**mental**  11:2
31:5 52:2,4
69:7,12
**mentioned**
38:10
**merit**  19:1
20:14 34:13

**merits**  19:11,12
21:13
**message**  34:22
34:24
**met**  37:13,17
37:21 51:17
60:18 61:4,5
62:4,6,8,9,11
**midnight**  45:18
**miles**  33:17,19
44:18 46:15,23
**mine**  63:13
**minor**  14:1
72:17,21
**minus**  69:14
**minute**  40:18
47:4
**misquote**  20:2
**misspoken**
72:19
**misstate**  54:12
**misunderstand**
53:13
**misunderstan...**
52:15,21 54:17
**misunderstood**
52:14
**moment**  69:24
**month**  61:11
**months**  14:24
61:1,10
**moraine**  9:15
9:18,19,20
**morning**  4:7

**mouth**  54:12
**move**  26:2 44:4
55:16
**moving**  55:2
**multiple**  70:6
**mumble**  48:6

**n**

**name**  4:7 12:14
**named**  20:19
**names**  9:1,3,4
72:22
**nash**  56:21
58:6 59:11,17
60:3 62:14,19
63:1 65:1,5
71:15,15,20,21
**necessarily**
23:20
**necessary**
31:13
**need**  15:15
36:22 44:21
51:20 60:4
62:22,23 71:21
**needed**  25:4
37:15 51:24
61:15 72:2
**needs**  61:21
62:4
**neither**  42:14
49:6
**never**  23:14
72:2,3,8
**new**  17:22 18:4

| | | | |
|---|---|---|---|
| **nod** 4:19 | **office** 2:7 11:9 | 49:17,23 50:18 | **outlined** 17:6 |
| **north** 8:21 | 11:12 32:16 | 50:24 51:15,22 | **outside** 9:24 |
| **note** 6:5 | 33:22 59:6 | 52:3,7,11,14 | 26:13 39:22 |
| **noted** 29:3 | **oh** 13:1 33:7 | 53:10,23 54:2 | **overnight** |
| **notes** 70:1 | 55:12 70:2 | 54:15,21,23 | 57:21 |
| **notice** 1:14 3:8 | **oig** 21:22 | 55:12,16,19 | **own** 7:16 8:9 |
| 6:19,22 7:4,8 | **okay** 5:6,18 6:1 | 56:7,7,9,11,16 | 8:23 |
| 8:1 55:18,22 | 6:10,14,17,21 | 56:20,22 57:5 | |
| 56:13,14,18 | 7:3,10,14,24 | 57:13 58:6 | **p** |
| 57:9,17 68:3,6 | 8:5,12,14,20,23 | 59:11 60:5,12 | **p.m.** 73:8 |
| **notified** 32:15 | 9:4,8 10:2 11:9 | 61:5,12,19,21 | **packet** 30:3 |
| **nuh** 4:21 | 11:15 12:6 | 62:2,7,11,16 | **page** 3:3 |
| **number** 4:9 | 13:17 14:6,10 | 63:2,7,9,21 | **palos** 9:11,16 |
| **nurse** 31:16 | 15:4,6,10,13,17 | 64:17 65:17,22 | **paragraph** |
| 48:16 | 15:24 16:10,19 | 66:9 67:3,6,23 | 22:3,8 58:13 |
| **nursing** 31:18 | 17:12 19:9 | 68:13 69:16 | 58:16 |
| | 20:7 21:5,16 | 70:8,8,13 71:6 | **paraphrase** |
| **o** | 22:10,16 24:14 | 72:2,6,10 | 23:5 65:8 |
| **object** 22:7 | 25:7,24 26:2 | **once** 57:9 59:2 | **paraphrased** |
| 25:6,16 28:21 | 26:13,22,23 | 65:9 | 64:9 |
| 28:22 | 28:8,17 29:22 | **openly** 49:4 | **paraphrasing** |
| **objection** 25:20 | 30:12,23 31:14 | **opportunity** | 64:23 71:12 |
| 29:3,6 | 31:20 32:5,18 | 13:19 15:14,21 | **pardon** 61:7 |
| **objections** 29:1 | 33:2,19,22 | 65:20 72:16 | **parents** 9:19 |
| 29:2 | 34:1,6,16,20 | 73:2 | **part** 28:22 |
| **observe** 29:19 | 36:3,11,14 | **opposing** 29:1 | 32:23 38:7 |
| **observes** 22:6 | 37:21 38:10,14 | **order** 57:10 | 43:7 49:11 |
| **obviously** 7:3 | 38:20 39:10,21 | **original** 57:23 | 56:16 |
| 29:7 | 40:12,16,21 | **originally** | **particularly** |
| **occur** 38:6 | 41:3,11 42:17 | 47:21 | 72:21 |
| **occurred** 35:17 | 42:20 43:4 | **outcome** 30:6 | **parties** 74:17 |
| 49:6,10 66:6 | 44:4,24 46:10 | 36:3,16 43:5 | **party** 13:21 |
| 72:4 | 46:14,17 47:2 | 43:24 66:11,14 | **pass** 67:5 |
| **occurs** 69:17 | 47:7,15 48:2,7 | 66:16 74:18 | **past** 72:8 |
| **october** 10:18 | 48:9,21 49:11 | | **patients** 61:14 |

[paula - promoted]                                    Page 13

**paula**  32:11
  33:3 35:9 36:4
  40:23,23 41:1
  41:16,18,18
  42:1,18,23
  52:9 56:4,5
  61:23 63:18
  64:8
**peers**  61:20
  64:1
**people**  49:9,20
  55:1
**perform**  35:21
**performance**
  60:16
**person**  20:1
  42:4,5,5 43:22
  45:5,6,8,13,16
  48:17 51:11
**personal**  8:9
  74:12
**personality**
  34:14 35:20
**personally**  14:3
  18:15 26:4
**personnel**  8:2
**perspective**
  51:8
**phone**  65:23
  66:1,6 71:22
**physical**  14:20
  14:22
**picture**  46:13
  63:1

**place**  23:17
  25:11 67:13
**places**  23:20
**plaintiff**  1:4,14
  2:6 13:22
  23:14 32:5
**plaintiff's**  3:10
  6:21 22:20
**play**  51:24
**played**  62:24
**please**  15:16
  17:17 21:3
  25:14 26:21
  69:24
**point**  16:12
  17:20 38:6
  52:1
**police**  21:22
  30:4,10
**policies**  3:8
  5:17,19 6:2
  15:13 16:1,4
  16:11,15,19
  17:2,5 18:7
  20:22 24:3,10
**policy**  14:17
  16:23 17:2,14
  17:14,19,24
  18:3,4,23 19:9
  24:17 25:4
  57:6 70:22
**popped**  65:23
**position**  11:22
  31:4,14 32:6
  35:22 37:2,18

  54:9,11,13,17
  62:16,18 63:24
  69:11
**possibly**  34:5
**post**  52:12
  71:22
**postgraduate**
  10:8
**potential**  49:13
  49:15
**potentially**
  65:15
**power**  43:17
**preliminary**
  4:12 6:5
**prepare**  5:8,13
  6:11
**prepared**  7:18
**prescription**
  5:3
**present**  8:15,20
  36:1
**presented**
  43:23
**preserve**  25:20
**preserved**  29:6
**prevent**  23:8
**previous**  6:1
  9:3 11:16
  25:16 26:18
  49:8 52:11
  74:6
**previously**
  16:11 26:12

**prior**  13:2 31:4
  31:15 65:22,24
**probably**  48:16
**probationary**
  61:3
**problem**  4:23
**procedure**  1:16
  19:9 23:19
  57:6
**procedures**
  24:3
**proceed**  20:20
  55:7,10
**proceeded**
  36:16
**proceeding**
  13:10,14
**proceedings**
  74:14
**process**  18:21
  19:13 38:1,7
  55:1 56:17
  59:2 67:20
  68:7,23 69:9
  69:17
**processed**  69:3
**processing**
  68:20
**produced**
  23:13
**proficient**  8:13
**promoted**  52:5
  52:7,8,10,11
  60:12 62:3,12
  69:13,14,21

**promotion**
60:22 69:7,16
69:19
**proof**  53:16,17
**proper**  67:13
**properly**  72:20
**provide**  20:16
38:2,9 43:8,10
55:4,5 66:21
**provided**  18:17
20:20 21:15
24:15 30:1
37:14 44:2
45:7,21 51:13
53:18
**provides**  19:7
**providing**
23:22
**psychology**
10:6
**public**  10:14
11:4,6
**pull**  15:12
22:16 34:18
47:4 58:4
71:21
**pulling**  47:5
**punished**  27:2
27:7
**punishment**
31:9
**purpose**  51:22
52:13 72:17
**purposes**  13:17

**pursuant**  1:14
1:15
**purview**  38:12
39:6,16
**put**  8:8 37:3
54:11 57:9,17
57:21
**puts**  56:12
**putting**  55:21

**q**

**qualifications**
69:20
**question**  5:21
6:6,7 17:17
21:3 23:11
25:17 29:8,9
32:8 39:8 44:3
45:22 47:21
49:8 50:7
52:13 53:24
66:13
**questions**  4:16
5:4 6:1 7:12,15
7:18 8:5 23:2
25:22 67:4,6
71:6

**r**

**race**  16:5 20:13
21:6,7 28:5
51:9 53:9
**racial**  18:8,11
18:13 20:8
26:5,10,23
32:19 33:8

41:12,13 44:20
45:23 46:5
52:17,18 53:3
54:15
**racially**  27:7
41:4,6 42:6
**racist**  41:2 49:4
49:17,24 50:5
53:6 55:21
56:1
**radtke**  1:23
74:3,23
**rapport**  60:9
**ray**  12:15
**reach**  70:3
**read**  23:6 24:3
29:9,11 36:20
44:19
**reading**  22:13
36:23
**really**  20:24
45:22 60:7
**reason**  42:15
42:22 43:1,2
45:3 48:23
51:6 52:16
67:19 70:10
**reasonable**
19:24
**reassigned**
30:24 31:2,6,7
31:15,17,18,21
31:23
**reassignment**
31:4,12

**recall**  10:4 15:5
15:8 47:1 61:1
63:19
**receive**  12:6,7
14:10,12,14,17
14:20,21,22,23
17:3 18:4
30:19 68:16
**received**  12:21
15:2 17:23
18:2 29:21
30:16 45:1
48:4 57:20
60:21 64:3
68:4,9 71:4
**receiving**  20:4
68:14,15,18
**recent**  17:14,19
**recision**  64:24
65:18
**recognize**  7:8
22:19
**recollection**
34:6
**recommended**
70:19
**record**  25:16
25:20 29:11
73:7 74:13
**reduced**  74:12
**refer**  16:7
21:23
**reference**  19:24
**referenced**  8:4

**referencing**
  47:10
**referring**  13:18
**reflect**  17:10
**refusal**  12:22
**refused**  66:23
**refusing**  35:23
**regarding**  12:4
  16:4,16 41:15
  46:15 50:19
  58:20 63:24
  65:5
**regardless**
  23:24
**regards**  16:21
  58:10
**registered**
  31:16
**regular**  32:6
**related**  13:14
  63:15,17
**relation**  64:7
**relations**  11:24
  61:4,5,13,14,15
**relative**  74:16
**remind**  28:24
**rephrase**  17:17
  21:3 26:21
  29:8
**reply**  34:22,24
**report**  24:4
**reported**  1:23
  58:16 74:11
**reporter**  74:2,4

**reporter's**  4:14
**reports**  5:19
  6:3
**representative**
  6:23 11:4,17
  11:19
**reprimand**
  30:16
**request**  57:23
  68:15,18,20
**requested**
  34:12 36:18
  45:9
**requesting**  37:1
**require**  41:19
  65:11
**required**  39:20
  40:9,9,11
  41:20 45:14
  69:13
**rescind**  56:13
  56:18,24 58:11
  58:15,20,24
  64:18 65:1,6
  65:14 68:15,18
  68:20 71:11
**rescinded**
  57:10 59:19
  63:11 64:5,12
  64:14 65:9,20
  66:23
**rescinding**  57:5
  57:7 58:17
  68:8,23 71:22

**residential**
  33:20 43:20
  44:13,15
**resign**  44:21
  57:18
**resignation**
  56:24 57:6,7
  57:19 58:11,15
  58:17,21,24
  59:19 63:11
  64:5,12,15,19
  65:1,6,7,9,19
  66:23 68:18
  71:11
**resigned**  56:23
**resigns**  55:20
**resources**  11:3
  11:5,17,18
  14:4 19:2,10
**respond**  29:23
**response**  19:1
**responses**  3:9
  22:20
**responsibility**
  66:20
**result**  49:23
**resulted**  26:19
  26:24
**retained**  3:11
**retaliation**  12:4
  12:8 13:7,15
  14:8 23:8
  24:23 26:5,15
  27:16,20 28:6

**review**  18:18
  19:16,16 20:1
  20:4 32:21
  35:18 38:1
  50:9 61:17
  62:22 69:24
  72:16,17 73:2
**reviewed**  5:15
  5:18 6:2 26:7
  33:9 34:11
  37:7 57:22
  60:24
**reviews**  60:16
**revision**  15:4
**revisions**  15:2
**rhonda**  12:15
**right**  4:18 17:5
  17:20,20 22:8
  46:3 52:1 53:1
  54:9 55:16
  56:12 60:13
  63:16 68:6,17
**rise**  19:21
  35:21
**rises**  19:5,18
  35:19
**road**  8:21
**robert**  2:8
**robert.hogue**
  2:9
**rochelle**  1:13
  3:4 4:2 58:7
**role**  51:24
**rpr**  1:23 74:23

[rss - staff]                                                      Page 16

**rss** 33:22 45:2
  46:11
**rug** 59:15
  63:23
**rules** 1:15
**running** 7:3

**s**

**saying** 28:2
  39:3 40:8
  46:22,23 50:1
  53:2,7,12,20
  55:24 65:13
**says** 20:9 22:5
  22:10 23:14
  24:3,20 34:21
  34:24,24 35:1
  40:4 57:9
  58:19,21
**scanned** 66:5
**schedule** 40:24
**school** 9:6,8,10
**scope** 35:22
  37:2,9 50:11
  51:10 53:8
**screen** 8:2,13
  17:15 36:8,14
**scroll** 7:6 16:2
  36:22 47:12
**second** 2:8
  15:11 16:2
  22:17 36:6
  47:5 56:8
**secretary** 57:11
  69:2

**secretary's**
  59:6 65:10
**section** 47:13
  61:17
**see** 6:16,16,18
  6:18,19,21
  15:9,13,18,20
  16:6 22:3,8,22
  23:11 26:2
  34:21 35:6
  36:19 47:7,15
  56:1 62:22,24
**seek** 28:15
**seen** 7:4,7
  16:11 22:23
  33:13 41:14
  60:15
**semiautomatic**
  69:19
**send** 70:10
**sending** 18:22
**sent** 5:15 30:3
  66:7
**sentence** 35:8
  58:16
**separate** 17:7
**series** 4:15
**service** 10:14
  11:4,6
**services** 4:11
  10:12 33:20
  37:24 43:20
  44:14,15
**set** 3:10 22:20
  74:20

**shake** 4:20
**share** 8:13
**sharing** 36:8
**shepard** 9:11
**shorthand** 74:2
  74:3
**shortly** 8:14
**show** 6:14 8:6
**sibyl** 56:21
  58:6 59:11
  62:14,19 66:7
**sibyl's** 66:3
**sick** 44:14
**side** 17:9,9
  19:12
**sideways** 34:17
  34:20 36:15
**signature** 72:12
  73:3,4 74:23
**signature's**
  73:6
**situation** 36:24
**six** 14:24 61:11
**smith** 28:12,14
  28:18 29:13,24
  30:9,13,19
  31:1,2,10,23
  32:2,8 63:18
**smith's** 31:14
**solely** 56:2
**somebody**
  19:14
**sorry** 5:1,20
  8:19 11:15
  15:17 34:22

  36:11 37:24
  38:12 43:15,21
  46:21 51:5
  52:4 55:12
  56:5 65:18,23
  66:12,19 68:16
  69:21 70:2
  71:2,7
**sort** 5:2 10:7
  13:6 27:11
  43:17 50:18,21
**south** 2:4,8
**speak** 6:10
  27:24 31:22
  32:1 46:14
**speaking** 29:2
  42:9,9 59:21
**specific** 17:24
  18:9 39:10
  40:17 54:3
  72:7
**specifically**
  39:2,14,15
  46:7 49:24
  53:10 64:6
**speculation**
  28:22
**spelling** 72:21
**spells** 19:3
**spoke** 40:22
  46:11,11,12
**springfield** 2:9
**staff** 36:17 40:9
  40:10 45:13,16
  45:18 64:3

[staffing - techs]                                          Page 17

| | | | |
|---|---|---|---|

**staffing** 45:12
45:15 46:9
51:11
**stamped** 68:11
**stand** 46:18
49:19 54:24
**standpoint**
23:22 60:7
**start** 14:18
28:12 57:5
67:11
**started** 5:7
59:14
**starts** 47:13
**state** 2:7 10:11
10:16,23 11:13
12:19 21:22
30:4,9 47:17
74:4
**stated** 37:5
41:18 42:14
46:18 47:24
49:6 58:24
**statement**
20:16 28:17
29:12 46:2
48:24 49:4
50:13,15 51:7
55:8 62:14
63:20
**statement's**
60:3
**statements**
20:18 28:16
35:18 36:17

38:21 43:8
44:1 46:1 55:4
**states** 1:1 47:15
48:5 58:14
**stating** 37:3
**stenographic...**
74:11
**step** 71:23 72:8
**steps** 19:7 23:7
**stopping** 8:13
**street** 2:8 8:16
**strike** 30:23
33:16 41:12
46:21 66:12
71:8
**structure** 43:16
**subject** 14:3,7
**submit** 34:10
70:19
**submitted** 26:8
33:14,15 34:1
57:19 59:1
**submitting**
21:8
**subpoena** 5:16
**subsequent**
17:2
**subsequently**
44:21 61:3
**substance** 5:3
**substantive**
72:24,24
**substitute** 13:3
13:5

**suggest** 70:2
**suggestion** 53:3
**suite** 2:4
**sulaimanlaw....**
2:5
**summary** 49:5
**sunny** 37:4
**sunscreen** 37:3
**superior** 70:24
**supersede**
67:24
**supervision**
45:19 51:16
**supervisor**
12:10,12 32:15
46:8 69:1
**supervisors**
33:21
**supplemental**
31:11
**sure** 6:15 7:7
15:18 16:8,9
17:12 21:3,4
22:3 24:18
32:22 39:11
43:16 47:3
50:16 58:3,23
63:9 65:11,21
67:8
**suspended**
30:17,22
**swept** 59:15
63:23
**sworn** 4:1,3
74:8

**t**

**take** 10:2 35:24
55:3
**taken** 1:14 9:23
10:7 43:11,13
43:18 50:19
72:20
**talk** 28:11
41:17
**talking** 5:23
18:6 38:23
**tardy** 12:21
**target** 69:15
**tasks** 37:1,7
50:10
**taught** 9:19
**taylor** 2:3 3:4,5
4:6,8 25:21,24
26:1 28:24
29:4,9,16
36:11,13 67:3
70:16,18 72:10
72:14
**teacher** 13:3,5
**tech** 31:5 37:9
38:12,12 39:6
39:16 40:1,2,5
52:1,2,4
**technician** 11:2
12:22,24 40:14
69:8
**technicians**
41:20
**techs** 39:19
40:18 61:14

**tell**  21:17 36:12
  50:14
**telling**  5:11
**tells**  21:5
**tendencies**  51:2
**term**  21:10,20
**terminate**
  69:10
**terminated**
  69:15
**terms**  28:5
  43:24 45:22
  49:17 50:5
**testified**  4:4
  13:9
**testify**  74:8
**testifying**  62:17
**testimony**
  52:22 54:12
  74:14
**thank**  56:11
  68:2,13 69:5
  69:22 73:5
**things**  4:12
  27:24 38:11,16
  39:4 40:9
**think**  12:21
  21:21 28:21
  40:7 48:18
  54:5,6 55:23
  59:23 60:5
  65:23
**thinking**  21:14
  21:21

**thoroughly**
  63:23
**thought**  47:19
  49:18 62:19
**three**  28:11
  47:14 48:18
  50:2 59:10
  60:9 61:1,10
  64:7
**thweatt**  44:18
**tickets**  14:1
**time**  26:3 27:23
  28:21 32:24
  33:3 37:18
  52:5 60:20
  61:11 65:17
  66:2,7,7
**timeline**  52:8
**timeliness**  72:7
**timely**  69:3
**times**  50:3 70:6
  72:18
**title**  10:13
  21:24 69:15
**titles**  10:22
  11:1
**today**  4:16 5:4
  6:12
**today's**  7:22
**told**  34:2 54:24
  59:17 63:10
  64:4,13 66:11
**tolerate**  55:20
**took**  23:8 56:1
  56:5

**top**  34:21
**topic**  42:2
**topics**  7:12,19
**towards**  40:16
**traffic**  14:1
**trained**  10:1
**trainee**  31:5
  37:9 38:12
  39:6,16 40:1
  52:2 60:21
  61:4 69:7,12
**trainee's**  69:11
**training**  12:8
  13:7 61:11
**transcript**
  72:16 73:3
  74:10
**treat**  21:8
**treatment**
  23:10
**true**  43:2,3
  51:7 74:13
**truth**  23:20
  74:8
**truthfulness**
  54:18
**try**  34:17,18
  46:12
**trying**  40:6
  54:7,19
**turn**  25:13 56:7
  66:9
**two**  23:20
  47:14 52:12
  56:13,13,18

  58:16 60:21
**type**  19:1
**types**  20:24
**typewriting**
  74:12
**typically**  61:9

---

**u**

**uh**  4:21,21
**uic**  9:18
**under**  54:14
  59:15 63:23
  74:12
**understand**
  5:22 6:6 7:10
  7:14 24:2,18
  25:19 39:8
  43:16 46:1
  50:1 52:20,23
  53:24 54:9,11
  54:13,16 59:7
**understanding**
  63:16
**understood**  6:8
  8:10 22:2
  63:14 71:13
**undertaken**
  49:3
**unfair**  23:10
**unit**  45:12
**united**  1:1
**university**  9:16
**unlawful**  23:9
  23:15
**unsubstantiat...**
  30:11

[unsure - written]                                                            Page 19

**unsure** 17:18
**update** 25:9
**updated** 17:21
  18:3,23
**ups** 70:16
**upset** 44:12
**urbana** 1:2
**use** 39:20 40:1
  40:2,5,10,11
**using** 17:13
  21:10 39:14,15

**v**

**v** 1:6
**valley** 9:15,18
**vaughn** 1:4
  26:13,18 27:22
  28:13 29:24
  30:9,12,24
  31:3,20 32:11
  32:16,19,24
  34:1 35:1
  37:17,21 38:10
  38:23 39:13,15
  41:2,23 42:6,9
  42:18 43:8,13
  44:10,12,16
  45:3 46:17,21
  47:9 50:2,22
  51:23 53:12
  54:10,14,17
  55:13,17 56:12
  56:17 57:14
  58:14,14,22
  59:14,18,23
  60:5,8,12 62:7

63:4 64:4,14
64:15 66:11,14
66:24 68:11
70:3,9,19 71:3
**vaughn's** 8:2
  26:24 28:5,9
  28:17 29:12
  30:15,23 31:3
  34:9 38:14
  42:23 44:19
  48:24 53:3
  55:9 58:10
  59:21 60:15
**veracity** 42:23
  48:23 52:16
**verbal** 4:22
**verbalizations**
  4:20
**verbalize** 4:17
**verbally** 4:16
**veronica** 44:5,7
  44:10,21 46:12
  46:18 47:16,18
  48:5,10 49:3
  49:12,19 50:13
  50:22,24 52:17
  52:18,22 53:5
  53:7 54:19
  56:2,4,6 63:18
  64:8 66:15
**veronica's**
  54:14
**version** 15:9
  18:23

**versus** 21:7
  67:12
**videoconfere...**
  1:17
**violence** 11:24
  16:22 30:2,10

**w**

**waive** 73:3,4
**waived** 73:6
**want** 5:13 16:2
  16:7 17:12
  20:2 22:3 23:4
  24:18 39:11
  43:15 54:5,6,8
  54:11 70:10
**wanted** 58:23
**warnings** 12:21
**warranted** 44:1
**way** 24:11 45:4
**week** 56:13,13
  56:18
**went** 9:15,16
  9:18,19 44:14
**west** 8:16
**whatsoever**
  66:24
**whereof** 74:20
**wife** 9:19
**wish** 73:3
**witness** 3:3 4:1
  28:20 29:14
  36:10 49:9
  67:5,8 73:4
  74:7,7,20

**witnesses** 42:13
  42:15 49:7,13
  49:15 53:21
**women** 46:19
**words** 54:11
  63:13
**work** 8:19 13:2
  13:7 19:6 31:7
  31:21,24 50:3
  51:8,9,10
  68:12
**worker** 32:11
  37:1 40:22,23
  41:17
**working** 10:16
  13:2 46:18
  48:10,13 49:20
  55:1,21
**workplace**
  11:24 16:22
  30:2,10
**write** 4:18,19
  36:21
**writing** 57:9
  59:1,3 65:9
**written** 20:16
  20:18 21:8
  22:12 24:5,10
  24:22 25:1,1
  28:15 29:20,22
  30:16 33:12
  35:3,17 36:17
  38:21 43:8
  48:5 55:3
  67:12 70:22,24

[wrongdoer - zooming]                                    Page 20

| |
| --- |
| **wrongdoer** |
| 26:20 27:1 |
| **wrote**   24:13 |
| 34:3 |
| **y** |
| **yeah**   15:16 |
| 28:20 47:15 |
| 55:11 58:3 |
| **year**   69:13 |
| **yearly**   12:8 |
| **yvonne**   44:17 |
| 44:18 |
| **z** |
| **zoom**   6:15 8:12 |
| 15:15 22:2 |
| **zooming**   15:18 |

**EXHIBIT 3**

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

**EXHIBIT 3**

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

**EXHIBIT 3**

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.