# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| CANDACE VAUGHN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-1107 |
| | ) | |
| ILLINOIS DEPARTMENT OF HUMAN | ) | |
| SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER & OPINION</u>

This matter is before the Court on Defendant Illinois Department of Human Services' Motion for Summary Judgment. (Doc. 33). Plaintiff has responded (doc. 35) and filed a Memorandum in Opposition (doc. 36).[1] For the following reasons, Defendant's Motion is granted.

### BACKGROUND[2]

Plaintiff Candace Vaughn sued the Illinois Department of Human Services ("IDHS") after her employment at the Fox Developmental Center ("Fox"), a facility

---

[1] Plaintiff's legal arguments and compliance with the requirements of Local Rule 7.1(D)(2) for responses to motions for summary judgment appear in her Memorandum in Opposition (doc. 36) rather than in her Response (doc. 35), which merely states the procedural posture of the case and requests that the Court deny summary judgment to Defendant. Exhibits are also attached to the Memorandum rather than the Response. For the sake of brevity and clarity, when using the term "Response" or "Plaintiff's Response" in this Order, the Court refers to Plaintiff's Memorandum in Opposition unless otherwise noted.

[2] The narrative in this section consists of undisputed facts (as indicated by Defendant's Motion for Summary Judgment (doc. 33) and Plaintiff's Memorandum in Opposition (doc. 36)) unless otherwise noted.

operated by Defendant, ended on December 17, 2021. (Doc. 16 at 2). Plaintiff worked at Fox for approximately a year and a half, having been hired as a Mental Health Technician Trainee on September 16, 2020, and later, on July 16, 2021, promoted to a non-trainee technician position. (Docs. 33 at 1–2, 36 at 2, 33-3 at 52). Plaintiff's work performance and evaluations were satisfactory. (Doc. 36 at 3).

During her time at Fox, Plaintiff, who is African-American (doc. 36 at 3), reported her coworkers' behavior to Defendant on three occasions. In each case, the complaint was received by a Residential Services Supervisor ("RSS") and ultimately forwarded to Rochelle Jackson, Director of Human Resources at Fox. (Docs. 36 at 3, 33-3 at 25, 30, 34, 44).

On March 10, 2021, Plaintiff placed a call to the RSS on duty immediately after an altercation between herself and Angela Smith, a Registered Nurse employed by Fox. (Docs. 36 at 2, 7, 33-1 at 30–31). Plaintiff further provided a written statement about the incident during Defendant's investigation of it. (Doc. 33-3 at 30–31). As a result of that investigation, both Smith and Plaintiff were disciplined. (Docs. 33 at 2, 33-3 at 30–31). Smith was suspended for two days and then reassigned to handle paperwork in an office setting on behalf of the nursing department. (Doc. 33-3 at 31). Plaintiff was given a written reprimand and temporarily demoted, in that she was reassigned to work in the dietary department rather than in patient care. (Docs. 33 at 2, 36 at 3). Both were allowed to return to their previous positions and duties approximately one month later. (Doc. 33-3 at 32).

Plaintiff's second complaint concerned Paula Hertz. (Doc. 33 at 2). In May 2021, she submitted a written, internal memo to her RSS stating that Hertz was rude to her, singled her out for criticism, and forced Plaintiff to wait longer to go on break than the other employees in her unit. (Doc. 33-3 at 34–35). She acknowledged that Hertz was rude to everyone at work but "complained that she was ruder to Plaintiff and discriminated specifically against Plaintiff." (Doc. 36 at 3–4).

Plaintiff's final complaint, filed with her RSS on December 3, 2021, described an altercation she had with Veronica Wilkinson that morning. (Docs. 33-1 at 20–22, 33-3 at 44). Following an argument over Plaintiff's work assignment, Plaintiff stated in a written memo that Wilkinson said, in her hearing, that she hated working with black women. (Doc. 33-4 at 4). The memos Plaintiff filed regarding Hertz and Wilkinson did not result in discipline, either for Plaintiff or for the two employees about whom she complained. (Doc. 33-3 at 43, 50).

In her memo regarding Wilkinson, Plaintiff additionally stated that she did not want to work at Fox anymore and was giving two weeks' notice of her departure. (Docs. 33 at 2, 33-1 at 20, 33-4 at 4). Human Resources informed Plaintiff that for her resignation to take effect, she would need to submit a separate memo; Plaintiff never did this and, as a result, believed her resignation had not been valid. (Docs. 36 at 2, 33 at 3). Later, however, Plaintiff informed Jackson that she did not intend to resign and wished to continue working for Defendant. After Jackson had consulted with Fox Center Director Sybil Nash and after both had spoken on the phone with Plaintiff, Nash decided not to accept Plaintiff's attempt to rescind her resignation. (Docs. 33 at

3, 36-2 at 8). Plaintiff was no longer employed at Fox after December 17, 2021. (Doc. 16 at 2).

Having filed a charge and obtained a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC") (docs. 16-1, 16-2), Plaintiff filed the instant lawsuit. The operative complaint (her Second Amended Complaint) states three claims against Defendant, all under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*: race-based discrimination, a hostile work environment created by race-based harassment, and retaliation. (Doc. 16 at 6–7). Defendant moves for summary judgment on all three counts. (Doc. 33 at 1).

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The nonmovant bears the burden of demonstrating that such genuine issue of material fact exists." *Aregood v. Givaudan Flavors Corp.*, 904 F.3d 475, 482 (7th Cir. 2018). "The parties must support their assertions that a fact is disputed or cannot be genuinely disputed by citing to admissible evidence in the record." *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018).

However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. . . . [I]t is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.* at 248. The entry of summary judgment is required, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The record is viewed in the light most favorable to the nonmovant, and the Court must draw all reasonable inferences from the evidence in the nonmovant's favor. *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 536 (7th Cir. 2018).

## DISCUSSION

### I.  Disputed Facts

In its Motion, Defendant identifies a list of "Undisputed Material Facts," numbered and accompanied by citations to the record, as required by Local Rule 7.1(D). (Doc. 33 at 1–3). Plaintiff, responding, disputes five of these. (Doc. 36 at 2–3). She also offers her own version of events in the "Additional Material Facts" section of her Response (doc. 36 at 3–4); some of these additional facts directly contradict Defendant's "Undisputed Material Facts," while others address issues not mentioned by Defendant.

Taken together, the parties' filings indicate that the following facts in this matter are in dispute: whether Smith physically pushed Plaintiff or merely closed a door in her face; whether or not Plaintiff was willing to care for more than one patient on the morning she and Wilkinson argued over the number of patients to whom Plaintiff would be assigned; whether Plaintiff's first communication to Defendant that she wished to rescind her resignation occurred on December 16, 2021, or on the following day, December 17; whether Defendant's decision not to allow Plaintiff to rescind her resignation was motivated by the untimeliness of Plaintiff's notice or the fact that Plaintiff had filed complaints of discrimination concerning her coworkers; and whether any other employee at Fox had ever attempted (successfully or not) to rescind a notice of resignation.

The details of Plaintiff's altercations with Smith and Wilkinson are immaterial in that they speak neither to Plaintiff's race nor to her employer's response to her complaints. Plaintiff does not allege, for example, that Smith only shoved African-American coworkers but had purely verbal conflicts with white coworkers. Nor does it matter to Plaintiff's allegations regarding Wilkinson whether or not Defendant accurately described her concern that she was being assigned too much work. Regardless of the exact number of patients Mental Health Technicians such as Plaintiff were supposed to be caring for at one time, her claim is that a white worker was allowed to do less work, while Plaintiff was given more work because she is black. The final three disputed facts (the date on which Plaintiff first informed Defendant that she wanted to rescind her resignation, Defendant's motivation for not allowing

her to continue working at Fox, and whether any other Fox employee had attempted to rescind resignations) are immaterial to this case because, as described below, they pertain only to claims that lie outside the scope of Plaintiff's EEOC charge.

The Court must deem Plaintiff's other "Additional Material Facts" admitted by Defendant, because Defendant never replied to Plaintiff's Response. L.R. 7.1(D)(3)(a)(5); *see Bordelon v. Chi. Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) ("[W]e have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment."). Of those facts, the Court finds the following to be material: that Plaintiff is African-American; that Plaintiff met the performance expectations associated with her employment at Fox and received a promotion during her time working there; and that Plaintiff was "reprimanded and demoted to kitchen staff" after the Smith incident.[3] (Doc. 36 at 3–4).

The Court finds that none of the disputed facts is material to the resolution of this action, and therefore the only question on summary judgment is whether Defendant is entitled to that outcome as a matter of law.

## II.    Race-based Discrimination

---

[3] Plaintiff also lists "Additional Material Facts" that are more akin to conclusions of law, such as that Plaintiff suffered an adverse employment action and that Plaintiff complained to Defendant of racial discrimination in her workplace. (Doc. 36 at 3). While Defendant did not dispute these conclusions in a reply, the substance of its Motion disputes them, and the Court will consider its arguments as they pertain to legal conclusions, although Defendant is reminded of the opportunity and responsibility it had to file a reply indicating which, if any, of Plaintiff's Additional Material Facts it disputes.

In her Second Amended Complaint (hereinafter "Complaint")[4], Plaintiff alleged that Defendant violated Title VII of the Civil Rights Act of 1964 by discriminating against her on the basis of race. (Doc. 16 at 6).

Title VII prohibits an employer from "discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may demonstrate race-based discrimination by an employer, in violation of Title VII, by showing that she is a member of the racial classification at issue, that she met the legitimate requirements of the job, that she suffered an adverse employment action, and that there was either direct or indirect evidence of race-based discrimination by the employer in relation to that action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

An adverse employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Herrnreiter v. Chi. Housing Auth.*, 315 F.3d 742, 744 (7th Cir. 2022). To be actionable under Title VII, the decision must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002). "[N]ot every criticism or disciplinary measure is an 'adverse employment action' for Title

---

[4] For the sake of brevity, Plaintiff's Second Amended Complaint (doc. 16), which is the operative complaint at this stage, will be referenced simply as the Complaint.

VII purposes." *Pantoja v. Am. NTN Bearing Mfg. Co.*, 495 F.3d 840, 847 (7th Cir. 2007).

In her Complaint, Plaintiff identified two adverse employment actions that could give rise to such a claim: her reassignment to kitchen duties after she engaged in an altercation with Smith, and her constructive discharge. (Doc. 16 at 4–5). In responding to Defendant's Motion for Summary Judgment, she continues to state that she was constructively discharged and also argues (incongruously, since actual resignation is an element of constructive discharge, *Green v. Brennan*, 578 U.S. 547, 555 (2016)) that she was subjected to racial discrimination when her employer refused to allow her to rescind her resignation once she had decided she wished to continue working.

However, when a plaintiff files an employment-discrimination suit, she must first file a charge with the EEOC, and "the scope of the subsequent judicial proceedings is limited by the nature" of those charges. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992). "An aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination." *Id.* The standard is "whether the claims in . . . the complaint are like or reasonably related to the allegations in the EEOC charge" (quotation omitted). *Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994). The claims are "not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint

must, at minimum, describe the *same conduct* and implicate the *same individuals*" (emphasis in original). *Rush*, 966 F.2d at 1110.

Plaintiff's EEOC charge, which she filed with the Court in an attachment to her Complaint, did not allege constructive discharge, nor did it mention the fact that Plaintiff's employment had ended by the time she filed the charge on December 29, 2021. (Doc. 16-1 at 1). It certainly did not state that Plaintiff resigned, attempted to rescind her resignation, and was prevented from doing so. There are no facts whatsoever that could have put Defendant on notice that she had claims under Title VII in connection to either her attempted resignation or Defendant's decision not to let her rescind that resignation. Nor could the EEOC "settle the dispute through conference, conciliation, and persuasion" as to those claims, thus "frustrat[ing] the EEOC's investigatory and conciliatory role." *Cheek*, 31 F.3d at 500.

Plaintiff did mention her allegation of constructive discharge in her Complaint (doc. 1 at 6), Amended Complaint (doc. 9 at 6), and Second Amended Complaint (doc. 16 at 5). Defendant moved to dismiss Plaintiff's first two complaints (docs. 7, 13); however, in neither motion did Defendant move to dismiss Count I, as to Plaintiff's alleged constructive discharge, on the basis that it lay outside the scope of Plaintiff's EEOC charge. Defendant answered the Second Amended Complaint and this matter proceeded to discovery, without this Court having had the opportunity to dismiss the constructive-discharge claim, as the scope-of-charge rule is not jurisdictional. *Id.* However, "it is a condition precedent with which Title VII plaintiffs must comply," *id.* (citing *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir. 1985)), and so this

Court may and must bar the out-of-scope claim from proceeding at this stage, even while acknowledging the time, effort, and judicial resources that would have been saved if Defendant had properly moved to dismiss it.

Therefore, the Court will not consider Plaintiff's Count I claim in relation to her discharge and will instead turn to her claim that she was discriminated against when Defendant temporarily reassigned her to the dietary department.

The parties here do not dispute that Plaintiff is African-American, that she met the qualifications for the jobs of Mental Health Technician Trainee (and, once promoted, Mental Health Technician), and that she performed those jobs satisfactorily during her tenure at Fox. The parties also agree that in connection to the Smith incident, Plaintiff was disciplined by receiving a written reprimand and being reassigned to dietary and custodial duties (as opposed to the patient-care duties she was hired to perform) for a period of about one month. (Docs. 33 at 2, 33-3 at 32).

Defendant has admitted Plaintiff's characterization of her reassignment as a demotion, although as a practical matter, no evidence has been presented showing that Plaintiff's job title or compensation changed as a result of this disciplinary action—either during the month when she worked in the dietary department or thereafter. Still, her reassignment did involve "significantly different responsibilities," *Herrnreiter*, 315 F.3d at 744; she was assigned to work in the kitchen, rather than caring for patients as she had been hired and trained to do. A reassignment can also constitute an adverse employment action where the new job is

"objectively inferior," involving "significantly harsher working conditions than the plaintiffs' prior positions." *Tart v. Ill. Power Co.*, 366 F.3d 461, 473 (7th Cir. 2004).

Courts have often found temporary reassignments do not rise to the level of an adverse employment action. In *Collins v. Meike*, a teacher's temporary reassignment to substituting for other teachers was not "significant" enough to qualify as an adverse employment action. 52 Fed. Appx. 835, 837 (7th Cir. 2002). In *Daulo v. Commonwealth Edison*, the plaintiff was not subjected to an adverse employment action when he was temporarily transferred to another shift, during which he performed the same duties as before but under closer supervision for retraining purposes. 938 F. Supp. 1388, 1398 (7th Cir. 1996). "Temporarily assigning a minor amount of extra work is not an adverse employment action." *Watson v. Potter*, 23 Fed. Appx. 560, 563 (7th Cir. 2001). Yet Plaintiff's reassignment to the kitchen, while temporary, was neither insignificant nor at all related to the job she had previously performed. (Doc. 36 at 8). Plaintiff has satisfied the adverse-employment-action element of her race-based discrimination claim. The remaining question is whether Plaintiff has shown, by any evidence or method of proof, that her temporary demotion was motivated by an intent to discriminate against Plaintiff because of her race.

Discriminatory intent may be proven by the offer of direct evidence (either an "outright admission by the decisionmaker" or "a convincing mosaic of circumstantial evidence"), or by the indirect method, in which the plaintiff establishes a *prima facie* case as described above, then offers evidence that someone similarly situated (except for being of a different race from the plaintiff) did not suffer the same adverse

treatment. *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783–84 (7th Cir. 2004). This creates a rebuttable presumption of discrimination, shifting to the defendant the burden of "articulat[ing] some legitimate, nondiscriminatory reason" the plaintiff was subjected to the adverse employment action while the comparator was not. *McDonnell Douglas*, 411 U.S. at 802. In order to prevail, the plaintiff must show this proffered justification is a mere pretext, devised to cover up the employer's actual, discriminatory motive. *Id.* at 804. "To expose the employer's reason as forming a mere pretext for discrimination, the plaintiff may show that a discriminatory reason was more likely to have motivated the employer than the reason given, or that the employer's explanation is not credible." *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 400 (7th Cir. 1992). "An inquiry into pretext requires that we evaluate the honesty of the employer's explanation, rather than its validity or reasonableness." *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013).

Plaintiff offers neither direct statements nor circumstantial evidence that could indicate Defendant took race into account when meting out her and Smith's respective penalties. Nor does she introduce any valid comparators. "In general, a plaintiff who believes another individual is similarly situated must at least show that this comparator (1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish his conduct or the employer's treatment of him." *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014). Presumably, all employees at Fox are held to the same standard regarding workplace

violence and hostile altercations between coworkers, although there is no evidence before the Court on this specific subject. The question of whether Smith's and Plaintiff's conduct was similar is a disputed one. However, Plaintiff and Smith worked under different supervisors (docs. 33-1 at 26, 33-2 at 11) and had different job titles, which created a distinction (which Plaintiff does not dispute) in the way in which they were disciplined.

Plaintiff argues that Smith, who is white, was treated more favorably because she was allowed to continue her nursing duties after being disciplined for the incident in question. (Doc. 36 at 3). This description distorts the record; she may have remained in the nursing department, but her duties involved paperwork and phone calls, not patient care. (Docs. 33-2 at 30, 33-3 at 30–31). Furthermore, Smith was given a punishment that was more serious than Plaintiff's overall, in that she was suspended for two days, while Plaintiff was only given a reprimand. (Docs. 33 at 2, 33-3 at 30–31). Both were reassigned to alternate duties for roughly the same amount of time. (Doc. 33-3 at 32). If Plaintiff suffered an adverse action Smith did not (having to work in the kitchen), it is also true that Smith suffered an adverse action that Plaintiff did not (a two-day suspension).

Plaintiff argues that even though Smith was given a harsher penalty on paper, she was allowed to spend her reassignment time in relative comfort, working at a desk instead of in the kitchen, where the work was "hard and sweaty." (Doc. 33-1 at 36). The difficulty and unpleasantness of Plaintiff's temporary assignment is enough to characterize it as an adverse employment action, but even if the Court accepts that

14

it made Plaintiff's punishment more severe than Smith's, it does not suffice as evidence that she was treated worse than Smith because of the difference in their racial classifications. In their depositions, both Smith and Jackson stated that under their respective collective-bargaining agreements, Registered Nurses who needed to be reassigned away from patient care for any reason would be directed to perform nursing tasks that could be done in the office, while Mental Health Technicians would be reassigned to the dietary department. (Docs. 33-2 at 31, 33-3 at 31).

Neither party refers to the collective-bargaining agreement (or any other reason Smith and Plaintiff might have been temporarily reassigned to perform different types of duties) in its lists of facts, either disputed or undisputed, or in its argument section. However, when considering a motion for summary judgment, a court "may consider other materials in the record," Fed. R. Civ. P. 56(c)(3), such as Smith's and Jackson's statements in their depositions. Plaintiff's only statement on the subject is that, when asked if she was reassigned to the kitchen pursuant to her collective-bargaining agreement, she replied, "I don't know. I don't think so." (Doc. 33-1 at 34). Where it is Plaintiff's burden to make out a *prima facie* case of racial discrimination, the Court does not find this attestation of uncertainty sufficient to establish a genuine dispute as to whether Smith, a licensed healthcare professional, and Plaintiff, who did not hold a nursing license, were similarly situated. Smith is an unfit comparator to Plaintiff, and this Court finds that no reasonable jury could conclude that the only relevant difference between the two was race.

Plaintiff offers Smith as the only potential comparator; she does not cite any white Mental Health Technician (or other employee working in a similar role) who was not reassigned to kitchen duty or disciplined as harshly as Plaintiff after a verbal spat with a superior. No disputed facts in this matter are material to Plaintiff's claim of race-based discrimination, and the undisputed facts do not support a *prima facie* case as to that claim. Summary judgment is granted for Defendant on Count I.

## III.  Hostile Work Environment

Plaintiff's claim that Defendant maintained a racially hostile work environment is based on her allegation that three of Defendant's employees harassed, micromanaged, argued with, or overworked Plaintiff, and that they did not treat white employees in the same manner. (Docs. 16 at 7, 36 at 12). Additionally, Plaintiff claims one of those coworkers verbalized a negative view of black women after arguing with her about a work assignment. (Doc. 36 at 12).

A finding of a race-based hostile work environment is appropriate when the plaintiff was subjected to harassment, racial in nature, that was "so severe or pervasive that it altered the conditions of her employment." *McKenzie v. Milwaukee Cty.*, 381 F.3d 619, 624 (2004). "Title VII is not a general code of workplace civility, nor does it mandate 'admirable behavior' from employees." *Id.* (quoting *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir. 2001)). "An employer 'is essentially strictly liable if the employee's supervisor created the hostile work environment.' . . . When the harassment was inflicted by a coworker, however, an employer is liable only if it was negligent in discovering or remedying the harassment." *Mitchell v. Plumbers & Steamfitters Local Union No. 157*, No. 2:08-cv-0230, 2010 WL 3614292

16

(S.D. Ind. Sept. 7, 2010) (quoting *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000)). "[T]he employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Williams*, 361 F.3d at 1029 (citation omitted).

The undisputed facts would not permit a reasonable jury to find that Plaintiff's coworkers' conduct created a race-based hostile work environment. With respect to her interactions with Smith and Hertz, the undisputed facts cannot support a conclusion that their actions were race-based at all. There is no evidence that Smith's assault on Plaintiff (whether physical or purely verbal) was motivated by racial animus. In fact, Smith admitted in her deposition that she was disciplined on a subsequent occasion for an argument she engaged in with a white coworker. (Doc. 33-2 at 25). Plaintiff acknowledged Hertz was rude to other coworkers, not to her alone.[5] While Defendant admits Plaintiff's contention that Hertz was ruder to Plaintiff than to anyone else and singled her out for harassment (such as micromanaging her patient-care tasks and placing her last on the schedule to take breaks), there is no

---

[5] In support of this undisputed fact ("Plaintiff also complained about Paula Hertz but acknowledged that Paula was rude to everyone"), Defendant cites to a portion of Plaintiff's deposition transcript that contains no mention of Plaintiff's impression that Hertz was rude to all her coworkers. (Doc. 33 at 2). A statement to that effect appears later in the transcript (doc. 33-1 at 61–62), and in the interest of the efficient administration of justice, the Court will deem this fact undisputed and supported by the record; however, Defendant is strenuously reminded of its duty, in appearing before this Court, to comply with Federal Rule of Civil Procedure 56(c)(1) and Local Rule 7.1(D)(1) by accurately citing to a portion or portions of the attached record that support each assertion that a fact is either genuinely in dispute or not in dispute.

evidence that Hertz's behavior was motivated by Plaintiff's race. Plaintiff testified in her deposition that she was not the only African-American employee who worked in the same unit as Hertz and that Hertz did not treat those employees the way she treated her. (Doc. 33-1 at 43–44, 60, 62). Hertz's conduct is also comparable to other kinds of workplace behavior that has been found not to violate Title VII. *See McKenzie*, 381 F.3d at 624–25 (acting "standoffish" toward female coworkers and using coarse language around women); *Patton v. Ind. Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002) (acting arrogantly and failing to incorporate employee feedback). Singling out an employee for disfavor, criticism, and rudeness is certainly not desirable in the workplace, but without more, it is not race-based discrimination.

Plaintiff's final example of racial harassment is Wilkinson's insistence that she care for a larger group of patients than she thought she should, followed by the anti-black comment she alleges Wilkinson made at the conclusion of their argument. Plaintiff acknowledges mental health care technicians were often required to provide care for more than one patient during a shift, but she says she believed Wilkinson was asking her to attend to more patients than she should have at one time (and more than a white Mental Health Technician was required to care for on the previous day). (Docs. 36 at 2, 10, 36-2 at 7). Wilkinson's account of the incident was that Plaintiff insisted she care only for the one patient for whom she had previously been responsible, even though she should have known employees with her job title could be assigned additional patients. (Doc. 33 at 2). A verbal altercation ensued, and Plaintiff called the RSS on duty to inquire whether she had to do as Wilkinson had

18

instructed. (Doc. 33-4 at 1). The RSS confirmed that she had to comply with Wilkinson's directives, and Plaintiff told Wilkinson she did not feel well and had been exposed to COVID-19, and that she was going home. (Doc. 33-4 at 1–2). At that point, according to Plaintiff, Wilkinson said that she did not like working with black women. (Docs. 16 at 5, 36 at 10, 12).[6]

After Plaintiff filed an internal memo complaining about Wilkinson, Jackson investigated the allegations by requesting a written statement from each coworker and checking staffing levels on the day of the incident and the day before. (Doc. 33-1 at 51). She determined that the unit where Plaintiff was working on the morning in question was shorter staffed that day than on the previous day, and that this circumstance explained why Plaintiff had been assigned more patients than her white counterpart. (Doc. 33-3 at 45). Wilkinson denied making the comment about black women. (Doc. 33-3 at 48). Jackson stated that she did not know whether there were any witnesses present who might have heard the remark and that Plaintiff did not identify any potential witnesses for her to interview. (Doc. 33-3 at 48). No disciplinary measures were taken towards either Plaintiff or Wilkinson as a result of the episode. (Doc. 33-3 at 50).

---

[6] Oddly, neither party lists Wilkinson's statement as a disputed or undisputed fact. Thus, Defendant has neither admitted nor disputed that she uttered the words in question. The Court is also under no obligation to consider portions of the record to which the parties have not cited. Fed. R. Civ. P. 56(c)(3). Acknowledging this, the Court proceeds to inquire whether, even if the remark had been made, it could constitute racial harassment giving rise to a hostile-work-environment action.

The briefing and the record do not support the conclusion that Wilkinson told Plaintiff to care for more patients because of her race. However, there can be no doubt that a comment from a coworker that she hates working with people of the plaintiff's race is racial in nature and plainly implies a race-related motivation.

In considering whether racially harassing conduct is severe or pervasive, such that it produces a hostile work environment, factors a court may consider "include the severity of the allegedly discriminatory conduct, its frequency, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's work performance." *Passananti v. Cook Cty.*, 689 F.3d 655, 667 (7th Cir. 2012). To be actionable, isolated incidents of racial harassment must be so severe that they "amount to discriminatory changes in the terms or conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998). In *Drake v. Minnesota Mining & Manufacturing Co.*, the court granted summary judgment to the defendant corporation, finding a single incident in which the plaintiff's coworker angrily expressed racial animus to him did not constitute severe harassment. 134 F.3d 878, 885 (7th Cir. 1998). A supervisor's isolated comment to a worker of Thai descent that he should "go back East" was likewise not enough to show harassment under Title VII. *Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998).

Like those remarks, Wilkinson's words (as recounted by Plaintiff) were subjectively and objectively offensive. However, they constituted an isolated incident and were not coupled with physical contact or threats of force. Plaintiff alleges

Wilkinson either muttered the remark under her breath as Plaintiff was leaving (doc. 33-1 at 20) or directed it to another nurse (doc. 36 at 12), rather than aiming it at Plaintiff as a provocation or invective. (Doc. 33-1 at 20). The encounter with Wilkinson may have affected Plaintiff's ability to do her job in the short term, in that she tendered her resignation on the same day, yet once she had "time to calm down," she decided to continue working at Fox. (Doc. 33-1 at 53). Although the Response refers to this employee as "Supervisor Veronica Wilkinson" and mentions cases finding a supervisor's use of a "racial slur" more significant than a mere coworker's (doc. 36 at 12), Plaintiff does not cite to any portion of the record in support of the assertion that Wilkinson was her supervisor.[7]

---

[7] Frustratingly, neither the pleadings nor the summary-judgment briefing nor any portion of the record appears to identify Plaintiff's supervisor or supervisors. The Complaint refers to "Josh Lynn Miles" (elsewhere spelled Jocelyn and Joshlyn Miles) as Plaintiff's supervisor (doc. 16 at 5); throughout the depositions, various individuals with the title RSS ("Residential Shift Supervisor") are also referred to as supervisors to whom Plaintiff did or could complain. (For example, RSS Yvonne Thweatt wrote to Rochelle Jackson that Plaintiff had called her (Thweatt) to ask her about her work assignment on December 3, 2021, and whether she had to follow Wilkinson's orders. (Doc. 33-4 at 1).) "[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment action against the victim." *Vance v. Ball State University*, 570 U.S. 421, 424 (2013). Although Plaintiff refers in her Response to "Supervisor Veronica Wilkinson" (doc. 36 at 12), the only individuals who appear to have taken tangible employment actions against Plaintiff in this case are Raymond Jackson, who disciplined Plaintiff after the Smith incident, and Sybil Nash, who effectively discharged her by refusing to let her rescind her resignation. This is far from established, though, and the Court should not have to exhaustively comb the record for evidence. However, it need not reach the question of whether Wilkinson was Plaintiff's supervisor, because without severe or pervasive race-based harassment, the employer-liability element is not at issue.

The Court finds Plaintiff cannot meet her burden of showing that Wilkinson's remark alone constituted severe racial harassment, and thus she has not established a question for a jury on her claim of hostile work environment. Defendant's Motion is granted as to this count.

## IV.   Retaliation

The briefing of Count III confronts the Court with a thorny procedural problem. Both parties proceed as though this count alleges retaliation occurred only when Defendant refused to let Plaintiff continue working at Fox, and both parties accept the factual narrative that Plaintiff tendered her resignation on December 3, 2021, then attempted to rescind it, and that her employment at Fox ended after Nash decided not to accept that rescission. Yet these facts and the retaliation claim based upon them appear nowhere in the Complaint or in Plaintiff's EEOC charge. Instead, both allege retaliation occurred only when Defendant disciplined Plaintiff after she complained about Smith's treatment of her on March 10, 2021—nine months before the eventual termination of her employment.

Plaintiff's arguments in response to Defendant's Motion on this count thus amount to an attempt to constructively amend her Complaint at the summary-judgment stage. This is frowned upon, though not absolutely prohibited, in this circuit. *Schmees v. HCI.com, Inc.* 77 F.4th 483, 485 (7th Cir. 2023) ("We hold that district courts retain discretion to interpret new factual allegations or claims presented in a plaintiff's briefs as a constructive motion to amend."). In the instant case, it was Defendant who first derailed the litigation of Count III by responding in its Motion to a claim Plaintiff never made in her Complaint, and so this Court is

sympathetic to Plaintiff's desire both to respond to the substance of Defendant's argument and to capitalize on a discovery process that had proven fruitful with respect to Defendant's internal communications as it weighed how to handle her resignation and subsequent announcement that she had changed her mind and no longer wished to leave Fox.

Yet, as explained above, the Court cannot allow Plaintiff to amend her Complaint to add a claim she never made or factually supported in her EEOC charge, and so it must disregard both parties' arguments on Count III as unrelated to any claim before the Court.

Plaintiff's original claim under Count III, that Defendant impermissibly retaliated against her by reassigning her after the Smith incident, must still be addressed. Defendant has not presented any argument in favor of summary judgment on this claim as it is currently articulated in the Complaint. However, the Court is obligated under the summary-judgment standard to evaluate independently whether any genuine dispute of material fact exists on this point and, if not, whether Defendant prevails as a matter of law. Here, Plaintiff bears the burden of proving the elements of a *prima facie* case that Defendant retaliated against her for protected activity when it temporarily reassigned her to kitchen duties after its investigation of the Smith incident. She does not do so.

"In order to make out a claim for retaliation, a plaintiff must demonstrate (1) that he engaged in statutorily protected activity; (2) that his employer took a materially adverse action against him; and (3) that the protected activity and the

adverse action are causally connected." *Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018). Statutorily protected activity includes "(1) filing a charge . . . or participating in any manner in an investigation . . . under Title VII or other employment statutes; or (2) opposing an unlawful employment practice." *Alley v. Penguin Random House*, 62 F.4th 358, 362 (7th Cir. 2023). A materially adverse action "is one which might well have dissuaded a reasonable worker from engaging in protected activity such as making or supporting a charge of discrimination." *Id.* To satisfy the causation element, the plaintiff must prove that the employer's retaliatory motive was the but-for cause of the adverse action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Plaintiff's claim founders on the first element. She was reassigned the day after her altercation with Smith (doc. 33-1 at 38) and before she filed either of her other complaints about coworkers, and so her statements to her employer about the Smith incident are the only activity the Court may consider in evaluating whether she engaged in protected conduct for which Defendant may have retaliated against her. To be protected activity under Title VII, a complaint "must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). Plaintiff presents no evidence that her complaints about the March 10, 2021, incident alleged that Smith discriminated against her on the basis of any protected category. By failing to file a reply, Defendant has admitted Plaintiff's statement that she "complained of racial discrimination and Defendant received those complaints." (Doc.

24

36 at 3). However, this undisputed fact does not specify when and about whom the complaints were made and could refer to the memos she later filed concerning Hertz and Wilkinson, which did allege discrimination (Hertz) and racial discrimination and animus (Wilkinson). (Docs. 33-3 at 35, 36-2 at 10).

There is also nothing to support the idea that Plaintiff was retaliated against for participating in an investigation. The record reflects that Defendant investigated the Smith incident as a possible instance of workplace violence (docs. 33-3 at 30, 36-2 at 2); neither Plaintiff nor Jackson referred to any investigation into the possibility that Smith argued with or pushed Plaintiff because of the latter's race.

It is thus unnecessary to reach the remainder of the elements and inquire whether Plaintiff's disciplinary reassignment was a materially adverse action, or whether her complaint against Smith or her participation in an investigation of workplace misconduct was the but-for cause of her one-month reassignment to the Fox kitchen. Defendant's Motion is granted as to Count III.

## CONCLUSION

Defendant's Motion for Summary Judgment (doc. 33) is GRANTED. All issues having been disposed of, this case is TERMINATED.


SO ORDERED.

Entered this 3rd day of February 2024.

s/ Joe B. McDade
_____
JOE BILLY McDADE
United States Senior District Judge
